## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND LABORERS HEALTH & WELFARE FUND, individually on behalf of all those similarly situated,<br><br>                  Plaintiff,<br><br>    v.<br><br>BAUSCH HEALTH COMPANIES INC., BAUSCH HEALTH IRELAND LTD., SALIX PHARMACEUTICALS, LTD, SALIX PHARMACEUTICALS, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., TEVA PHARMACEUTICALS USA, INC., and ACTAVIS LABORATORIES FL, INC.,<br><br>                  Defendants. | Civil Action No. |

## CLASS ACTION COMPLAINT AND
## <u>DEMAND FOR JURY TRIAL</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES ............................................................................................................. 4

III.    JURISDICTION AND VENUE ......................................................................... 6

IV.     REGULATORY BACKGROUND ...................................................................... 8

     A.      The regulatory structure for approval and substitution of generic
        drugs.............................................................................................................. 8

          1.     The Hatch-Waxman Amendments and Abbreviated New
               Drug Applications. ........................................................................ 9

          2.     Regulatory exclusivities for new drugs...................................... 11

          3.     Paragraph IV certifications and section viii carveouts. ............ 12

          4.     The brand company's economic incentive to file litigation
               and obtain a 30-month stay on generic approval. ...................... 13

          5.     The first filer's 180-day exclusivity period. ............................. 14

          6.     Pathways to avoid the first filer ANDA's exclusivity
               period. ......................................................................................... 16

          7.     Patents are subject to judicial and administrative scrutiny. ...... 17

     B.      The competitive effects of AB-rated generic and authorized
        generic competition.................................................................................. 19

          1.     The first AB-rated generic takes the most market share and
               is priced below the brand. ........................................................... 22

          2.     Later generics drive prices down further. .................................. 22

          3.     Authorized generics, like all generics, compete on price. ........ 26

     C.      Manufacturers' Motive to Conspire...................................................... 28

          1.     No AG Payments ........................................................................ 31

               a)     No-AG Payment's value to the generic
                    manufacturer. ................................................................. 35

              b)     No-AG payment's cost to the brand manufacturer. ...................... 37

          2.     Deterrents to Second Filers........................................................ 37

|  |  | a) | Deterring Entry Via Litigation | 37 |

|  |  | b) | Deterring Entry Via License. | 39 |

|  |  | c) | Deterring entry via section viii statements | 39 |

| V. | FACTS | | | 41 |

|  | A. | Bausch brings Xifaxan to market | | 41 |

|  |  | 1. | Rifaximin was discovered in the early 1980s and initially approved for sale in the United States by the FDA in 2004. | 41 |

|  |  | 2. | Xifaxan was a blockbuster drug, accounting for the overwhelming majority of revenue for the Salix segment, and a substantial portion of Bausch's overall revenues. | 43 |

|  | B. | Bausch amasses a patent portfolio of more than 20 patents, but all were weak or of limited scope. | | 44 |

|  |  | 1. | Patents claiming polymorphs of rifaximin. | 46 |

|  |  | 2. | Patents claiming methods of treating IBS with rifaximin. | 47 |

|  |  | 3. | Patents claiming methods of treating, reducing the risk of, or maintaining remission of hepatic encephalopathy recurrence with rifaximin. | 47 |

|  | C. | Teva files the first ANDA threatening Bausch's monopoly and is promptly sued by Bausch. | | 48 |

|  |  | 1. | December 18, 2015: Teva files the first Xifaxan 550 mg ANDA. | 48 |

|  |  | 2. | Bausch continues to obtain, and list in the Orange Book, additional patents, leading to amendments to the complaint against Teva. | 49 |

|  |  | 3. | Teva acquires Actavis, and the Court sets a trial date for January 29, 2018. | 50 |

|  |  | 4. | March 2017: The FDA decides two Salix/Bausch citizen petitions and issues revised draft guidance. | 50 |

|  |  | 5. | The Bausch-Teva litigation continues | 51 |

|  | D. | Bausch pays Teva to delay its entry | | 52 |

|  |  | 1. | Bausch and Teva both have a history of using Hatch-Waxman settlements to recognize value for themselves, while harming purchasers. | 52 |

2.    There is no reason why Bausch and Teva would structure the deal as they did unless they were trying to obfuscate a payment. ................................................................... 56

3.    The deterrence payments. ........................................................ 60

4.    The payments from Bausch to Teva were large and unexplained. ........................................................................ 62

E.    Bausch announces that the Teva settlement added four years to the "useful life" of Xifaxan. ............................................................ 63

1.    Prior to paying Teva, Bausch expected generic competition to begin by 2024. ...................................................................... 63

2.    Bausch continues to obtain, and list, patents. ............................ 65

F.    Additional generics seek to enter the market, while Bausch continues amassing weak patents, and leveraging them to ensure most generics fall in line. ...................................................................... 66

1.    Sun Pharmaceuticals files an ANDA and gets sued. ................. 67

2.    Sandoz files and ANDA and gets sued. ...................................... 67

3.    Norwich files two ANDAs and gets sued. .................................. 68

4.    Sandoz settles with Bausch. ....................................................... 69

5.    Sun adds the 550 mg product to its ANDA, and quickly settles. ........................................................................................ 70

G.    Bausch files another Citizen Petition. .................................................... 71

H.    Norwich proceeds to trial and invalidates a substantial portion of Bausch's Xifaxan patent portfolio. ......................................................... 71

I.    The FDA decides Bausch's 2021 CP. ..................................................... 76

J.    Norwich received tentative approval, but remains bottlenecked behind Teva and thus unable to come to market. ................................... 76

K.    Additional generics file ANDAs, but remain blocked from entering the market. .............................................................................................. 77

1.    The Xifaxan patent landscape as of December 31, 2023. .......... 77

2.    Amneal files an ANDA and gets sued. ...................................... 78

3.    Zydus files an ANDA and gets sued. .......................................... 79

4.    Cipla files an ANDA and gets sued. .......................................... 80

5.      Carnegie files an ANDA and gets sued. ................................... 81

6.      Saba files an ANDA and gets sued. ...................................... 81

7.      Alkem files an ANDA and gets sued. ................................... 82

VI.     WITHOUT BAUSCH'S PAYMENTS TO TEVA, GENERIC
        COMPETITION WOULD HAVE ALREADY BEGUN................................. 83

        A.      Bausch's Weak Patents Could Not Prevent Generic Entry. ................. 83

                1.      The patents expiring on August 11, 2019 provided no basis
                        for Teva to delay entry until 2028............................... 84

                2.      The IBS-D method of treatment patents provided no basis
                        for Teva to delay entry until 2028............................... 84

                3.      The polymorph patents provided no basis for Teva to delay
                        entry until 2028. ............................................... 84

                4.      The HE patents, to the extent valid, could have been simply
                        carved out by Teva, and thus provided no basis for Teva to
                        delay entry until 2028. ......................................... 85

        B.      Teva would have entered by now. ...................................... 85

        C.      Other generics would have entered by now. ............................. 87

VII.    MARKET EFFECTS ............................................................ 87

VIII.   CLASS ALLEGATIONS ........................................................ 89

IX.     MARKET POWER............................................................. 92

X.      EFFECT ON INTERSTATE COMMERCE ................................... 98

XI.     CLAIMS FOR RELIEF ....................................................... 98

        COUNT I VIOLATION OF SECTION 16 OF THE CLAYTON ACT
                AND SECTIONS 1 & 2 OF THE SHERMAN ACT
                (DECLARATORY AND INJUNCTIVE RELIEF AGAINST
                BAUSCH AND TEVA)................................................. 98

        COUNT II MONOPOLIZATION AND MONOPOLISTIC SCHEME
                UNDER STATE LAW (AGAINST BAUSCH)................................ 100

        COUNT III  ATTEMPTED MONOPOLIZATION UNDER STATE LAW
                (AGAINST BAUSCH) ................................................ 103

        COUNT IV  CONSPIRACY AND COMBINATION IN RESTRAINT OF
                TRADE UNDER STATE LAW (AGAINST BAUSCH AND TEVA)............. 107

COUNT V  VIOLATIONS OF STATE CONSUMER PROTECTION LAWS............ 112

COUNT VI  UNJUST ENRICHMENT UNDER STATE LAW .................................. 145

DEMAND FOR JUDGMENT................................................................................. 173

JURY DEMAND .................................................................................................... 173

Plaintiff Rhode Island Laborers Health & Welfare Fund, individually and on behalf of all others similarly situated, brings this action against Bausch Health Ireland Ltd., Teva Pharmaceuticals USA, Inc., and their related companies, and alleges as follows:

## I.    INTRODUCTION

1.    Bausch markets rifaximin, a broad-spectrum antibiotic that has been used across the globe since 1987 for treating various gastrointestinal ailments, under the brand name Xifaxan. Bausch's Xifaxan 550 mg is the only rifaximin product available on the market to treat Irritable Bowel Syndrome with Diarrhea ("IBS-D"). It is also indicated for the treatment of overt hepatic encephalopathy ("HE") recurrence in adults and (in a 200 mg dosage) for travelers diarrhea in children. In 2024, Bausch's annual sales of Xifaxan in the U.S. were roughly $1.9 billion, with the overwhelming majority of those sales being in the 550mg dosage.

2.    But those revenues are the result of the fact that Bausch faces no Xifaxan competition. Fair competition would have limited the price of a 14-day supply of Xifaxan to less than $200. Instead, Bausch today is charging more than $2,000 for a 14-day regimen. And it is only able to do so because it violated the law.

3.    Since rifaximin has been known for decades, Bausch's rifaximin franchise is built on a series of secondary patents relating to specific polymorphic forms or particular methods of treating disease (such as specific dosing regimens). But many of Bausch's patents are narrow in scope, while others are infirm and cannot withstand Abbreviated New Drug Application ("ANDA") challenge under the Hatch Waxman Act from potential generic competitors. Courts held patents in two out of the three groups invalid; as to the third group, patents that claimed methods of using rifaximin to treat certain medical conditions, a competitor could have carved out those uses from its label (discussed further below) and come to market before they expired.

4.     Bausch knew its multi-billion dollar Xifaxan franchise was vulnerable to attack by generic competitors and feared a successful patent challenge opening the door to generic competition. Economic literature and real-world examples over the past two decades demonstrate that the overwhelming majority of brand drug sales switch quickly from the brand drug to lower-priced, therapeutically equivalent generic drugs. As a result, brand manufacturers' profits fall dramatically in a short period of time. Unfortunately, unscrupulous brand manufacturers sometimes try to avoid that fate by engaging in: (i) brand maturation strategies; or (ii) suing the first ANDA applicant only to later induce it to refrain from pursuing its ANDA application, creating a bottleneck blocking later filed ANDA applicants from timely market entry. Bausch did the latter here.

5.     When generic drug manufacturer Teva's predecessor developed a generic Xifaxan product and filed the first ANDA seeking approval to launch a competing generic product, Bausch sued them for infringing its patents to prevent and/or delay Teva's timely market entry. While Bausch and Teva settled the lawsuit, they did so through an unlawful agreement and improper allocation of the market. Bausch agreed to pay Teva to delay entering the market with 550 mg generic Xifaxan. In exchange for the payment, Teva agreed not to further pursue its ANDA litigation and patent challenge and to stay out of the market for as much as *nine* years, until January 2028. And with a guaranteed, exclusive entry date, Teva's incentive to pursue its own ANDA approval was also significantly diminished.

6.     Among the payments from Bausch to Teva was an agreement that, when Teva eventually did enter the market, Bausch would not allow competition in the form of Bausch's own generic product—a so-called authorized generic ("AG"). The U.S. Federal Trade Commission has conducted a study and issued an August 2011 report entitled Authorized

Generic Drugs: Short Term Effects and Long Term Impact: A Report of the Federal Trade

Commission ("Report"), which concluded that "*there is strong evidence that agreements not to*

*compete with an authorized generic have become a way for brand-name companies to*

*compensate generic competitors for delaying entry*." The Report further noted:

> These agreements can be part of "pay-for-delay" patent settlements, which have long
> concerned the Commission. *These agreements involve a brand name firm compensating a*
> *generic and the generic agreeing to delay its entry. One form that compensation can take*
> *is the brand's commitment, in exchange for the first-filer's agreement to delay entry, not*
> *to sell an AG during the first filer's 180 market exclusivity period.* Because the first
> filer's revenue will approximately double absent an authorized generic, its revenue will
> be much larger by agreeing to delay than if it litigated, won and faced AG competition.
> *The generic firm benefits from greater profits during the 180 day exclusivity; the brand-*
> *name firm benefits from later generic entry; but consumers suffer from delay of generic*
> *competition.* Because generics often are priced substantially below the price of brand
> name drugs, even a few additional months without generic competition can significantly
> increase overall prescription drug costs.
>
> \* \* \* \*
>
> The frequency of this practice and its profitability make it an attractive way to structure a
> pay-for-delay settlement, a practice that causes substantial consumer harm.

7.      Teva's agreement to delay its entry was extremely valuable to Bausch, and

Bausch's agreement not to compete with Teva by launching an AG was extremely valuable to

Teva. Bausch secured years of additional monopoly sales, while its unlawful payment was

possibly worth more than $300 million to Teva, far more than Teva could have made by winning

the patent case and competing fairly, and lawfully.

8.      Bausch and Teva also built additional anticompetitive provisions into their

settlement as a means of deterring other generic manufacturers from entering the market. For

example, if another generic manufacturer were to enter the market before January 2028, Bausch

agreed to let Teva do the same. This deterrence clause reduced other generic manufacturers'

incentive to challenge Bausch's patents. In fact, it worked against at least two generic

manufacturers, Sun Pharmaceutical Industries Ltd (Sun) and Sandoz, Inc. (Sandoz), both of which agreed to drop their patent challenges and stay out of the market until the delayed January 2028 date that Bausch and Teva set.

9.      A third generic manufacturer, Norwich Pharmaceuticals, Inc. (Norwich) was not deterred. It litigated Bausch's principal patents to conclusion, and it won. A federal court held that representative patents were invalid (for reasons that applied equally to other patents), and a court of appeals upheld that decision. Norwich could have easily, but had not yet, "carved out" certain HE-related uses of Xifaxan from its labeling. So Norwich remains bottlenecked behind Teva, even though key IBS-D and polymorph patents have been found invalid and unenforceable.

10.     As a result of Bausch's and Teva's unlawful conduct, a generic version of Xifaxan 550 mg is still not available seven years after the unlawful agreement with Teva, and more than three years after the Federal Circuit confirmed that key Bausch patents are invalid. End payors, like Plaintiff Rhode Island Laborers Health & Welfare Fund, are last in the chain of distribution and continue to pay monopoly prices rather than competitive prices for rifaximin and are likely to do so until sometime after January 2028.

## II.      PARTIES

11.     Plaintiff Rhode Island Laborers Health & Welfare Fund ("Plaintiff") is a health and welfare benefit fund with its principal office at 410 South Main Street, Providence, Rhode Island 02903. Plaintiff operates a self-insured health and welfare benefit plan and purchases, pays and/or provides reimbursement for some or all of the purchase price of prescription drugs purchased by its employees, retirees, and/or plan beneficiaries.

12.     During the Xifaxan class period, Plaintiff purchased, paid for, and/or provided reimbursement for some of all of the price of prescriptions of Xifaxan (rifaximin) at

supracompetitive prices in Rhode Island and New Hampshire, and, therefore, was injured in its business and property as a result of the Defendants' anticompetitive conduct alleged in this complaint. The Xifaxan prescriptions that Plaintiff, paid for, or provided reimbursement for, were for its members' personal use. Plaintiff intends to continue purchasing, paying for, and/or providing reimbursement for Xifaxan and will continue to be injured unless the requested injunctive relief is granted.

13.    Defendant Salix Pharmaceuticals, Ltd. is a corporation organized under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.

14.    Defendant Salix Pharmaceuticals, Inc. is a corporation organized under the laws of California with its principal place of business in Bridgewater, New Jersey. Salix Pharmaceuticals, Inc. is a wholly owned subsidiary of Salix Pharmaceuticals, Ltd.

15.    On April 1, 2015, Valeant Pharmaceuticals International, Inc. acquired Salix Pharmaceuticals, Ltd. and, on or about that date, assumed its rights and obligations under the patents that were at issue in the patent litigation between Salix and Teva Pharmaceutical Industries Ltd. Effective on July 13, 2018, Valeant Pharmaceuticals International, Inc. changed its corporate name to Bausch Health Companies Inc. Salix Pharmaceuticals, Ltd. is now a wholly owned subsidiary of Bausch Health Companies Inc.

16.    Defendant Bausch Health Ireland Ltd. is a corporation organized and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.

17.    Defendant Bausch Health Companies Inc. is a corporation organized and existing under the laws of British Columbia, Canada with its U.S. headquarters in Bridgewater, New Jersey.

18.    Except where indicated otherwise, Defendants Bausch Health Ireland Ltd., Bausch Health Companies, Inc., Salix Pharmaceuticals, Ltd., and Salix Pharmaceuticals, Inc. are hereafter collectively referred to as "Bausch."

19.    Defendant Teva Pharmaceutical Industries Ltd. is a corporation incorporated under the laws of Israel, with its principal place of business in Tel Aviv, Israel.

20.    Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation having its principal place of business in Parsippany, New Jersey.

21.    Defendant Actavis Laboratories FL, Inc., is a corporation incorporated under the laws of Florida, with its principal place of business in Davie, Florida. On August 2, 2016, Teva acquired Actavis Laboratories FL, Inc., which was the holder of ANDA No. 208959—one of the ANDAs at issue here—and thereby Teva became the owner of that ANDA.

22.    Except where indicated otherwise, Defendants Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., and Actavis Laboratories FL, Inc. are hereafter collectively referred to as "Teva."

23.    All of the Defendants' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful restraints of trade alleged herein, and were authorized, ordered, and/or undertaken by the Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of the Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

### III.    JURISDICTION AND VENUE

24.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of

the Defendants. The Court further has jurisdiction over this action pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 as this action also alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, that are actionable under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court also has jurisdiction over the claims under the various state laws under both 28 U.S.C. § 1332(d) and 28 U.S.C. § 1367(a).

25.     This action seeks to recover treble damages, interest, costs of suit, and reasonable attorneys' fees for the injuries sustained by the Plaintiff and members of the class (as defined below) resulting from Bausch's monopolization and from all Defendants' conspiracy to restrain trade in the United States market for Xifaxan and its generic equivalents. The action also seeks permanent injunctive relief against the Defendants to undo and prevent the unlawful conduct alleged here.

26.     Venue is appropriate within this district as the Defendants transact business here, and under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Further, the Defendants and/or their agents may be found in this district.

27.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

## IV.    REGULATORY BACKGROUND

**A.    The regulatory structure for approval and substitution of generic drugs.**

28.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"),[1] manufacturers that create a new drug must get approval from the FDA to sell the product by filing a New Drug Application ("NDA").[2] An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[3]

29.    When the FDA approves a brand manufacturer's NDA, the manufacturer submits information to the FDA so that the FDA can list, in a publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations (known as the "Orange Book"), certain patents relating to the drug. In particular, only patents that claim the drug or a method of using the drug, and that could reasonably be enforced against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the patents are properly listable.[4] The manufacturer may list in the Orange Book within 30 days of issuance any such patents issued after the FDA approved the NDA.[5]

30.    The FDA relies completely on the brand manufacturer's truthfulness about the nature of the patent, its validity, and the appropriateness of its listing in the Orange Book; the FDA does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

---

[1] Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified as amended in 21 U.S.C. § 301, *et seq.*).

[2] 21 U.S.C. §§ 301–392.

[3] 21 U.S.C. §§ 355(a), (b).

[4] Patents covering processes for making drug products may not be listed in the Orange Book.

[5] 21 U.S.C. § 355(b)(1), (c)(2).

1.      **The Hatch-Waxman Amendments and Abbreviated New Drug Applications.**

31.      The Hatch-Waxman Amendments, enacted in 1984, simplified regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.[6] A manufacturer seeking approval to sell a generic version of a brand drug may instead file an abbreviated new drug application, typically referred to as an ANDA. An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA and must further show that the generic contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug and that it is bioequivalent, i.e., absorbed at the same rate and to the same extent as the brand. The FDA assigns generics that meet these criteria relative to their brand counterparts an "AB" rating.

32.      The FDCA and Hatch-Waxman Amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic would be present in the blood of a patient to the same extent and for the same amount of time as the brand counterpart.[7]

33.      Bioequivalence is generally demonstrated via studies in which the proposed generic is compared to the Reference Listed Drug ("RLD," which is, in this instance, the brand-

---

[6] *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355).

[7] 21 U.S.C. § 355(j)(8)(B).

name drug approved under the NDA cited in the ANDA) in either *in vivo* or *in vitro* studies.[8]

These studies require the ANDA applicant to have access to sufficient samples of the RLD to

conduct the necessary comparisons. Without RLD samples, it is impossible to complete and file

an ANDA application.[9] In the ordinary course, a prospective ANDA sponsor obtains samples by

buying them, at market price, from a drug wholesaler or distributor.

34.    Through the Hatch-Waxman Amendments, Congress sought to expedite the entry

of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses

nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create

new and innovative products, including through the 30-month stay discussed below.

35.    The Hatch-Waxman Amendments achieved both goals, substantially advancing

the rate of generic product launches and ushering in an era of historically high profit margins for

brand pharmaceutical manufacturers. In 1983, before the Hatch-Waxman Amendments, only

35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all

did. In 1984, prescription drug revenues for brands and generics totaled $21.6 billion; by 2013,

total prescription drug revenues had climbed to more than $329.2 billion, with generics

---

[8] *In vivo* studies are studies conducted on live subjects. *In vitro* studies are conducted in a laboratory.

[9] *See* FDA, *Access to Product Samples: The CREATES Act* (Dec. 28, 2022), https://www.fda.gov/Drugs/Development ApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/Abbreviated NewDrugApplicationANDAGenerics/ucm607738.htm.

accounting for 86% of prescriptions.[10] Generics are dispensed about 95% of the time when a generic form is available.[11]

**2.      Regulatory exclusivities for new drugs.**

36.      In order to promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman Amendments also provide for exclusivities (or exclusive marketing rights) for new drugs. These exclusivities are granted by the FDA upon approval of a drug if statutory requirements are met. These exclusivities are listed in the Orange Book, along with any applicable patents, and can run concurrently with the listed patents.

37.      One such exclusivity, New Chemical Entity (NCE) exclusivity, applies to products containing chemical entities never previously approved by FDA either alone or in combination. If a product receives NCE exclusivity, the FDA may not accept any ANDA for review as to a drug containing the same active moiety for five years from the date of the NDA's approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an application may be submitted after four years.[12]

38.      A drug product may also receive a three-year period of exclusivity if a supplemental application is submitted that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that were essential to approval of the supplemental application. If this exclusivity is granted, the FDA may not approve

---

[10]*See* IMS Institute for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013* 30, 51 (2014), https:// oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/IMS-Medicine%20use %20and%20shifting%20cost%20of%20healthcare.pdf.

[11] *Id.* at 51.

[12] 21 U.S.C. § 355(j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).

an ANDA for that drug for three years from the date on which the supplemental application is approved.[13]

39.    And a drug product may receive a seven-year period of exclusivity for a specific indication if that indication is a "rare disease" under FDA's orphan drug exclusivity program.[14]

40.    Regulatory exclusivities are not always absolute bars to generic entry. For example, some can be overcome by carving out information in the label or for other reasons.[15]

**3.    Paragraph IV certifications and section viii carveouts.**

41.    To obtain FDA approval of an ANDA, a generic manufacturer must assure the FDA that the generic will not infringe any patents listed in the Orange Book that will not expire before the generic seeks to launch its product.

42.    Often, this requires the generic manufacturer to "certify" non-infringement as to each patent listed in the Orange Book as claiming the RLD or a use of such RLD for which the generic applicant is seeking approval by providing one of four "certifications":

- That no patent for the brand has been filed with the FDA (a "Paragraph I certification");

- That the patent for the brand has expired (a "Paragraph II certification");

- That the patent for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "Paragraph III certification"); or

- That the patent for the brand is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").[16]

---

[13] 21 U.S.C. § 355(j)(5)(F)(iv); 21 C.F.R. § 314.108(b)(2)(5).

[14] 21 U.S.C. § 360aa–cc.

[15] *See, e.g.*, 21 C.F.R. §§ 314.94(a)(8)(iv), 314.127(a)(7); 21 U.S.C. § 355a(o).

[16] 21 U.S.C. § 355(j)(2)(A)(vii).

43.     In addition, a generic manufacturer's ANDA may "carve out" a particular

indication, and the patents allegedly protecting that indication, by omitting it from its label (a

"section viii statement").[17] A section viii statement means that the generic has "carved out" of its

proposed drug label the method(s) of use claimed by the patent, thereby assuring the FDA that

the generic will not infringe.

44.     A generic manufacturer can also amend a pending ANDA to include a section viii

statement to a patent where its ANDA initially contained a Paragraph IV certification.

**4.      The brand company's economic incentive to file litigation and obtain a 30-
month stay on generic approval.**

45.     If a generic manufacturer files a Paragraph IV certification, a brand manufacturer

can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent

infringement.

46.     The high profit margins on brand drugs and the predictable effects of generic

entry—as discussed below, sales switch quickly from the brand to the generic—create powerful

financial incentives for brand manufacturers to sue any generic competitor that files an ANDA

with a Paragraph IV certification, even if the competitor's product does not actually infringe the

listed patent(s) and/or the patent is invalid or unenforceable. By simply listing the patents in the

Orange Book and filing the lawsuit, the brand manufacturer can delay final FDA approval of an

ANDA for up to 30 months.

47.     Under this counterbalance to Hatch-Waxman's simplified ANDA process, the

ANDA filing itself is treated as an artificial or "technical" act of patent infringement, entitling

the patent holder to sue for injunctive relief. If the brand manufacturer initiates a patent

---

[17] 21 U.S.C. § 355(j)(2)(A)(viii).

infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (i) the passage of two-and-a-half years, or (ii) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.[18] Until one of those conditions occurs, the FDA may grant "tentative approval," but it cannot authorize the generic manufacturer to market its product (i.e., grant final approval). The FDA may grant an ANDA tentative approval when it determines that the ANDA is ready for final approval but for the 30-month stay. The process of obtaining final approval after tentative approval is typically straightforward, merely requiring the applicant to submit an amendment requesting final approval and addressing any changes that may have occurred in the interim.[19] FDA recommends that any such amendments be filed before the exclusivity ends, allowing the final approval to be granted on the earliest possible date.[20]

### 5.    The first filer's 180-day exclusivity period.

48.    Generics may be classified as (i) first-filer generics (the generic company that filed the first ANDA for the relevant product), (ii) later-filer generics (the generic companies that filed ANDAs for the relevant product after the first-filer), or (iii) authorized generics, sometimes

---

[18] 21 U.S.C. § 355(j)(5)(B)(iii). This period is commonly called a "30-month Hatch-Waxman stay" or "30-month stay." The brand/patent holder can choose to sue the generic after 45 days, including waiting until the generic has launched its product, but, in that event, the brand cannot take advantage of the 30-month stay of FDA approval, and must instead satisfy the showing required to obtain a preliminary injunction to prevent the generic launch.

[19] FDA, *ANDA Submissions –Amendments and Requests for Final Approval to Tentatively Approved ANDAs Guidance for Industry* (Jan. 2024) https://www.fda.gov/media/119718/ download.

[20] *Id.*

abbreviated as "AG" (a generic product sold under the authority of the brand company's NDA, i.e., the brand product labeled as a generic).

49.    To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the first Paragraph IV generic manufacturer ANDA filer ("first-filer") a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug.[21] That is, when a first-filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand are either invalid or not infringed by the generic, the FDA cannot approve a later generic manufacturer's ANDA until that first generic has been on the market for 180 days.[22]

50.    The 180-day window is often referred to as the first-filer's six-month or 180-day "exclusivity." This is a bit of a misnomer because while the FDA may not grant final approval to another ANDA filer during this time period, a brand manufacturer can launch an AG at any time, manufacturing its AG in accordance with its approved NDA for the branded product but selling through a third party at a lower price point. Brand manufacturers frequently launch AGs in response to generic entry in order to recoup some of the sales they would otherwise lose.

51.    The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first-filer.[23]

_____

[21] 21 U.S.C. § 355(j)(5)(B)(iv), (D).

[22] Or, until its first-filer exclusivity has been forfeited. A first-filer can forfeit its 180-day exclusivity by, for example, failing to obtain tentative approval from the FDA for its ANDA within 30 months of filing its ANDA. 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa)(BB).

[23] *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 144 (2013) (quoting C. Scott Hemphill, Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem, 81 N.Y.U. L. REV. 1553, 1579 (2006)).

52.     A first-filer that informs the FDA it intends to wait until all Orange Book-listed patents expire before marketing its generic does not get a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents or to invent around such patents by creating non-infringing generics.

**6.     Pathways to avoid the first filer ANDA's exclusivity period.**

53.     The Hatch-Waxman Amendments also created statutory mechanisms to enable later-filer generics to enter the market before the first filer, despite its 180-day ANDA exclusivity.

54.     First, an applicant that is otherwise eligible for the 180-day ANDA exclusivity period can forfeit it. For example, a first filer forfeits its 180-day ANDA Exclusivity Period by failing to get tentative approval of its ANDA within 30 months after the application is filed (unless the failure is caused by an intervening change in approval requirements).[24]

55.     Second, Congress provided forfeiture provisions allowing a second filer to jump ahead of the first filer by obtaining a judgment of invalidity or noninfringement as to the relevant patents. When a second filer obtains such a judgment, the first filer has 75 days to enter the market; if it fails to do so, it forfeits its 180-day ANDA exclusivity period.[25]

56.     Third, Congress also provided that the 180-day ANDA exclusivity period only precludes approval of second filers to the extent the second filers also certify under Paragraph IV to the listed patents that rendered the first filer eligible for 180-day exclusivity. Generics relying on "section viii statements" are not subject to the first filer's ANDA Exclusivity Period (nor are they subject to any 30-month stay). The FDA can approve an ANDA containing only a section

---

[24] 21 U.S.C. 355 § (j)(5)(D)(i)(IV).

[25] 21 U.S.C. 355 § (j)(5)(D)(i)(I)(bb)(AA).

viii statement *without regard* to whether any other ANDA applicant is otherwise entitled to a

180-day ANDA exclusivity period.[26]

57.    Fourth, Congress provided that a first filer's 180-day ANDA exclusivity period

only prevents the FDA from approving other *ANDA*-based products during that period.[27] It does

not prevent other generic manufacturers from entering the market pursuant to a license granted

by the brand manufacturer under authority of its *NDA*. Second filers might use the leverage of

their patent challenges to negotiate a license from the brand manufacturer to enter the market

under its NDA (*i.e.,* as an AG product).

58.    The Hatch-Waxman Amendments thus created incentives for second filers to try

to enter the market before a first filer that, for example, settled its patent litigation by accepting a

reverse payment in exchange for a delayed entry date.

**7.    Patents are subject to judicial and administrative scrutiny.**

59.    A patent may be valid or invalid, infringed or not infringed, and enforceable or

unenforceable. Simply owning a patent does not entitle the patent owner to exclude others.

Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes*

proceedings by the Patent and Trademark Office (PTO), by court decision, or by jury verdict.

60.    A patent holder bears the burden of proving infringement. One way a generic can

prevail in patent infringement litigation is to show that its product does not infringe the patent

(and/or that the patent holder cannot meet its burden to prove infringement). Demonstrating

infringement, or noninfringement, will depend on the scope of a patent's claims. When a patent

claims a compound, such as rifaximin, the infringement analysis will turn on whether the

---

[26] 21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(12)(iii).

[27] 21 U.S.C. 355 § (j)(5)(D)(i)(II)(bb).

generic's product employs the same compound. When a patent claims a method of use—in which the compound is used in delineated steps or processes to achieve a specific outcome, such as treating a certain form of irritable bowel syndrome or reducing symptoms such as bloating—the infringement analysis will turn on whether the generic's product is to be used in the same manner to achieve the same outcome. While a patent can claim a new unobvious method of use for an old compound, a patent cannot validly claim a compound that is already known.

61.     Another way a generic can prevail in a patent-infringement suit is to show that the patent is invalid or unenforceable. A patent is invalid or unenforceable when, among other things: (i) the disclosed invention is not novel or is obvious in light of earlier prior art; (ii) an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose information or submits false information material to patentability to the PTO during prosecution; and/or (iii) two or more related patents claim inventions, which are not patentably distinct from each other and the patents are not subject to a terminal disclaimer linking ownership and terms of the patents (and no exception, such as the safe harbor, applies).

62.     In view of the *ex parte* nature of patent prosecution, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of: (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent; and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent-infringement suit.

63.     As a statistical matter, if the parties litigate a pharmaceutical patent-infringement suit to a decision on the merits, it is more likely that a challenged non-drug-substance patent will be found invalid or not infringed than upheld. The Federal Trade Commission ("FTC") reports

that generics prevailed in 73% of Hatch-Waxman patent cases resolved on the merits between

1992 and 2002.[28] An empirical study of all substantive decisions rendered in every patent case

filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a

decision on the merits, the generic wins 74% of the time.[29] A more recent study found that

generics prevailed in 44% of cases since 2002, but in 59% of cases without active-ingredient

patents (as here), concluding that this is because cases with weaker patents are settling, while

cases with stronger patents are going to trial.[30]

64.    Patents can also be challenged through *Inter partes* Review (IPR) before the

Patent Trial Appeal Board ("PTAB"), in which a third party challenges the validity of the claims

of a patent on the basis of prior art comprising patents or printed publications.[31]

**B.    The competitive effects of AB-rated generic and authorized generic competition.**

65.    Over the forty years that the Hatch-Waxman Act has provided the process for

generic approvals in the U.S., the distribution, sales, and pricing of brand and generic drugs has

been heavily studied. In large part, for small molecule, retail distribution drugs predictable

patterns of distribution, sales, and pricing have emerged.

---

[28] FTC, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* vi-vii (July 2002), https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf.

[29] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 TEX. L. REV. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

[30] Ruben Jacobo-Rubio, et al., The Distribution of Surplus in the US Pharmaceutical Industry: Evidence from Paragraph iv Patent-Litigation Decisions, 63 J. Law & Econ. 203, 228-229, 234 (2020), https://jonwms.web.unc.edu/wp-content/uploads/sites/10989/2021/06/ParIV Settlements_JLE.pdf.

[31] 35 U.S.C. § 311.

66.     For brand drugs, several structural features of the industry combine to provide a period for high, monopoly pricing for successful brand name prescription drugs. The FDCA affords periods of exclusivity to new drug applicants, and the Hatch-Waxman Act similarly does so through, for example, the 30-month stay discussed earlier. The Patent Act helps create, where lawfully implemented, a period of exclusive exploitation of a patented drug invention. These statutory rights create incentives for drug companies to innovate and launch new drugs by providing a limited period for market power, when companies can charge monopoly rent levels for products.

67.     In addition, unlike most other economic markets, healthcare markets in the U.S. have a distinct feature: there is an "agency" issue. With a prescription drug, (i) the physician decides which drug is to be selected, (ii) a health benefit provider pays (all or most) of the cost of the drug, and (iii) the patient consumes the drug. Prescription drugs may only be dispensed pursuant to a doctor's prescription, and a licensed pharmacist may dispense only the brand-name drug named in the prescription or its AB-rated, FDA-approved generic equivalent.[32] These industry features also foster, before the availability of an AB-rated generic, for the brand product to be priced at monopoly rent levels during periods of exclusivity.

68.     For generic drugs, several structural features of the industry combine to (i) foster the approval of generic drugs, (ii) terminate the period of high, supracompetitive pricing by the brand, and (iii) achieve low, commodity-level pricing of generic prescription drugs. The exclusivities in the FDCA each have strict, limited periods of duration, as do the exclusivities provided under the Hatch-Waxman Amendments to that Act. The Patent Act provides strict

---

[32] In many states, pharmacists must substitute an AB-rated generic for a brand-name drug without seeking permission from the prescribing doctor.

expiration periods for patents after which the invention is to be open to the public. Strict generic approval requirements under the FDCA (including, for example, that the generic use the same active pharmaceutical ingredient(s), that the product be bioequivalent to the brand, that the generic comply with the same level of cGMP requirements as the brand, and that the label generally be the same as the brand) mean that, as a matter of federal law, an approved AB-rated generic must be treated the same as the brand (and the same as other AB-rated generics of the same product). Since the passage of the Hatch-Waxman Amendments, every state has adopted drug product selection laws that either require or permit pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitution is not permitted). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic such that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing. And extensive health benefit payor designs, largely through formularies, facilitate the substitution of generic products for the brand.

69.    These industry features result in a predictable, intended, and dramatic shift in the pricing of small molecule prescription drugs when AB-rated generic versions of the brand enter, or should enter, the U.S. marketplace. A transition from monopoly to commodity is the *quid pro quo* the brand monopolist must allow for having been provided the legal exclusivities that have ended.

70.    When there is no generic competition for a brand drug, the brand manufacturer can set and maintain prices without losing sales. The ability to do this is the result of the brand manufacturer's monopoly power over the market for that drug.

1.  **The first AB-rated generic takes the most market share and is priced below the brand.**

71.    Experience and economic research show that the first generic manufacturer to market its product prices it below that of its brand counterpart, on average between 82 to 86% of the pre-entry brand price.[33] This price differential is driven by the generic manufacturer's economic incentive to take as much market share from the brand as possible, as quickly as possible. Given that every state either requires or permits that a prescription written for the brand be filled with an AB-rated generic, even with just one generic in the market, about 80%, shifts from the brand to the lower-priced generic in the first six months; within a year that will approach 90%.[34] Thus, a first, and sole, generic manufacturer almost always captures a large share of sales from the brand. The generic manufacturer usually prices somewhat below the brand (typically around 85% of the brand price), resulting in some reduction in the average price paid for the drug at issue (brand and AB-rated generic combined).

72.    During the 180-day exclusivity period, the first-filer generic is the only ANDA-approved generic manufacturer on the market (though the brand's AG can be, and often is, on the market during the 180-day exclusivity period). In the absence of competition from other generics, the 180-day exclusivity period can be a highly lucrative time for the first-filer generic manufacturer (often amounting to about 80% of all profits that it will ever make on the product).

2.  **Later generics drive prices down further.**

73.    Once multiple generic competitors enter the market, the competitive process

---

[33] FTC 2011 AG Study at ii–iii, vi, 34; FTC Pay-for-Delay Study at 1.

[34] Brand drugs experiencing generic entry in 2017–2019 fell to 23% market share on average after one year; for brand drugs with sales greater than $250 million (like Revlimid), brand market share fell to 18% on average one year after generic entry. Henry Grabowski, et al., Continuing Trends in U.S. Brand-name and Generic Drug Competition, *Journal of Med. Econ.*, 24(1), 908, 916 (2021), https://www.tandfonline.com/doi/full/10.1080/13696998.2021.1952795#d1e258.

accelerates, because in an effort to gain market share, generic manufacturers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[35] The FTC has found that on average, within a year of generic entry, prices drop to 15% of the brand's price.[36] That trend has been corroborated in studies using data from 2010 to 2013, 2015 to 2017, and 2013 to 2022.[37] (Of course, those studies have analyzed full generic competition, rather than a structure in which generic manufacturers were each limited to a percentage allocation of the market).

---

[35] *See, e.g.*, Tracy Regan, Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market, 26 INT'L J. INDUS. ORG. 930 (2008); Richard G. Frank, The Ongoing Regulation of Generic Drugs, 357 NEW ENG. J. MED. 1993 (2007); Patricia M. Danzon & Li-Wei Chao, Does Regulation Drive Out Competition in Pharmaceutical Markets?, 43 J.L. & ECON. 311 (2000).

[36] FTC, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* 8 (Jan. 2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf ("FTC Pay-for-Delay Study").

[37] *See, e.g.*, Richard Frank, et al., The Evolution of Supply and Demand for Generic Drugs," The Milbank Quarterly, 99(3) 828, 842 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC 8452364/pdf/MILQ-99-828.pdf (for large market oral drugs that lost patent protection between 2010 and 2013, the median index price of generic drugs fell to about 10-20% of brand price after one year); FDA, *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices* (Dec. 2019), https://www.fda.gov/media/133509/download?attachment; *see also* Mohammed Jamjoom, et al., Generic Entry and Effect of Market Competition on Outpatient Pharmacy Drug Prices, Journal of Generic Medicines: The Business Journal of Generic Medicines Sector 20(2) (2024) (study of median generic prices as a percentage of brand name drug from 2013-2018 using prices from the Centers for Medicare and Medicaid Services National Average Drug Acquisition Cost database from January 2013 to February 2022).

74.    A 2019 FDA study explicitly shows how, as the number of generic producers increases, the price of the drug decreases, following the law of supply and demand:[38]



75.    FDA found that, with one generic manufacturer, the average manufacturer price was 39% lower than the brand price before generic competition, and the invoice price was 31% lower. With two competitors, prices drop to 54% and 44% lower, respectively. And with six or

_____

[38] FDA, *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices* 2–3 (Dec. 2019), https://www.fda.gov/media/133509/download?attachment.

more competitors, both measures show a 90% or greater price reduction.[39] The figure below shows these price discounts over time.



76.     According to the FDA and the FTC, price reductions increase substantially when the number of generic competitors goes from one to two. In that situation, there are two commodities that compete on price. And this effect continues as additional generics enter the market.[40]

77.     In the end, the brand manufacturer's sales decline to a small fraction of their level before generic entry. This is because, although "generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price.

---

[39] *Id*.

[40] *See, e.g.*, Conrad, R., and R. Lutter. (2019). *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices*, FDA, at 3 (Dec. 2019), https://www.fda.gov/media/133509/download; Gupta, R., N. D. Shah and J. S. Ross, Generic Drugs in the United States: Policies to Address Pricing and Competition, *Clinical Pharmacology & Therapeutics*, 105 (2): 329-37 (2019).

According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Billions more are saved when hospitals use generics."[41]

78.    In the generic entry scenarios analyzed in the studies cited above, the generics entered the market without any constraints on their ability to use lower prices to capture market share. This ability to capture market share by lowering prices is essential to the regulatory regime created by the Hatch-Waxman Act.

79.    Brand manufacturers are well aware of the rapid erosion of brand sales caused by generic entry into the market. Brand manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to unlawful tactics.

**3.    Authorized generics, like all generics, compete on price.**

80.    An "authorized generic"—frequently referred to as an "AG"—is a product sold under the authority of the brand's approved NDA. An AG, then, is chemically identical to the brand drug but is sold as a generic, typically through either the brand manufacturer's subsidiary (if it has one) or through a third-party distributor. If the 180-day exclusivity period applies to a first-filer ANDA, the exclusivity exists only to bar the FDA from approving another ANDA during that time period. The exclusivity does not apply to products sold under the authority of the original NDA. As a result, the 180-day exclusivity does not bar the entry of authorized generics; the statutory scheme does not prevent a brand manufacturer from marketing and selling (directly or indirectly) an AG at any time or from licensing another company to do so.

81.    The FDA has found that allowing brand manufacturers to introduce AGs during the 180-day exclusivity period is consistent with the "fundamental objective of the Hatch-Waxman [A]mendments" to encourage competition and, as a result, "lower prices in the

---

[41] *See* Ann Saudi Med 2008; 28(1): 33-41 at 36, *Brand and generic medications: Are the interchangeable?* (2008), https://pmc.ncbi.nlm.nih.gov/articles/PMC6074234/pdf/asm-1-33.pdf.

pharmaceutical market."[42] The FDA reasoned that if a brand releases an AG at a reduced price during the 180-day exclusivity period, "this might reasonably be expected to diminish the economic benefit" to the generic first-filer by increasing competition and causing the generic to "reduc[e] the substantial 'mark-up' [generics] can often apply during the [180-day] period."[43] Such competition, and the resulting price decreases, work to benefit drug purchasers.

82.    Brand manufacturers recognize the significant economic advantages of releasing their AGs to compete with the first-filer generic during the 180-day exclusivity period. One study noted that "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[44]

83.    Competition from an AG substantially reduces drug prices and the revenues of the first-filer generic (especially during the 180-day exclusivity period).

84.    A study analyzing three examples of AGs found that "[f]or all three products, authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[45]

85.    The FTC similarly found that AGs capture a significant portion of sales, reducing the first-filer generic's revenues by about 50% on average.[46] The first-filer generic makes much less money when it faces competition from an AG because: (i) the AG takes a large share of unit

---

[42] FDA Response to Mylan and Teva Citizen Petitions at 11–12, Docket Nos. FDA-2004-P-0400 (formerly 2004P-0075) and FDA-2004-P-0146 (formerly 2004P-0261) (July 2, 2004).

[43] *Id.* at 12.

[44] Kevin A. Hassett & Robert J. Shapiro, Sonecon, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals* 3 (May 2007), http://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf.

[45] Ernst R. Berndt, et al., Authorized Generic Drugs, Price Competition, and Consumers' Welfare, 26 Health Affairs 790, 796 (2007).

[46] FTC 2011 AG Study at 139.

sales away from the first-filer; and (ii) the presence of the AG causes prices, particularly generic prices, to decrease.

86.     Authorized generics are, therefore, a significant source of price competition. In fact, they are the only potential source of generic price competition during the first-to-file generic manufacturer's 180-day ANDA exclusivity period. All drug industry participants recognize this. In 2006, the branded pharmaceuticals industry group known as PhRMA sponsored a study that concludes that the presence of an AG causes generic wholesale prices to be more than 15% lower as compared to when there is no authorized generic. Generic companies recognize it.[47] Brand companies recognize it.[48]

## C.    Manufacturers' Motive to Conspire

87.     In the absence of generic competition, brand manufacturers can usually sell the brand drug for a price far above the marginal cost of production, which allows them to generate profit margins in excess of 70% (and sometimes up to 98%) on hundreds of millions of dollars in sales. Economists refer to this ability to generate such high profit margins as "market power."

---

[47] One generic stated that "[d]ue to market share and pricing erosion at the hands of the authorized [generic], we estimate that the profits for the 'pure' generic during the exclusivity period could be reduced by approximately 60% in a typical scenario." *See* FTC 2011 AG Study at 81. Another generic manufacturer quantified the fiscal consequences of competing with an authorized generic and determined that the authorized generic reduced its first generic's revenues by two-thirds, or by approximately $400 million. Comment of Apotex Corp. in Support of Mylan Citizen Petition at 4, Docket No. 2004P-0075 (Mar. 24, 2004), https://web.archive.org/web/2004 1216115511/http://www.fda.gov/ohrms/dockets/dailys/04/apr04/040204/04P-0075-emc 00001.pdf.

[48] Commenting on an FDA Citizen Petition by drug manufacturer Teva Pharmaceuticals, Pfizer stated: "Teva's petition [to prevent the launch of an authorized generic] is a flagrant effort to stifle price competition – to Teva's benefit and the public's detriment." Comment of Pfizer at 6–7, Docket No. 2004P-0261 (June 23, 2004), https://web.archive.org/web/20050601041653/ http://www.fda.gov/ohrms/dockets/dailys/04/June04/062904/04p-0261-cr00001-01-vol2.pdf; Comment of Johnson & Johnson at 1, FDA Docket No. 2004P-0075 (May 11, 2004), https:// web.archive.org/web/20041227172543/http://www.fda.gov/ohrms/dockets/dailys/04/June04/ 060404/04p-0075-c00002-vol1.pdf.IS.

When generics enter the market, however, they quickly take 90% or more of the total unit sales of the drug. And when multiple generics are in the market, competition between them drives down the price of the drug to near the marginal cost of production. This price competition delivers enormous savings to drug purchasers.

88.    The brand and generic manufacturers have a collective interest in preventing or forestalling this competition. If they work together to prevent or delay competition, they can maintain the excessively high profit margins previously enjoyed only by the brand manufacturer and split the resulting excess profits between themselves. They can keep for themselves the enormous savings that price competition would have delivered to drug purchasers. The following series of charts demonstrates the manufacturers' common interest in delaying such competition.

89.    A brand manufacturer in a marketplace without competition from generics receives all of the profits on all of the unit sales:



90.    When generic entry occurs, the brand manufacturer loses most of the unit sales; the generic manufacturers sell most of the units, but (once true generic competition occurs) do so

at drastically reduced prices; and price competition delivers enormous savings to drug

purchasers. Competition converts what formerly were excess profits into purchaser savings:



91.    To avoid this loss of profits, the brand and generic manufacturer can agree not to

compete and, instead, to split the purchaser savings between themselves. For such an

anticompetitive scheme to work, the brand and generic manufacturers need a way to divide the

purchaser savings between themselves. The generic manufacturer will not refrain from

competing if it does not share in the ill-gotten gains.

92.    Payoffs from the brand manufacturer are a means by which the brand and generic

manufacturers agree to divide between themselves the ill-gotten gains that the delayed

competition makes possible. These unlawful pay-off deals are often referred to as "pay-for-

delay," "reverse-payment," or "exclusion-payment" agreements. They are depicted here:



### 1.    No AG Payments

93.    When brand manufacturers made unlawful payoffs to generic competitors in the 1990s, the payoffs took the form of cash payments. As a result of regulatory scrutiny, congressional investigations, and civil antitrust litigation, however, brand and generic manufacturers have had to get more creative in hiding these unlawful payoffs in increasingly elaborate agreements.

94.    One form of non-cash payoff is the no-authorized generic promise (a "No-AG Payment"). Pursuant to a No-AG Payment, the brand manufacturer agrees not to market an authorized generic version of the drug until after a period of time—often 180 days, but sometimes even longer—following the first filer's entry into the market. In exchange, the generic manufacturer agrees to delay its entry into the market (i.e., its competition with the branded drug).

95.    As noted above, the first filer's 180-day ANDA exclusivity period does not prohibit the brand manufacturer from marketing its NDA-based authorized generic during the

180 days. The Hatch-Waxman Amendments' 180-day marketing period is "exclusive" only as against other ANDA-based products, not as against the brand manufacturer's NDA-based authorized generic.

96.    As also noted above, it is almost always financially advantageous for the brand manufacturer to begin marketing an authorized generic as soon as (or in some cases even before) the first ANDA-based generic manufacturer enters the market. Competition from an authorized generic, in turn, has a drastically negative effect on the first filer's revenue, typically cutting it by more than half. The competing authorized generic takes a substantial volume of the unit sales and drives prices lower—all to the benefit of drug purchasers.

97.    In exchange for an agreement from the brand manufacturer *not* to market an authorized generic that would cause this substantial loss of revenue and profit, a generic first filer may be willing to agree to delay its entry into the marketplace. The additional profits that the brand manufacturer gains from the delayed onset of generic competition more than make up for the profits that it forgoes by not competing with an authorized generic.

98.    The brand manufacturer gains from the delayed onset of generic competition. The first filer gains from the absence of generic competition after it finally does enter the market. And drug purchasers lose three times over: first by the delay in the onset of the first filer's entry into the market; second, by the absence of authorized-generic competition once the first filer finally enters; and third, by the "bottleneck" that the first filer's delayed entry causes—absent forfeiture of the first filer's 180-day ANDA Exclusivity Period, second filers generally cannot enter the market until the expiration of the first filer's artificially delayed 180-day ANDA Exclusivity Period.

99.     Historically, no-AG agreements between brand and generic manufacturers took the form of an explicit promise written into a settlement agreement. However, as more courts recognized no-AG promises as a form of unlawful payment for delay that could violate the antitrust laws, the parties moved to a different model.

100.     More recently, in an attempt to obfuscate the no-AG promise, brand and generic manufacturers often enter into settlements containing either an agreement to cap the number of pills the generic may sell (this insidious form of market allocation is sometimes referred to by co-conspirators by the innocuous sounding phrase "volume-limited generic license") or a profit-share provision (sometimes called a royalty) pertaining to generic sales. Rather than an express promise not to launch an authorized generic, the economics of a settlement containing volume limits or profit share provisions make it unprofitable for the brand company to do so. Thus, while the brand company may retain the theoretical right to launch an authorized generic, both parties to the agreement understand at the time they are entering the agreement that no rational brand company would do so under the circumstances.

101.     In a 2019 report, the Federal Trade Commission (FTC) identified a "royalty structure" as a "common form of possible compensation" in Hatch-Waxman settlements, referring to a profit-share/royalty structure as similar to a *de facto* no-AG agreement."[49]

---

[49] Overview of Agreements Filed in FY 2019, A Report by the Bureau of Competition (the 2019 FTC Report) at 2, available at https://www.ftc.gov/system/files/ftc_gov/pdf/fy-2019-mma-report.pdf; *Journal of Competition Law & Economics*, The Simple Math of Royalties and Drug Competition During the 180-day Generic Exclusivity Period, Drake, Keith M. and McGuire, Thomas G. (2024).

102.    And as Courts began to examine profit-share/royalty provisions in Hatch-Waxman patent settlements, many have found that they may be "effectively a kickback."[50] Such profit shares both incentivize the brand manufacturer not to launch another generic into the market and demonstrate the substantial value the generic secured under the agreement.[51]

103.    In other words, profit-share provisions can be akin to an implicit no-AG promise, since the brand's launching its own AG would be in its own economic *dis*interest.

104.    In *Intuniv*, for example, the court sustained purchasers' claims of an unlawful reverse payment based on allegations that a Hatch-Waxman patent settlement included a profit-share/royalty provision during the 180-day exclusivity period, which added an incentive for the brand manufacturer to stay out of the market during the generic manufacturer's exclusivity period.[52]

105.    Likewise, in *Amitiza*, the court sustained reverse payment claims premised on allegations that the brand manufacturer paid the generic manufacturer to delay generic entry via a no-AG agreement by structuring the profit share/royalty to ensure that there is only one generic available, despite the brand manufacturer nominally retaining the right to launch a competing authorized generic.[53]

106.    A more recent concept that has crept into Hatch-Waxman patent settlements is the volume-limited generic license, whereby the brand company allows the generic to come to

---

[50] *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 859 (N.D. Cal. 2021) (citing *FWK Holdings LLC v. Shire PLC*, 2017 WL 11449668, at *8 (D. Mass. Oct. 10, 2017) ("*Intuniv* MTD dec.").

[51] *Intuniv* MTD dec., at *8; *In re Intuniv Antitrust Litig*, 496 F.Supp.3d 639, 670 (D. Mass. 2020); *see also In re Amitiza Antitrust Litig.*, 2022 WL 1796895, at *4 (D. Mass. Dec. 27, 2022).

[52] *Intuniv* MTD dec., at *8.

[53] *In re Amitiza Antitrust Litig.*, 2022 WL 1796895, at *2-*4 (D. Mass. Dec. 27, 2022).

market but only cover a certain specific percentage of the market, essentially capping the number of pills the generic may sell. So long as the volume limit is less than the expected generic substitution rate, both the generic and the brand end up better off than they would through lawful competition. Through such a license, the brand company and generic company set up an economic structure that makes it economically irrational for the brand company to launch a competing authorized generic.

107.    For example, the internal projections from one brand company who settled Hatch-Waxman litigation with volume-limited licenses revelated that it was projecting that "the generics expected to make more money selling a limited quantity of branded [drug] at monopoly prices than if they had pursued litigation against [the brand manufacturer]."[54]

> a) **No-AG Payment's value to the generic manufacturer.**

108.    A No-AG Payment is very valuable to the first filer. The first filer often earns the overwhelming portion of all of the profits it will ever make on the drug—as much as 80% of all that it will ever make—during its 180-day ANDA exclusivity period. It is almost always more lucrative for the first filer to delay entry and have 180 days on the market as the only generic than to enter the market earlier and face immediate competition from an authorized generic. So, the first filer may be willing to agree to delay its entry in exchange for a No-AG Payment.

109.    The Supreme Court has recognized that 180 days of generic exclusivity "can prove valuable, possibly 'worth several hundred million dollars'" to the first filer.[55] And because

---

[54] *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2024 WL 4023561 at *11 (N.D. Cal. Aug. 26, 2024).

[55] *FTC v. Actavis, Inc.*, 570 U.S. 136, 143 (2013) (quoting C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1579 (2006)).

an authorized generic can reduce the value of that exclusivity by more than 50%, a "no-AG agreement . . . may be of great value to . . . the first-filing generic."[56]

110.    Thus, "no-AG agreements are likely to present the same types of problems as reverse payments of cash."[57] As explained by the then-Chairman of the FTC:

> Because the impact of an authorized generic on first-filer revenue is so sizable, the ability to promise not to launch an AG is a huge bargaining chip the brand company can use in settlement negotiations with a first-filer generic. It used to be that a brand might say to a generic, "if you go away for several years, I'll give you $200 million." Now, the brand might say to the generic, "if I launch an AG, you will be penalized $200 million, so why don't you go away for a few years and I won't launch an AG."[58]

111.    Payoffs by means of No-AG Payments usually exceed the value that the first filer could have obtained even if it had won the patent infringement litigation. As a reward for winning the patent litigation, the Hatch-Waxman Amendments provide the first filer a period of 180 days of exclusivity as against other ANDA-based generic products. But the statute does not prevent the brand manufacturer from marketing an authorized generic during that time. By settling the patent case in exchange for a No-AG Payment, the first filer converts that six months of ANDA-based generic exclusivity into a period of total generic exclusivity, thus doubling its unit sales while charging a vastly higher price.

---

[56] *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 404 (3d Cir. 2015).

[57] *King Drug*, 791 F.3d at 404.

[58] Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics (June 2009), http://www.ftc.gov/os/2009/06/P062105authgenstatementLeibowitz.pdf.

### b) No-AG payment's cost to the brand manufacturer.

112.    While No-AG Payments are very valuable to the generic manufacturer, they would be very costly to the brand manufacturer if they did not have the intended anticompetitive effect of delaying generic entry. The brand manufacturer forgoes making half or more of the generic sales during the 180-day ANDA exclusivity period. Those forgone sales are a pure loss to the brand manufacturer because the addition of a second generic to the market does not significantly increase the rate at which purchasers substitute a generic for the branded product.

113.    Of course, No-AG Payments are exceedingly valuable to the brand manufacturer—despite the loss of sales of an authorized generic—because they do in fact have the intended effect of causing the generic manufacturer to delay entering the market.

### 2. Deterrents to Second Filers

114.    A brand manufacturer can also provide significant value to a first-filing generic manufacturer by including provisions in the agreement designed to deter other generic manufacturers (i.e., second filers) from entering the market before the delayed entry date to which the first filer has agreed. These deterrence clauses come in at least three varieties.

### a) Deterring Entry Via Litigation

115.    One type of deterrence clause provides that the delayed entry date to which the first filer has agreed will be moved earlier if any other generic manufacturer (i.e., a second filer) prevails in patent litigation against the brand manufacturer.

116.    The purpose and effect of such a clause is to reduce second filers' incentives to litigate the brand manufacturers' patents to conclusion. Absent the deterrence clause, a second filer could enter the market before the first filer under certain circumstances, thereby enjoying a substantial period where it would have the only ANDA-based generic product on the market.

117.    When a second filer secures a final court judgment that the brand manufacturer's patents are invalid or not infringed, the first filer forfeits its 180-day ANDA Exclusivity Period if it does not enter the market within 75 days of the court decision.[59] The first filer would forfeit its statutory exclusivity period if, for example, it agreed with the brand manufacturer to delay entry until Year 4 and a second filer establishes patent invalidity in Year 2. Having agreed not to begin marketing until Year 4, the first filer could not enter the market within 75 days of the second filer's favorable court decision in Year 2. The first filer would forfeit its 180-day ANDA Exclusivity Period, and the second filer could enter the market and potentially get a substantial period with the only ANDA-based generic product on the market.

118.    The deterrence clause allows the brand manufacturer and the first filer, through their joint conduct, to circumvent the statutory incentive for second filers to try to improve on the entry date to which the brand manufacturer and first filer agreed. In the example above, absent the deterrence clause, the Hatch-Waxman Amendments would allow the second filer to enter the market in Year 2 and enjoy a substantial period as the only ANDA-based generic product on the market. The first filer would be stuck on the sidelines until its agreed entry date. The prospect of being the only ANDA-based generic product on the market motivates a second filer to incur the substantial costs and burdens of litigating the patent case to try to enter the market before the first filer's agreed entry date. The deterrence clause eliminates that possibility, reducing second filers' incentives to litigate the patent case to conclusion.

119.    The deterrence clause results in delayed generic entry in at least two ways: (i) it eliminates second filers' ability to use successful patent litigation to enter the market before the first filer's agreed entry date, and (ii) by reducing the threat to the first filer's 180-day ANDA

---

[59] 21 U.S.C. § 355 (j)(5)(D)(i)(I)(bb).

exclusivity period, the clause compensates the first filer for agreeing to delay its entry into the market. In short, the clause eliminates a significant competitive threat to the first filer, in return for which the first filer agrees to delay its entry into the market.

**b)    Deterring Entry Via License.**

120.    An unscrupulous brand manufacturer could also use another type of second-filer deterrent to compensate the first filer for agreeing to delay entry into the market. This type of deterrence clause provides that the brand manufacturer will not grant a license to any other generic manufacturer, under authority of the brand manufacturer's NDA, to enter the market before the first filer.

121.    Absent the brand manufacturer's agreement not to grant such a license to a second filer, the second filer could use its own challenges to the brand manufacturer's patents as leverage to negotiate a license (under authority of the brand's NDA) to enter the market before the first filer. The second filer could thereby enjoy a substantial period where it would have the only generic product on the market.

122.    This type of deterrence clause prevents the brand manufacturer from granting such a license, in exchange for which the first filer agrees to delay its entry.

**c)    Deterring entry via section viii statements.**

123.    As noted above, Congress provided a pathway for second filers to enter the market ahead of first filers, without their having to win patent litigation or get a license from the brand manufacturer. Second filers that enter the market pursuant to Section viii statements are not subject to the first filer's ANDA exclusivity period. By "carving out" from their ANDAs the uses covered the brand manufacturer's method-of-use patents, these second filers can enter the market without having won any patent litigation and without a license from the brand manufacturer.

124.    Unscrupulous brand manufacturers try to deter entry by these second filers with another type of deterrence clause. These clauses provide that if a second filer enters the market without having won patent litigation and without a license, the first filer's entry date is moved up to the date that the second filer enters. The clause thus prevents the second filer from having any period on the market as the only ANDA generic. The loss of that possibility reduces second filers' incentives to enter the market ahead of the first filer via Section viii statements. Again, in return for the deterrence clause the first filer agrees to delay entering the market.

125.    In short, the Hatch-Waxman Amendments leave open at least three pathways for second filers to enter the market before a first filer that has agreed to delay entry into the market. The second filer can win the patent litigation and trigger forfeiture of the first filer's 180-day ANDA exclusivity period if it fails to enter the market within 75 days of the favorable court decision. The second filer can negotiate an earlier entry date in an NDA-based license agreement with the brand manufacturer. And, the second filer can enter the market by means of a Section viii statement. The deterrence clauses work together to dissuade second filers from trying to enter the market before the first filer's agreed entry date, thereby compensating the first filer for agreeing to delay its entry into the market.

126.    The then-Chairman and CEO of Apotex, Inc.—one of the largest generic manufacturers in the world—testified to Congress that these clauses reduce incentives for second filers to continue to litigate for earlier market entry, harming purchasers and consumers:

> Consumers are the biggest losers under this system. If subsequent filers do not have the incentive to take on the cost of multimillion patent challenges these challenges will not occur. Weak patents that should be knocked out will remain in place, unduly blocking consumer access to generics. The challenges to brand patents by generic companies that Hatch-Waxman was designed to generate

will decrease. And settlements that delay consumer access to the
generic will, in turn, increase.[60]

127.     Through No-AG Payments and deterrence clauses, the brand manufacturer and

the first filer can work together to impair generic competition and split the resulting gains

between themselves.

## V.     FACTS

128.     Bausch filed, prosecuted, and listed at least 30 patents in the FDA Orange Book

as claiming Xifaxan 550 mg or its uses. Since the rifaximin compound itself was invented

decades earlier, these patents related to methods of using the drug and to specific polymorph

forms. Despite the fact that those patents were weak and could not, on their own merits, hold off

competition from generic versions of the drug, Bausch used them to achieve its goal of delaying

generic competition. It did so by paying first-filing generic Teva to delay its entry, thereby

blocking all other would-be competitors.

**A.     Bausch brings Xifaxan to market.**

**1.     Rifaximin was discovered in the early 1980s and initially approved for sale in
the United States by the FDA in 2004.**

129.     Rifaximin, the active ingredient in Xifaxan, has been widely used as an antibiotic

for decades. It was first approved in Italy in 1985 under the brand name Normix for the treatment

of various gastrointestinal maladies. The U.S. patent on the compound rifaximin has long since

expired.

---

[60] Statement of Bernard Sherman, CEO, Apotex, Inc., (March 31, 2009),
http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg67822/pdf/CHRG-111hhrg67822.pdf at 218.

130.    On December 21, 2001, Salix[61] submitted NDA No. 021361, seeking FDA

approval for rifaximin tablets to be marketed and sold in the United States under the brand name

Xifaxan 200 mg.

131.    On May 25, 2004, the FDA approved Xifaxan 200 mg for the treatment of

patients (>12 years of age) with travelers' diarrhea caused by noninvasive strains of *escherichia*

*coli*.

132.    On June 24, 2009, Salix submitted NDA No. 022554, seeking FDA approval for

rifaximin tablets to be marketed and sold under the brand name Xifaxan 550 mg, indicated for

the treatment the reduction in risk of overt hepatic encephalopathy ("HE") recurrence in adults.

133.    HE is a liver disease that affects the brain. For patients with HE, the liver does not

properly filter toxins from the blood, which can cause changes to the patient's mental state.

134.    On March 24, 2010, the FDA granted approval to NDA No. 022554 with respect

to the HE indication in patients ≥18 years of age.

135.    On June 7, 2010, Salix submitted a Supplemental New Drug Application

("sNDA") under NDA No. 021361, for Xifaxan 550 mg, introducing a new indication for the

treatment of irritable bowel syndrome with diarrhea ("IBS-D") in adults.

136.    Irritable bowel syndrome is characterized by symptoms including abdominal pain,

bloating, frequency, urgency, gas, and changed bowel habits, such as diarrhea, constipation, or

alternating diarrhea and constipation. IBS may be caused, for example, by abnormal motility,

abnormal muscular coordination, changes in the microbiome in the colon or small intestine,

---

[61] In 2015 Bausch paid roughly $11 billion to acquire Salix Pharmaceuticals Ltd. ("Salix").
Today, Salix is described by Bausch as a "segment" of its overall business. For consistency, and
since the wrongful conduct alleged in this complaint generally occurred after the 2015
acquisition, "Bausch" is generally used herein when discussing the conduct at issue.

intolerance to certain foods, or psychological factors. Subtypes of IBS include IBS with diarrhea (IBS-D), IBS with constipation (IBS-C), or IBS with alternating diarrhea and constipation (IBS-A). The IBS-D subtype comprises about one-third of IBS patients.

137.    On May 27, 2015, FDA approved the sNDA for Xifaxan 550 mg for the treatment of IBS-D in adults.

138.    At present, Bausch's 550 mg Xifaxan tablets are indicated for: (i) reduction in risk of overt hepatic encephalopathy recurrence in adults; and (ii) treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults, with each indication having a different dosing regimen.

**2.    Xifaxan was a blockbuster drug, accounting for the overwhelming majority of revenue for the Salix segment, and a substantial portion of Bausch's overall revenues.**

139.    Xifaxan represented the crown jewel of Salix's business and was a primary reason why Bausch acquired Salix in 2015.

140.    By 2017, Bausch's branded product segment was recognizing revenue of over $2.4 billion, and Xifaxan alone accounted for approximately 40% of that sum. And Xifaxan revenue was continuing to increase each year - from $979 million in 2017, to $1.195 billion 2018, to $1.452 billion in 2019.

141.    Following the delayed-entry settlement with Teva in September 2018, discussed in detail below, Xifaxan revenues (and its importance to Bausch's overall bottom line) continued to climb.

142.    Bausch has acknowledged to its investors that Xifaxan sales accounted for "approximately 80% of the Salix segment revenues and approximately 21% of [Bausch]'s revenues for 2023 and 2022, respectively." In comparison, "[n]o other single product group represented 10% or more of the company's Salix segment product sales."

143.    During that same time period, the Salix segment continued to recognize more than $2 billion in annual revenue, with profits of $1.489 billion in 2022 and $1.548 billion in 2023.

144.    In 2024, Bausch's annual U.S. revenues for its Salix segment was $2.333 billion, with sales of Xifaxan comprising over $1.9 billion of that as it was continuing to drive sales growth. And over the first half of 2025, U.S. sales of Xifaxan exceeded $987 million. The majority of those sales are for treatment of IBS-D.

145.    Xifaxan revenue was so critical that any expiration of its patent protection sooner than anticipated would adversely impact Bausch's future cash flows, result in shortened useful lives of Xifaxan's intangible assets, increase amortization expenses, and materially affect company operations.

**B.    Bausch amasses a patent portfolio of more than 20 patents, but all were weak or of limited scope.**

146.    The patents Bausch was relying upon to protect its Xifaxan cash cow fell into three general categories: (1) patents claiming various polymorphs of rifaximin (the "polymorph patents"); (ii) patents claiming methods of treating IBS with rifaximin (the "IBS patents"); and (iii) patents claiming methods of using rifaximin to treat hepatic encephalopathy (the "HE patents").

147.    As of December 31, 2015, Bausch had listed nearly two dozen patents in the Orange Book claiming aspects of Xifaxan 550 mg (ANDA 225554) and its uses, with expiration dates ranging from August 11, 2019 to October 2, 2029:

| Patent | Issue Date | Expiration | Submission | OB Codes | Coverage |
|--------|-----------|-----------|-----------|----------|----------|
| 6,861,053 | 03/01/2005 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |
| 7,452,857 | 11/18/2008 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |
| 7,605,240 | 10/20/2009 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |

| Patent | Issue Date | Expiration | Submission | OB Codes | Coverage |
|---|---|---|---|---|---|
| 7,718,608 | 05/18/2010 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |
| 7,935,799 | 05/03/2011 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |
| 8,309,569 | 11/13/2012 | 07/18/2029 | 06/18/2015 | U-1707, U-1708 | IBS |
| 7,045,620 | 05/16/2006 | 06/19/2024 | 2010 | DS | P |
| 7,612,199 | 11/03/2009 | 06/19/2024 | 2010 | DS, DP | P |
| 7,902,206 | 03/08/2011 | 06/19/2024 | 04/07/2011 | DS, DP | P |
| 7,906,542 | 03/15/2011 | 06/01/2025 | 04/07/2011 | DS, DP | P |
| 7,915,275 | 03/29/2011 | 02/23/2025 | 06/18/2015 | U-1707, U-1708 | P |
| 8,158,644 | 04/17/2012 | 06/19/2024 | 05/09/2012 | DP | P |
| 8,158,781 | 04/17/2012 | 06/19/2024 | 05/08/2012 | DS | P |
| 8,193,196 | 05/05/2012 | 09/02/2027 | 06/18/2012 | DS, DP, U-1707, U-1708 | P |
| 8,518,949 | 08/27/2013 | 02/27/2026 | 09/16/2013 | DP | P |
| 8,741,904 | 06/03/2014 | 02/27/2026 | 07/11/2014 | DS, U-1526, U-1707, U-1708 | P |
| 8,835,452 | 09/16/2014 | 06/19/2024 | 10/01/2014 | DS, DP | P |
| 8,853,231 | 10/07/2014 | 06/19/2024 | 11/05/2014 | DP | P |
| 8,642,573 | 02/04/2014 | 10/02/2029 | n/a | U-1481 | HE |
| 8,829,017 | 09/09/2014 | 07/24/2029 | 09/09/2014 | U-1562 | HE |
| 8,946,252 | 02/03/2015 | 07/24/2029 | 02/03/2015 | U-1481 | HE |
| 8,969,398 | 03/03/2015 | 10/02/2029 | 03/04/2015 | U-1481 | HE |

148.    In addition to patents, Bausch was also actively taking steps to prevent, or at least delay, would-be generic competition by filing Citizen Petitions ("CP") with the FDA seeking to stop the approval of any ANDA referencing Xifaxan unless certain bioequivalence and pharmaceutical equivalence criteria were satisfied. Two such petitions were filed in 2008 (the "2008 Bausch CP") and 2016 (the "2016 Bausch CP"). As discussed below, these petitions were largely rejected by the FDA, although they did result in some minor changes to the applicable draft guidance.

1.    **Patents claiming polymorphs of rifaximin.**

149.    Polymorphism is the ability of the same chemical compound, in solid form, to
exist in more than one crystal form. The different crystalline forms of the same compound are
called "polymorphs." One known way of obtaining different polymorphs of a compound is to
dissolve the compound in heated water or another solvent so it dissolves into a solution and then
cooling the solution to turn the dissolved compound into solid crystals which can then be
separated and dried.

150.    When water is used as part of the solvent system to form solid crystals, water
often becomes part of the crystalline form. A hydrate is a class of crystal form in which water is
inside of the crystal lattice. Rifaximin exists in at least five different polymorphic hydrate forms,
which are differentiated by the amount of water in the crystal form of each polymorph.
Polymorphic forms of a compound are conventionally given formal names using Greek, Roman
or Arabic letters or numerals. The five different rifaximin hydrate polymorphs are named alpha
(α), beta (β), gamma (γ), delta (δ), and epsilon (ε) rifaximin with each designation having a
specific water content or range of water content and each having a unique crystalline form, with
its own physical and analytical characteristics.

151.    The manufacturing conditions under which rifaximin is created may impact the
polymorphic form and thus the compound's properties; for example, polymorphic form β is the
most stable.

152.    Of the patents Bausch had listed in the Orange Book as of December 31, 2015,
twelve claim some of these rifaximin polymorphs. For example, the '620, '199, '206, '275, '542,
'644, '452, '231 and '781 patents claim the α, β, and γ rifaximin polymorphs, including those
made by a specific process, and uses for the same, while the '196, '949, and '904 patents claim

the δ and ε rifaximin polymorphs, including those made by a specific process, and uses for the same.

153.     All these polymorph patents were subject to invalidity challenges, and to the extent any of the patents could survive such a challenge, limitations, such as being specific to a type of polymorph or to specific properties or methods of making a given polymorph, provided a roadmap for a generic manufacturer to avoid infringing these patents.

**2.      Patents claiming methods of treating IBS with rifaximin.**

154.     Of the patents Bausch had listed in the Orange Book as of December 31, 2015, six claim methods of treating IBS-D with rifaximin.

155.     Five of these (the '053, '857, '240, '608, and '799 patents, all expiring on August 11, 2019) claimed certain methods of using rifaximin to treat patients with IBS, but without specific dosing regimens. Regardless of the merits of these patents, they could not have prevented any generic from entering the market after their August 11, 2019 expiration.

156.     The sixth (the '569 patent, expiring July 18, 2029) is directed to similar treatment indications, but has claims reciting specific dosing regimens. Over time, and as discussed below, Bausch would continue to obtain patents claiming methods of treating IBS-D using specific dosing regimens or target patients.

157.     The '569 patent and the other later expiring IBS-D patents are all subject to serious validity challenges and/or claim specific indications (such as a particular dosing regimen) that a generic manufacturer easily could (if the patent were upheld as valid) avoid.

**3.      Patents claiming methods of treating, reducing the risk of, or maintaining remission of hepatic encephalopathy recurrence with rifaximin.**

158.     Of the patents Bausch had listed in the Orange Book as of December 31, 2015, four claim treatment methods specific to HE through administering rifaximin.

159.    The '573 patent covers certain methods of "maintaining remission of hepatic encephalopathy" by "administering rifaximin daily to a subject for a period of about 12 months or longer."

160.    The '017 patent covers certain methods of using rifaximin at a dose of 1,000-1,200 mg/day and "cautiously" for the treatment of hepatic encephalopathy in patients who also have travelers' diarrhea and either a Child-Pugh Class C score or a model end stage liver disease score of 25 or greater.

161.    The '252 patent covers certain methods of using rifaximin to reduce the risk of HE recurrence in patients who have travelers' diarrhea and hepatic insufficiency.

162.    The '398 patent covers certain methods of using "rifaximin daily for a period of about 12 months or longer" to decrease a subject's risk of an HE breakthrough episode.

163.    These patents all claim methods of use specific to treating HE, so a generic could easily utilize section viii statements to avoid these patents and submit proposed labeling to the FDA that omits (or "carves out") the HE indications.

## C.    Teva files the first ANDA threatening Bausch's monopoly and is promptly sued by Bausch.

### 1.    December 18, 2015: Teva[62] files the first Xifaxan 550 mg ANDA.

164.    On December 18, 2015, Teva filed the first ANDA (No. 208959) seeking approval to manufacture, market, and sell a generic version of Xifaxan 550 mg.

165.    On February 11, 2016, Teva sent a Paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that certain patents listed in

---

[62] ANDA No. 208959 was filed by Actavis, which was acquired by Teva in August 2016. Since most of the events giving rise to this action occurred after that date, and for consistency, "Teva" is generally used throughout this Complaint.

the Orange Book for Xifaxan were invalid, unenforceable, or will not be infringed by the activities described in Teva's ANDA.

166.    On February 29, 2016, Teva issued a press release announcing that the FDA had accepted its Xifaxan ANDA and stating that it "believes it is the 'first applicant' to file an ANDA for the generic version of XIFAXAN 550 mg and, should its ANDA be approved, may be entitled to 180 days of generic market exclusivity."

167.    On March 23, 2016, Bausch filed suit against Teva in the U.S. District Court for the District of Delaware (the "Bausch-Teva Litigation"), alleging that Actavis infringed one or more claims of the '569, '573, '017, '252, '398, '620, '199, '206, '542, '275, '644, '781, '196, '949, '904, '452, '231, '053, '857, '240, '608, and '799 patents.

168.    Pursuant to the Hatch-Waxman Amendments, just by filing the suit Bausch triggered an automatic 30-month stay of the approval of Teva's ANDA.

169.    On May 24, 2016, Teva filed an answer to the claims, denying Bausch's allegations and asserting affirmative defenses and counterclaims: (1) denying that its rifaximin tablets would infringe claims of any of the asserted patents; (2) alleging that the asserted patents are invalid' and (3) alleging unenforceability (because of Bausch's inequitable conduct during prosecution) of one or more of the asserted patents.

**2.    Bausch continues to obtain, and list in the Orange Book, additional patents, leading to amendments to the complaint against Teva.**

170.    On June 14, 2016, Bausch filed its First Amended Complaint, adding the newly-issued and recently-Orange Book-listed U.S. patent 9,271,968 (the "'968 patent") to the suit.

171.    On July 1, 2016, Teva filed its Amended Answer and Counterclaims, which Bausch answered on July 18, 2016.

172. On December 12, 2016, Bausch filed its Second Amended Complaint, adding the recently-issued and newly-Orange Book-listed U.S. patent 9,421,195 (the "'195 patent") to the suit.

173. On December 27, 2016, Teva filed its Second Amended Answer and Counterclaims, which Bausch answered on January 10, 2017.

**3. Teva acquires Actavis, and the Court sets a trial date for January 29, 2018.**

174. Meanwhile, as Bausch was obtaining patents and amending its complaint, on August 2, 2016, Teva acquired Actavis and thereby became the owner of ANDA No. 208959 and a participant in the Bausch-Teva Litigation.

175. Around this same time, the court entered a case scheduling order, including scheduling a seven-day trial to begin on January 29, 2018.

**4. March 2017: The FDA decides two Salix/Bausch citizen petitions and issues revised draft guidance.**

176. On March 16, 2017, the FDA issued responses to two petitions that Salix/Bausch had filed (the "2008 Bausch petition" and the "2016 Bausch petition") asking the FDA to refuse to approve any Xifaxan ANDA that did "not contain scientifically appropriate data demonstrating bioequivalence (BE)."

177. The FDA noted that since the time it had issued prior draft guidance (November 29, 2011 for 200 mg strength Xifaxan and February 13, 2012 for 550 mg strength Xifaxan) "the sensitivity of bioanalytical assays for rifaximin have improved significantly" and as a result, the FDA had "revised the draft product-specific recommendations for both strengths of rifamixin tablets to include an option for demonstrating BE with in vitro dissolution studies and BE studies with PK endpoints for proposed generic rifaximin drug products that are Q1 [(qualitatively)] and Q2 [(quantitatively)] the same as Xifaxan." And, "for proposed generics that are Q1

[(qualitatively)] and Q2 [(quantitatively)] the same, [ANDA] applicants should conduct two two-treatment, two-period, crossover PK studies, one fasting and one fed."

178.   The FDA also noted that differences in the polymorphic form of rifaximin would *not* be a basis to withhold ANDA approval.

179.   Also on March 16, 2017, the FDA issued a revised draft guidance entitled "Draft Guidance on Rifaximin. Per the Federal Register notice, this was done simply to consolidate two prior guidances on the 200 mg (Nov 2011) and 550 mg (Feb 2012) and issue "a single guidance for industry on generic rifaximin tablets."

### 5.   The Bausch-Teva litigation continues

180.   Meanwhile, in early 2017 Teva and Bausch were busy briefing claim construction issues and discussing which specific patents and claims would be at issue in the Bausch-Teva litigation.

181.   On May 10, 2017, the parties agreed to a roughly one-year suspension of the litigation, that would last until April 30, 2018, and also agreed that the 30-month stay on FDA approval shall be extended until February 12, 2019 (or a later date calculated based on the length of the litigation stay). As a result, all scheduled litigation activities, including the June 8, 2017 *Markman* hearing and the January 2018 trial date, were indefinitely removed from the Court docket.

182.   The parties subsequently requested to extend the stay four more times, ultimately extending the litigation stay to October 1, 2018, and the regulatory bar on approval of Teva's ANDA to the later of December 28, 2019, or the period of time during which the action remained stayed after May 15, 2017.

D.    **Bausch pays Teva to delay its entry.**

1.    **Bausch and Teva both have a history of using Hatch-Waxman settlements to recognize value for themselves, while harming purchasers.**

183.    Facing imminent generic erosion, Bausch engaged in a scheme to block generic competition by paying Teva to delay its market entry until January 1, 2028 and, in doing so, ensuring that other generic entrants were blocked as well. Once it secured its (delayed) entry date and authorized generic rights, Teva was no longer incentivized to devote its resources to pursuing the earliest approval date for its still-pending ANDA.

184.    For decades it has been part of Teva's corporate strategy to settle Hatch-Waxman patent cases in ways that provide it "value" beyond what the statute itself provides. A primary way that Teva extracts this value is by insisting on contract provisions that create "exclusivities" that the statute itself does not provide.

185.    These contractual exclusivities—none of which is authorized or otherwise contemplated by the Hatch-Waxman Amendments—include No-AG clauses (see IV.C.1 above), and deterrence clauses (see IV.C.2 above). As late as 2018, it was common for Teva to insist on such provisions as part of settling its Hatch-Waxman litigations.

186.    For its part, Salix's parent company (then known as Valeant) had such an unsavory history of anticompetitive conduct that it was hauled before a Congressional Committee in 2016. Representative Cummings highlighted Salix's exploitation of a brand prescription drug called Glumetza, whose price Salix had suddenly raised by 800% over a six week period. He noted that Salix had "raise[d] the prices astronomically [for a] temporary period of time before other competitors enter the market."

187.    This was not a new move for Bausch, who had a history of acquiring a branded drug product and raising the price 800%+. In order to placate Congress, Valeant's then-CEO

testified to the U.S. Senate on April 27, 2016 that "it was a mistake to pursue, and in hindsight I regret pursuing, transactions where a central premise was a planned increase in the prices of the medicines." And he gave them the false comfort that, going forward, "[w]e expect our pricing actions to track industry norms."

188.    Yet, at that very moment, Valeant and Salix were concealing from Congress exactly why Salix was able to take the dramatic price increases on Glumetza. Salix had paid its generic competitor to delay entry into the market. That payment took two basic forms: (1) a No-AG clause; and (2) deterrence clauses. Salix took the price increases on Glumetza during the period of delayed generic entry that it had bought from the generic competitor in exchange for those payments.

189.    In the wake of the Congressional investigations, in 2016 Valeant got a new CEO and a new General Counsel. On July 13, 2018, Valeant changed its name to Bausch Health Companies Inc.—a public-relations gambit to try to distance itself from its unsavory past.

190.    But the new management team was keenly aware of the enormous profits that Salix gained from the reverse payments that it had made—and failed to disclose to Congress— with respect to Glumetza. And in 2018 when generic Xifaxan was poised to enter the market, Bausch and Salix were under enormous financial pressure. Bausch was in the midst of a multi-year effort to restructure its operations and to pay off debt. Xifaxan was key to those efforts— Salix had recently heavily invested in a sales force centered on Xifaxan, which accounted for more than 68% of the pharmaceutical unit's revenues in 2018.

191.    So Bausch responded to the prospect of generic Xifaxan with the same anticompetitive strategy that had been used with respect to Glumetza. Bausch paid its generic competitor to delay entry so that it could continue to reap unwarranted profits on a key drug.

Bausch provided Teva with the same type of reverse payments that it had used with respect to Glumetza, including: (1) a No-AG agreement; and (2) deterrence clauses.

192.    On September 12, 2018, before the Court was able to weigh in on the merits of Xifaxan patents, Bausch announced the settlement of the Bausch-Teva Litigation. That deal pushed Teva's entry date far beyond the date merited by the strength of Bausch's patents. Absent that unlawful deal, Teva in fact would have entered the market far sooner than January 1, 2028.

193.    Bausch's press release trumpeting the settlement stated that Teva was given the option, beginning on January 1, 2028 (or earlier if another generic Xifaxan product entered the market), to "(1) market a royalty-free generic version of XIFAXAN 550 mg tablets, should it receive approval from the U.S. Food and Drug Administration on its Abbreviated New Drug Applicant, or (2) to market an authorized generic version of XIFAXAN 550 mg tablets with drug supply being provided by Salix. In the case an authorized generic is marketed, the volume of the authorized generic will be subject to manufacturing and supply quantities until final patent expiry, and Bausch Health will receive an undisclosed share of the economics from [Teva] on its sales of an authorized generic."

194.    While (for obvious reasons) the press release does not mention it, the economics of the deal struck between Bausch and Teva necessarily include a promise by Bausch *not* to launch an AG during Teva's initial launch period because the terms of the deal make Bausch launching an AG during that period uneconomic (i.e., less profitable than just sharing the supracompetitive profits flowing from Teva's volume-limited launch). This "no-AG agreement" by Bausch means that for that period of time Teva would be the only generic Xifaxan 550 mg on

the market,[63] allowing Teva to sell more generic product, at a far higher price, than it could if Bausch marketed an authorized generic in competition with Teva. As a result, even accounting for a royalty payment and the volume limit, Teva almost certainly comes out ahead and makes more profit than it could have had it won the litigation.

195.    As discussed above, when generic products enter the market, they rapidly garner 80-90% or more of the total unit sales (brand and generic) of the drug. The number of generic products does not typically affect the number of unit sales that the brand loses to the generics, or the rate at which it loses them (though it does affect the price of the generic product). The brand manufacturer is going to quickly lose the overwhelming majority of the unit sales regardless of whether one, two, or more generics enter the market.

196.    Consequently, in a market free from unlawful agreements, it makes economic sense for brand manufacturers of big-selling drugs facing market entry by a generic with eligibility for the 180-day ANDA Exclusivity Period to launch their own authorized generics, and they almost always do so. Doing so allows them to capture a portion of the lost revenue that otherwise would only flow to the generic seller. In such case, when a first-to-file generic enters the market with 180-day ANDA Exclusivity, purchasers typically benefit from competition between *two* generics: (1) the first-to-file ANDA generic's product and (2) the brand's authorized generic. Since these generics will compete on price, initially the two-generic price is typically 50% of the brand price (as compared to 85% when only one generic is in the market). Fairly rapidly it will drop to 10% or lower.

---

[63] Given Teva's first-to-file status, both Teva and Bausch understood that no other ANDA generic filer would be able to obtain final approval from the FDA until Teva had been on the market for 180 days.

197. Bausch and Teva were both very familiar with these economic realities. However, Bausch had pledged to Congress that it had mended its ways. So, Bausch and Teva disguised the payment, using economic subterfuge, rather than an open, straightforward contractual commitment, to accomplish Bausch's no-AG promise to Teva.

198. The structure of the deal makes it economically irrational for Teva to launch its own ANDA product and face competition from Bausch's AG product. By offering Teva the option of selling a volume-limited Bausch-supplied AG product, the parties ensured that each of them would win, and drug purchasers would lose.

**2.      There is no reason why Bausch and Teva would structure the deal as they did unless they were trying to obfuscate a payment.**

199. The Bausch-Teva agreement nominally provides Teva with two pathways to entry, but as discussed above, simple economics dictate which path will be chosen. The Bausch-Teva agreement was structured so as to mask payments designed to ensure that Bausch and Teva would allocate the market amongst themselves and share undeserved monopoly profits in exchange for Teva delaying market entry of a generic competitor.

200. The combination of both royalty payments and volume-limited sales – contractual provisions that have each independently been found anticompetitive – makes the Bausch-Teva agreement a particularly harmful market allocation agreement.

201. The Bausch-Teva no-AG agreement is simply an allocation of the market for generic Xifaxan sales. It is anticompetitive, and there is nothing pro-competitive about those terms in the settlement.

202. If Teva were to choose the first option and launch its own ANDA product, it would enjoy 180 days free from other ANDA competition. But it would almost certainly face generic competition from an authorized generic from Bausch.

203.    Were that to happen, the price Teva could charge would decrease substantially (from ~85% to no more than 50% of the brand price.) And Teva would lose a substantial portion of potential sales. Bausch was already capable of supplying the entire market; a reasonable, competitively acting company in Teva's position would have been ready, willing, and able to supply half of the market or more. So, it is likely the two generic products would split the generic sales roughly 50/50. Using reasonable assumptions based on historical market trends, Teva could expect to make roughly $247.5 million on generic sales during the first 180 days on the market.[64]

204.    As discussed below, if Teva were to choose the second option and sell only a fixed number of pills at the one-generic price with the parties "shar[ing] of the economics" it would do significantly better. And so would Bausch, as the two companies that should be competing instead become partners sharing supracompetitive profits. But consumers would be harmed – not only by having to wait longer to have the option of purchasing a generic Xifaxan, but also by paying a higher one-generic price once entry did occur. This is shown by the

---

[64] This figure assumes a 2028 market size of roughly $2.2 billion in brand sales of Xifaxan, which is conservative given the current market size ($1.993 billion in 2024) and reasonable assumptions on future growth. Applying a 90% generic penetration rate during the first 6 months, a 50% generic price discount with two generics (Teva's ANDA product and an AG) on the market), and an equal split of the generic unit sales as between Teva and the AG. Total generic sales would be $495 million ($1.1 billion * 90% * 50%), and a half share of that would be $247.5 million. While Bausch would also make $247.5 million in AG sales, it would make an additional $110 million in brand sales during this time.

following chart, which compares the generic price in a competitive market with that in a market tainted by an anticompetitive agreement such as the one entered into by Bausch and Teva:



205.    Bausch has acknowledged that the volume of Teva's authorized generic sales "will be subject to manufacturing and supply quantities until final expiry." While, for obvious reasons a bit opaque, this is an admission by Bausch that there is a ceiling as to how many pills Teva may sell at the one-generic price. And as discussed above, volume limits are simply another tactic used by brand manufacturers to allocate the market between itself and the settling generic.

206.    By definition, the volume limit placed on Teva's generic sales will serve to restrict the amount of generic units that will be sold starting in January 2028. And the gap will *not* be made up with authorized generic sales from Bausch because it has no economic incentive to launch an authorized generic under those circumstances. With Teva's sales capped at a specific number, additional generic sales above that limit come at the expense of a higher-priced brand sale. In short, any volume limit that is below the expected rate of generic substitution would mean that any AG sales would simply be cannibalizing higher-priced brand sales. Since

Bausch can simply sell the higher-priced brand Xifaxan rather than a lower-price authorized generic, it will always choose to do so. There is a broad range of volume limits that make it economically irrational for Bausch to launch its own authorized generic, and there is no reason why Bausch would do so. As a result of this artificial scarcity of generic supply, purchasers only have available the limited quantity of authorized generic product and, once that is gone, no choice but to purchase the higher-priced brand product.

207. While the precise volume limit in the Bausch-Teva deal is unknown at this time, it is likely set at a percentage that ensures both Teva and Bausch make more make more money than they would in an open, competitive market. As a result, Teva was motivated to delay its entry until January 2028.

208. When Bausch announced that it would be sharing the economics with Teva, it was acknowledging that the Bausch-Teva agreement contains a profit-sharing provision, whereby Teva would be sharing some of its ill-gotten profits with Bausch. Given Bausch's history, it is not surprising that they tried to obscure this fact.

209. By shifting some portion of Teva's profit back to Bausch, the royalty provision serves to shift the "acceptable" (to Teva and Bausch) range of Teva sales discussed above. Bausch could do better receiving a royalty on a higher-priced single-generic than it could by selling its own authorized generic at a lower 2-generic price.

210. Up to a point, the higher the royalty rate is, the more generic sales Bausch is willing to give Teva.

211. In other words, the profit-share provision deters Bausch from launching its own AG, as doing so would be in its own economic *dis*interest. Unless they were so high that Teva would have been *dis*incentivized to accept them.

212.    Of course, Bauch and Teva did not have to settle their dispute on these unlawful terms. They were free to, and should have, negotiated a settlement based on the merits of the patent dispute. Instead, they negotiated over the quantity of generic product Teva would be allowed to sell (volume limit), the portion of profits Teva would send back to Bausch (the profit-share), and the period of time Teva would wait to begin selling generic product (delay).

**3.    The deterrence payments.**

213.    Bausch also paid Teva to delay its entry into the market by deterring other generic manufacturers from entering the market before Teva. Bausch agreed to deter those threats to Teva; in exchange, Teva agreed to delay entry until January 2028.

214.    When crafting the terms of their agreement, Bausch and Teva knew that other generic manufacturers would pose a competitive threat to each of them. In September 2018 Xifaxan 550 mg annual sales were already at the blockbuster level, and Teva was about to agree to delay unrestrained competition for more than nine years. This created the incentive and ability for other generic manufacturers to try to enter the market before Teva to get a period of *de facto* market exclusivity—*i.e.*, to be the only ANDA generic on the market.

215.    As explained above, Congress provided at least three pathways for second filers to enter the market ahead of a first filer that agreed to such a substantially delayed entry: (a) via successful litigation; (b) via a license from the brand manufacturer; and (c) via section viii statements.

216.    Bausch agreed to contractual provisions designed to help protect Teva from the threat of subsequent filers beating Teva to the market by allowing Teva to accelerate its entry in the event that a subsequent filer entered before January 2028. Those provisions deterred subsequent filers from trying to reach the market ahead of Teva.

217.    *First*, Bausch's payments to Teva included a clause that prevents second filers from entering the market ahead of Teva by winning a patent challenge against Bausch. Under the settlement, Bausch gave Teva the right to launch whenever a second filer receives an appellate court ruling affirming that all the patents entitling Teva to 180-day exclusivity are invalid and/or not infringed. The clause allows Teva to move up its entry date while also retaining its ANDA exclusivity. Without the clause, Teva would forfeit its ANDA exclusivity by failing to enter the market within 75 days of an appellate court affirming that judgment.

218.    *Second*, Bausch agreed to advance Teva's entry date in the event that a subsequent filer were to enter the market by any means, including the use of section viii statements.  For example, if Teva were to forfeit exclusivity by failing to obtain timely approval, another generic could obtain approval and enter the market by addressing one set of patents (*e.g.*, the HE patents) using section viii statements and winning litigation with respect to another set of patents (*e.g.*, the polymorph and IBS patents).  Again, absent this clause, Teva would be stuck on the sidelines while these more enterprising generic manufacturers entered the market long before Teva's delayed January 2028 date.

219.    *Third*, Bausch also agreed that if Bausch were to grant a license to any manufacturer to enter the market before Teva's delayed date of January 1, 2028, Teva's agreed entry date would be moved up to the second filer's earlier date.

220.    Thus, Bausch and Teva arranged that second filers could not get ahead of Teva—despite its agreement to a 9+ year delay—via a litigation victory against Bausch or a license from Bausch.

221.    These provisions eliminated pathways that Congress provided for second filers to enter the market ahead of first filers that have agreed with the brand manufacturer to delay entering the market with competing generic products.

222.    In exchange for the no-AG payment and these additional payments from Bausch, Teva agreed to delay entry into the market until January 1, 2028.

**4.    The payments from Bausch to Teva were large and unexplained.**

223.    Given the limited publicly available information, calculating the value of the payments from Bausch to Teva with mathematical precision is difficult. However, based on the economics discussed above, the payments from Bausch to Teva were possibly in excess of $300 million, which is why Teva agreed in 2018 to delay entry until January 2028.

224.    Without the no-AG payment, Teva would face competition from Bausch's authorized generic during the 180-day ANDA exclusivity period. The no-AG agreement allows Teva to capture the entire generic market at a higher price. Even accounting for the volume-limiting factor and the profit share, Teva made substantially more revenue under the agreement than it otherwise would have, more than doubling its revenues.

225.    For example, assuming a volume limit of 60% and a price with one generic on the market of 85% of the brand price, Teva could expect to make $561 million before accounting for any royalty payments during its first 180 days on the market.[65] Even if a 25% royalty rate were factored in, Teva would still make $420.75 million.

226.    The size of the payment to Teva is the difference between Teva's sales with the no-AG pact (likely $420.75-$561 million) and its sales in a competitive market ($247.5 million),

---

[65] $1.1 billion million in brand sales * 60% volume-limited generic rate * 85% generic price = $561 million.

or somewhere between $173.25-$313.5 million.  The size of the payment could be higher or lower depending on the exact volume limitation and royalty rate contained in the Bausch/Teva agreement, neither of which have been disclosed, but is under any circumstances large and unexplained.

227.    In addition to the enormous value given to Teva, the reverse payment represented an economic sacrifice by Bausch.  In a competitive market, Bausch would have earned $247.5 million (about equal to what Teva would have earned) by marketing its own authorized generic. Of course, the anticompetitive profits that Bausch will earn by delaying generic competition until 2028 will far outweigh that sacrifice.

228.    The size of the payment also far exceeds the litigation costs that Bausch saved by settling the patent case. Bausch saved less than $10 million in litigation costs by settling.  Thus, Bausch's agreement to forgo AG sales of $247.5 million cannot be explained as merely an effort to avoid incurring litigation costs. It is instead explained as a successful effort to impair and delay generic competition.

229.    Bausch and Teva's anticompetitive agreement has forced Xifaxan 550 mg purchasers marketwide to pay, and unless enjoined by this Court will continue to force them to pay, unlawful supracompetitive prices, totaling nearly two billion dollars every year.

**E.    Bausch announces that the Teva settlement added four years to the "useful life" of Xifaxan.**

      **1.    Prior to paying Teva, Bausch expected generic competition to begin by 2024.**

230.    Before the unlawful agreement with Teva, Bausch considered the "useful life" of Xifaxan to be ending in 2024. However, as Bausch made clear in its 2019 Annual Report, the settlement with Teva extended that period significantly; while Bausch did not disclose in the

SEC filing the *means* that it used to secure the deal—an unlawful No-AG Payment—it did report the *effect* of the deal:

> "Effective September 12, 2018 [the date of the Teva deal], the Company changed the estimated useful life of its Xifaxan 550 mg®-related intangible assets **due to the positive impact of an agreement between the Company and [Teva]** resolving the intellectual property litigation regarding Xifaxan 550 mg® tablets. Under the agreement, the parties have agreed to dismiss all litigation related to Xifaxan 550 mg® tablets, and all intellectual property protecting Xifaxan 550 mg® will remain intact and enforceable. **As a result, the useful life of the Xifaxan 550 mg® related intangible assets was extended from 2024 to January 1, 2028."**

231.    Extending the monopoly profits from Xifaxan was enormously consequential for Bausch's bottom line. In 2020 Xifaxan accounted for more 75% of the Salix segment's revenues, while no other product produced even as much as 10% of the Salix revenues, and Xifaxan accounted for fully 24% of Bausch's revenues company-wide—more than the revenue generated by two of Bausch's other entire product segments.

232.    The financial markets, while kept in the dark as to *how* Bausch got Teva to accept the 2028 entry, had no doubt as to the deal's enormous value to Bausch given the weakness of its patents. When valuing a brand manufacturer's stock price, analysts assess the likely outcome of generic manufacturers' challenges to the brand's patents. Settlements without reverse payments do not significantly affect stock prices, on average, indicating they usually meet traders' expectations about generic entry. In contrast, stock prices tend to increase after a settlement with reverse payments because the generic entry date has been delayed beyond traders' expectations.

233.    On September 12, 2018, Bausch announced the generic-entry date that it had paid Teva to accept. The stock market was shocked. Immediately upon Bausch's announcement, its stock price skyrocketed. The stock price rose 14% on the first day of trading after the announcement, adding a billion dollars to Bausch's market capitalization:



234.    Bausch did not advise investors that it had paid Teva to accept the near decade-long delay in entering the market. Instead, it misleadingly—falsely—reported in its SEC filings that "[t]he Company will not make any financial payments or other transfers of value as part of the agreement."

**2.    Bausch continues to obtain, and list, patents.**

235.    Throughout the pendency of the Bausch-Teva litigation, Bausch continued to obtain additional patents purporting to cover novel aspects of using rifaximin to treat IBD-S and HE and list them in the Orange Book.  As of July 31, 2019, Bausch had listed the following unexpired patents:

| Patent | Issue Date | Expiration | Submission | OB Codes | Coverage |
|---|---|---|---|---|---|
| 6,861,053 | 03/01/2005 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |
| 7,452,857 | 11/18/2008 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |

| Patent | Issue Date | Expiration | Submission | OB Codes | Coverage |
|---|---|---|---|---|---|
| 7,605,240 | 10/20/2009 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |
| 7,718,608 | 05/18/2010 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |
| 7,935,799 | 05/03/2011 | 08/11/2019 | 2015 | U-1707, U-1708 | IBS |
| 7,045,620 | 05/16/2006 | 06/19/2024 | 2010 | DS | P |
| 7,612,199 | 11/03/2009 | 06/19/2024 | 2010 | DS, DP | P |
| 7,902,206 | 03/08/2011 | 06/19/2024 | 04/07/2011 | DS, DP | P |
| 7,906.542 | 03/15/2011 | 06/01/2025 | 04/07/2011 | DS, DP | P |
| 7.915.275 | 03/29/2011 | 02/23/2025 | 06/18/2015 | U-1707, U-1708 | P |
| 8,158,644 | 04/17/2012 | 06/19/2024 | 05/09/2012 | DP | P |
| 8,158,781 | 04/17/2012 | 06/19/2024 | 05/08/2012 | DS | P |
| 8,193,196 | 06/05/2012 | 09/02/2027 | 06/18/2012 | DS, DP, U-1707, U-1708 | P |
| 8,518,949 | 08/27/2013 | 02/27/2026 | 09/16/2013 | DP | P |
| 8,741,904 | 06/03/2014 | 02/27/2026 | 07/11/2014 | DS, U-1526, U-1707, U-1708 | P |
| 8,835,452 | 09/16/2014 | 06/19/2024 | 10/01/2014 | DS, DP | P |
| 8,853,231 | 10/07/2014 | 06/19/2024 | 11/05/2014 | DP | P |
| 9,271,968 | 03/01/2016 | 02/27/2026 | 06/08/2016 | DP | P |
| 8,309,569 | 11/13/2012 | 07/18/2029 | 06/18/2015 | U-1707, U-1708 | IBS |
| 8,642,573 | 02/04/2014 | 10/02/2029 | 2015 | U-1481 | HE |
| 8,829,017 | 09/09/2014 | 07/24/2029 | 09/09/2014 | U-1562 | HE |
| 8,946,252 | 02/03/2015 | 07/24/2029 | 02/03/2015 | U-1481 | HE |
| 8,969,398 | 03/03/2015 | 10/02/2029 | 03/04/2015 | U-1481 | HE |
| 9,421,195 | 08/23/2016 | 03/10/2030 | 10/11/2016 | U-1481 | HE |
| 9.629.828 | 04/25/2017 | 07/24/2029 | 04/27/2017 | U-1994 | HE |

**F.    Additional generics seek to enter the market, while Bausch continues amassing weak patents, and leveraging them to ensure most generics fall in line.**

236.    Even after the announcement of the Bausch-Teva settlement, numerous other generics pursued ANDAs seeking to sell generic rifaximin. Three generic manufacturers filed Xifaxan ANDAs in 2019. Two, Sun Pharmaceutical Industries Ltd. ("Sun") and Sandoz, Inc. ("Sandoz"), were deterred from litigating and reached settlements. However, the third, Norwich,

did not settle. It litigated the patents to a trial which it largely won, confirming the weakness of the majority of Bausch's patent protection. As discussed below, however, Norwich remains bottlenecked behind by Teva due to the unlawful agreement to delay entry into 2028.

**1. Sun Pharmaceuticals files an ANDA and gets sued.**

237.    In early 2019 Sun submitted an ANDA (No. 213042) to the FDA, seeking authorization to manufacture, market and sell a generic version of Xifaxan 200 mg.

238.    By way of a letter dated March 11, 2019, Sun notified Bausch that it had submitted its ANDA and provided a Paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that the certain patents listed in the FDA's Orange Book for Xifaxan 200 mg are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Sun's generic product.

239.    On April 24, 2019, Bausch initiated a patent lawsuit against Sun in April 2019 in the U.S. District Court for the District of Delaware asserting the '620, '199, '206, '542, '644, '781, '452, '231, '275, '196, '8,949, '904, '968, & '115 patents.

240.    On June 24, 2019, Sun filed its Answer, Affirmative Defenses, and Counterclaim to Bausch's complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

241.    On July 15, 2019, Bausch filed its Answer to Sun's Counterclaims.

**2. Sandoz files and ANDA and gets sued.**

242.    In 2019 Sandoz submitted an ANDA with a Paragraph IV certification to the FDA seeking authorization to market a generic version of Xifaxan 550 mg.

243.    By way of a letter dated September 4, 2019, Sandoz notified Bausch that it had submitted its ANDA and provided a Paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that certain patents listed in the FDA's Orange

Book for Xifaxan 550 mg are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Sandoz's generic product.

244.    On September 30, 2019, Bausch began a patent lawsuit against Sandoz in the U.S. District Court for the District of New Jersey asserting the '620, '199, '206, '542, '275, '644, '781,'196, '569, '8,949, '904, '452, '231, & '968 patents.

245.    On December 16, 2019, Bausch filed an amended complaint, adding infringement claims relating to the '384 patent, which had issued on October 29, 2019.

246.    On January 15, 2020, Sandoz filed its Answer and Counterclaim to Bausch's Amended Complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

247.    On February 5, 2020 Bausch answered Sandoz's counterclaims.

**3.    Norwich files two ANDAs and gets sued.**

248.    On or about December 19, 2019, Norwich submitted ANDA No. 214369, seeking approval for both IBS-D and HE indications and included Paragraph IV certifications to a number of the Orange Book-listed patents.

249.    On December 20, 2019, Norwich submitted ANDA No. 214370, seeking FDA approval to market generic rifaximin 200 mg. Norwich's 200 mg ANDA (No. 214370) did not include any Paragraph IV certifications.

250.    By way of a letter dated February 14, 2020, Norwich notified Bausch that it had submitted its ANDA and provided a Paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that certain patents listed in the FDA's Orange Book for Xifaxan 550 mg are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Norwich's generic product.

251.    On March 26, 2020, Bausch began a patent lawsuit against Norwich in the U.S. District Court for the District of Delaware (the "Bausch-Norwich Litigation") asserting the '620, '199, '206, '542, '275, '644,
 '781, '196, '569, '949, '573, '904, '017, '452, '231, '252, '398, '968, '195, '9,828, '4,828, '397, & '384 patents.

252.    On June 1, 2020, Norwich filed its answer and affirmative defenses to Bausch's complaint.

**4.    Sandoz settles with Bausch.**

253.    On May 6, 2020, Bausch announced that it had entered a settlement with Sandoz pursuant to which Sandoz agreed to refrain from selling generic Xifaxan 550 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

254.    Of course, at the time of this settlement, Sandoz was well aware of Teva's first-to-file status (and resulting 180 day ANDA exclusivity) and the basic terms of the Bausch-Teva agreement.

255.    In particular, Sandoz was aware of the deterrence clauses in the Bausch/Teva agreement. As noted above, those clauses had the purpose and effect of precluding later filers, such as Sandoz, from entering the market before Teva's unlawfully delayed entry date. Those anticompetitive clauses significantly diminished Sandoz's incentives to continue litigating its patent challenges against Bausch. Absent the unlawful restraints, Sandoz would have had multiple paths to earlier entry, including (i) after a litigation victory, (ii) an "at risk" launch as to any patents not carved out of its ANDA pursuant to a section viii statement, or (iii) under a lawful license from Bausch.

256.    Bausch and Teva's unlawful agreement prevents certainty as to what would have happened if they had not exchanged payment for delay. But it is certain that Sandoz would have had multiple paths to entering the market far sooner than January 2028—the date that Sandoz accepted given that Teva *did* delay in exchange for payments and that the agreement *did* include the deterrence clauses.

257.    Absent the unlawful restraints in the Bausch/Teva agreement, Sandoz's generic Xifaxan 550 mg would already be on the market. Indeed, given the fact that Sandoz received tentative approval of its ANDA on December 29, 2020, it is possible it could have already been on the market for over 4 years.

**5.    Sun adds the 550 mg product to its ANDA, and quickly settles.**

258.    While the Bausch-Sun lawsuit over Sun's 200 mg ANDA was pending, in or about August 2020, Sun submitted a Paragraph IV certification to the FDA, seeking authorization to market a generic version of Xifaxan 550 mg.

259.    By way of a letter dated August 10, 2020 Sun sent Bausch a Notice of Paragraph IV certification asserting that the U.S. patents listed in the FDA's Orange Book for Xifaxan 550 mg were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Sun's generic product.

260.    On September 22, 2020, shortly after Bausch received Sun's Paragraph IV certification regarding Xifaxan 550 mg and before any lawsuit over the implicated patents was filed, Bausch and Sun entered into an agreement by which Sun agreed to refrain from selling generic Xifaxan 550 mg and 200 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

261. Of course, at the time of this settlement, Sun, like Sandoz, was well aware of Teva's first-to-file status (and resulting 180 day ANA exclusivity) and the basic terms of the Bausch-Teva agreement.

262. In particular, Sun was aware of the deterrence clauses in the Bausch/Teva agreement. Those clauses deterred Sun, from trying to enter the market before Teva's unlawfully delayed entry date. And absent the unlawful restraints in the Bausch/Teva agreement, Sun would have not settled for a January 2028 licensed entry date—the date that the unlawful restraints caused Sun to accept—but would have had multiple paths to earlier entry, including: (i) after a litigation victory; (ii) an "at risk" launch as to any patents not carved out of its ANDA pursuant to a section viii statement; or (iii) under a lawful license from Bausch.

263. Absent the unlawful restraints in the Bausch/Teva agreement, Sun's generic Xifaxan 550 mg would already be on the market.

**G. Bausch files another Citizen Petition.**

264. On January 15, 2021, the FDA received another CP from Bausch (the 2021 Bausch CP). Once again, Bausch asked the FDA to refrain from approving any ANDA referencing Xifaxan unless certain bioequivalence and pharmaceutical equivalence criteria were satisfied.

265. As discussed below, the FDA would once again largely deny the 2021 Bausch CP.

**H. Norwich proceeds to trial and invalidates a substantial portion of Bausch's Xifaxan patent portfolio.**

266. In March 2022, the trial court in the Bausch-Norwich Litigation held a multi-day bench trial as to certain representative Xifaxan patents.

267.    Bausch had initially asserted twenty-six patents, but shortly after the close of evidence, Bausch and Norwich submitted a stipulation significantly narrowing the claims and patents at issue. In particular, the parties' stipulation provided for a final judgment of non-infringement to be entered "with respect to Norwich's current ANDA No. 214369, including the current ANDA Product and any use of the current ANDA Product, concerning each claim of the '620, '542, '275, '644, '781, '196, '949, '904, '017, '452, '231, '252, '398, '968, '9,828, '4,828, '384, '763, and '694 patents and also provided that Norwich's counterclaims of invalidity with respect to those same patents be dismissed without prejudice.

268.    The stipulation also provided that a final judgment of non-infringement be entered "with respect to Norwich's current ANDA No. 214369, including the current ANDA Product and any use of the current ANDA Product, concerning claims 2 and 4-16 of the '667 patent, claims 1-3 and 5-7 of the '199 patent, claims 1-33, 35, and 37-57 of the '206 patent, claims 2-5 of the '573 patent, claims 2-4 and 7-12 of the '195 patent, and claims 2-8 and 13 of the '397 patent" and also provided that Norwich's counterclaims of invalidity with respect to those same patents be dismissed without prejudice.

269.    As a result of the stipulation, Bausch was proceeding on specific claims of seven patents:

- Claim 4 of the '199 polymorph patent which claims rifaximin in polymorphic form β wherein the rifaxmin has certain x-ray powder diffraction pattern peaks and a water content of greater than 5%;

- Claim 36 of the '206 polymorph patent which claims a pharmaceutical composition comprising of (1) rifaximin in polymorphic form β wherein the rifaxmin has certain x-ray powder diffraction pattern peaks and a water content of between 4.5% and 40% and (2) an acceptable excipient or carrier;

- Claim 6 of the '195 HE patent which has three elements: (1) reducing the risk of HE occurrence; (2) by orally administering 550 mg of rifaximin twice daily; (3) for a period of 12 months or longer;

- Claim 8 of the '573 HE patent which has three elements: (1) maintaining remission of HE; (2) by administering 550 mg of rifaximin; (3) for a period of 12 months or longer;

- Claim 11 of the '397 HE patent which has four elements: (1) reducing the risk of a breakthrough overt HE episode; (2) by administering 550 mg of rifaximin twice daily; (3) for a period of about 12 months; (4) to a patient having a certain "Conn" score;

- Claim 12 of the '397 HE patent which has five elements: (1) reducing the risk of a breakthrough overt HE episode; (2) by administering about 1000 mg to about 1200 mg of rifaximin daily; (3) for a period of about 12 months; (4) to a patient having a certain "Conn" score; (5) "further comprising administering lactulose;

- Claim 2 of the '569 IBS-D patent which has two elements: (1) administering rifaximin 550 mg 3 times a day for 14 days; and (2) after stopping rifaximin achieving 12 weeks of adequate relief;

- Claim 3 of the '667 IBS-D patent which has three elements: (1) administering rifaximin 550 mg 3 times a day for 14 days; (2) to treat IBS-D; (3) in a subject 65 years of age or older.

270.     And Bausch and Teva had agreed that any judgment as to these claims "shall apply to each patent claims from which that [claim] depends. For avoidance of doubt, this [applied] to claim 1 of the '569 patent, claim 1 of the '667 patent, claim 34 of the '206 patent, claims 1 and 6-7 of the '573 patent, claims 1 and 5 of the '195 patent, or claims 1 and 9 of the '397 patent."

271.     Following a multi-day trial, the U.S. District Court for the District of Delaware issued a final judgment on August 10, 2022, (the "Norwich Judgment"), finding the representative polymorph patents and IBS-D patents invalid as being obvious.

272.     As to the representative claims of the two polymorph patents, the court found "clear and convincing" evidence that claim 4 of the '199 patent and claim 36 of the '206 patent were obvious in light of well-known prior art and common knowledge.

273.     In particular, as to claim 4 of the '199 patent, the Court found that a piece of prior art (Cannata) discloses processes for preparing a crystalline form of rifaximin which, given its

strong antibacterial properties and low bioavailability, would have motivated a person of skill in the art (POSA) to evaluate it as a drug candidate. A POSA would also have been motivated to characterize that rifaximin, performing routine testing for water content and hydration formation, and would have had a reasonable expectation of success in characterizing the claimed polymorph β.

274.    As to claim 36 of the '206 patent, the Court found that rifaximin had previously been formulated as a pharmaceutical composition comprising acceptable excipient or carriers. And the only difference between those prior teachings and claim 36 was the characterization of the polymorphic form β so, for the same reasons claim 4 of the '199 patent was invalid as obvious, so was claim 36 of the '206 patent.

275.    The district court's findings apply equally to the other claims Bausch had previously asserted but later withdrew. The court found the polymorph claims invalid because the prior art taught the preparation and use of crystalline rifaximin, and that one skilled in the art had good reason to use routine techniques to characterize the crystalline rifaximin produced by the prior art which would have led to detection of the polymorph β form claimed and asserted as present in the accused product. The other polymorphic forms of rifaximin would similarly been detected by routine characterization of the crystalline rifaximin produced by the prior art and the other rifaximin polymorph patent claims differ only in minor variations of excipients, hydration levels, or pharmaceutical formulation—none of which, under the court's obviousness analysis, would have conferred patentability. Accordingly, the other polymorph patent claims likewise would have been found invalid as obvious had they been tried.

276.    As to the representative claims of the two IBS-D patents, the court found "clear and convincing" evidence that they were invalid as obvious in light of well-known prior art.

277.    The Court found that several pieces of prior art reported success in treating IBS with rifaximin, providing "strong evidence that a POSA would have a motivation to use rifaximin for the treatment of IBS-D." A POSA would also "have had the motivation to select an optimal dosing regimen" from within the known range of 10-14 days and would have been motivated to use a larger tablet to reduce a patient's pill burden and improve compliance. Finally, given prior art describing rifaximin use to treat IBS-D in patients 65 years and older, a POAS would have had a reasonable expectation of success of doing so.

278.    Similarly, although the court adjudicated only representative claims of the IBS-D patents, under its reasoning, the other, untried claims would also have been found obvious. The court held that rifaximin's use in treating IBS-D was well-known in the art, that the dosage and duration recited in the representative claims were within the prior art ranges, and that the claimed age subgroup (patients 65 and older) did not present any unexpected results. The other claims Bausch withdrew vary only in immaterial respects—such as the inclusion of treatment endpoints like "adequate relief," or other dosing regimens that fall within the art-taught range and likewise would have been found invalid as obvious had they been tried. The claims of Bausch's later acquired U.S. Patent No. 11,779,571, and 11, 564,912 are similar to the IBS-D patent treatment claims the court found invalid and/or that Bausch withdrew from consideration, but for specifying that the subject being treated is a female. However, the court's obviousness analysis would apply equally to those claims, and specifying the treatment is for female subjects (compared to the general population of those 65 years or older) similarly does not confer patentability to those claims.

279.    As to the representative claims of the HE patents, the Court found them to be valid and infringed by Norwich's ANDA Product as described in its then-current ANDA.

280.    Following the Court's decision, Norwich amended its ANDAs to include section viii statements (instead of Paragraph IV certifications) to the HE patents. But the FDA still only granted it tentative approval in light of Teva's blocking position as a still-unapproved first-to-file.

281.    On appeal, the Federal Circuit affirmed the trial court's decision.

**I.    The FDA decides Bausch's 2021 CP.**

282.    On September 2, 2022, the FDA issued its response to the 2021 Bausch petition. In its response, the FDA rejected Bauch's arguments concerning the polymorph profile and ingredient sameness, *in vitro* dissolution testing for bioequivalence, clinical endpoint BE studies, and systemic PK studies. Bausch's requests as to each of these were denied in full.

283.    The FDA did grant one small aspect of the Bausch 2021 CP, relating to a provision in the 2017 Draft Guidance on Rifaximin allowing for certain waiver of PK and CEBE studies. While noting "that there were limitations in the design of [the study relied upon by Bausch] affecting its ability to support a definitive conclusion," there was some evidence raising scientific concerns about the waivers.

284.    So the FDA indicated that it would be issuing revised *Draft Guidance on Rifaximin* that would remove the option of seeking "a biowaiver for a PK BE study on the 550 mg strength or, for non-Q1/Q2 formulations, a CEBE study on the 200 mg strength."

285.    This revised draft guidance was issued in November 2022.

**J.    Norwich received tentative approval, but remains bottlenecked behind Teva and thus unable to come to market.**

286.    The FDA granted tentative approval to Norwich's ANDA No. 214370 (on September 2, 2022) and to Norwich's ANDA No. 214369 (on June 2, 2023).

287.    Norwich's final ANDA approvals remain bottlenecked behind both Teva and the 30-month stay resulting from Bausch's lawsuit.

**K.    Additional generics file ANDAs, but remain blocked from entering the market.**

288.    In 2024, four additional generic companies filed ANDAs. However, all remain unable to come to market due to, *inter alia*, remaining bottlenecked behind Teva and having final approval blocked by the 30-month stay imposed as a result of the lawsuits Basuch filed against each.

**1.    The Xifaxan patent landscape as of December 31, 2023.**

289.    Throughout this period of time, Bausch continued to obtain, and list in the Orange Book, patents that it asserted were valid and claimed Xifaxan or uses of Xifaxan. To summarize, the following patents were listed in the Orange Book for Bausch's NDA 225554, covering the 550 mg product, as of December 31, 2023:

| Patent | Issue Date | Expiration | Submission | OB Codes | Coverage |
|---|---|---|---|---|---|
| 7,045,620 | 05/16/2006 | 06/19/2024 | 2010 | DS | P |
| 7,612,199 | 11/03/2009 | 06/19/2024 | 04/07/2011 | DS, DP | P |
| 7,902,206 | 03/08/2011 | 06/19/2024 | 04/07/2011 | DS, DP | P |
| 7,906.542 | 03/15/2011 | 06/01/2025 | 04/07/2011 | DS, DP | P |
| 7.915.275 | 03/29/2011 | 02/23/2025 | 06/18/2015 | U-1707, U-1708 | P |
| 8,158,644 | 04/17/2012 | 06/19/2024 | 05/09/2012 | DP | P |
| 8,158,781 | 04/17/2012 | 06/19/2024 | 05/08/2012 | DS | P |
| 8,193,196 | 06/05/2012 | 09/02/2027 | 06/18/2012 | DS, DP, U-1707, U-1708 | P |
| 8,518,949 | 08/27/2013 | 02/27/2026 | 09/16/2013 | DP | P |
| 8,741,904 | 06/03/2014 | 02/27/2026 | 07/11/2014 | DS, U-1526, U-1707, U-1708 | P |
| 8,835,452 | 09/16/2014 | 06/19/2024 | 10/01/2014 | DS, DP | P |
| 8,853,231 | 10/07/2014 | 06/19/2024 | 11/05/2014 | DP | P |
| 9,271,968 | 03/01/2016 | 02/27/2026 | 06/08/2016 | DP | P |
| 8,309,569 | 11/13/2012 | 07/18/2029 | 06/18/2015 | U-1707, U-1708 | IBS |

| Patent | Issue Date | Expiration | Submission | OB Codes | Coverage |
|---|---|---|---|---|---|
| 10,456,384 | 10/29/2019 | 02/26/2029 | 11/12/2019 | U-2643 U-2644 | IBS |
| 10,703,763 | 06/07/2020 | 02/26/2029 | 07/14/2020 | U-1708 U-2847 U-2848 | IBS |
| 10,765,667 | 09/08/2020 | 02/26/2029 | 10/19/2020 | U-2643 U-2644 | IBS |
| 11,564,912 | 01/31/2023 | 02/26/2029 | 02/02/2023 | U-3511 U-3512 | IBS |
| 11,779,571 | 10/10/2023 | 02/26/2029 | 10/23/2023 | U-3706 | IBS |
| 8,642,573 | 02/04/2014 | 10/02/2029 | 2014 | U-1481 | HE |
| 8,829,017 | 09/09/2014 | 07/24/2029 | 09/09/2014 | U-1562 | HE |
| 8,946,252 | 02/03/2015 | 07/24/2029 | 02/03/2015 | U-1481 | HE |
| 8,969,398 | 03/03/2015 | 10/02/2029 | 03/04/2015 | U-1481 | HE |
| 9,421,195 | 08/23/2016 | 03/10/2030 | 10/11/2016 | U-1481 | HE |
| 9,629,828 | 04/25/2017 | 07/24/2029 | 04/27/2017 | U-1994 | HE |
| 10,314,828 | 06/11/2019 | 07/24/2029 | 07/01/2019 | U-1481 | HE |
| 10,335,397 | 07/02/2019 | 07/24/2029 | 07/24/2019 | U-2579 | HE |
| 10,709,694 | 07/14/2020 | 07/24/2029 | 07/23/2020 | U-2579 | HE |

290.    Certain of these patents could not lawfully be listed in the Orange Book, yet Bausch did so anyway.

**2.    Amneal files an ANDA and gets sued.**

291.    In or about January 2024, Amneal Pharmaceuticals of New York, LLC and Amneal EU, Limited (collectively "Amneal") submitted an ANDA (No. 218862) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets (the "Amneal ANDA Product").

292.    Amneal's ANDA includes a Paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or not infringed by the Amneal ANDA Product. Amneal's ANDA seeks FDA approval for the treatment of IBS-D.

293.    On or about February 27, 2024, Amneal sent a notice letter and detailed statement as to its Paragraph IV certification to Bausch, asserting that the Amneal ANDA Product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the

Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

294.    On April 5, 2024, Bausch filed a patent infringement lawsuit against Amneal under the Hatch-Waxman Amendments, in the United States District Court for the District of New Jersey alleging that Amneal's ANDA product would infringe the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

295.    On January 16, 2025, the FDA granted tentative approval to Amneal's Xifaxan ANDA.

296.    Amneal's final ANDA approval remains bottlenecked behind both Teva and the 30-month stay resulting from Bausch's lawsuit.

**3.    Zydus files an ANDA and gets sued.**

297.    In or about July 2024, Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited (collectively "Zydus") submitted an ANDA (No. 218650) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets (the "Zydus ANDA Product").

298.    Zydus's ANDA includes a Paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or not infringed by the Zydus ANDA Product. Zydus's ANDA seeks FDA approval for the treatment of IBS-D.

299.    On or about August 15, 2024, Zydus sent a notice letter and detailed statement as to its Paragraph IV certification to Bausch, asserting that the Zydus ANDA Product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, '196, '949, '904, '968, and '763 patents.

300.    On September 27, 2024, Bausch filed a patent infringement lawsuit against Zydus under the Hatch-Waxman Amendments, in the United States District Court for the District of

New Jersey alleging that Zydus ANDA product would infringe the '571, '912, '196, '949, '904, '968, and '763 patents.

301.    Bausch and Zydus subsequently negotiated a Confidential Settlement and License Agreement, and on August 19, 2025, the Court entered a stipulation dismissing Bausch's patent infringement claims.

302.    Zydus's ANDA approval remains bottlenecked behind Teva.

**4.    Cipla files an ANDA and gets sued.**

303.    In or about August 2024 Cipla USA, Inc., and Cipla Limited (collectively "Cipla"), submitted an ANDA (No. 219570) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets (the Cipla ANDA Product").

304.    Cipla's ANDA includes a Paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or not infringed by the Cipla ANDA Product. Cipla's ANDA seeks FDA approval for the treatment of IBS-D.

305.    On or about September 18, 2024, Cipla sent a notice letter and detailed statement as to its Paragraph IV certification to Bausch, asserting that the Cipla ANDA Product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, and '196 patents.

306.    On November 1, 2024, Bausch filed a patent infringement lawsuit against Cipla under the Hatch-Waxman Amendments, in the United States District Court for the District of New Jersey alleging that Cipla's ANDA product would infringe the '571, '912, and '196 patents.

307.    Cipla's ANDA approval remains bottlenecked behind both Teva and the 30-month stay resulting from Bausch's lawsuit.

**5.      Carnegie files an ANDA and gets sued.**

308.     In or about September 2024 Carnegie Pharmaceuticals LLC and Carnegie Pharma
Limited (collectively "Carnegie"), submitted an ANDA (No. 219892) to the FDA, seeking FDA
approval for its rifaximin 550 mg tablets (the "Carnegie ANDA Product").

309.     Carnegie's ANDA includes a Paragraph IV certification that Bausch's relevant
patents are invalid, unenforceable, and/or not infringed by the Carnegie ANDA Product.
Carnegie's ANDA seeks FDA approval for the treatment of IBS-D.

310.     On or about October 1, 2024, Carnegie sent a notice letter and detailed statement
as to its Paragraph IV certification to Bausch, asserting that the Carnegie ANDA Product would
not infringe any valid and enforceable claim of the various patents that Bausch had listed in the
Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including
the '571, '912, and '196 patents.

311.     On November 7, 2024, Bausch filed a patent infringement lawsuit against
Carnegie under the Hatch-Waxman Amendments, in the United States District Court for the
District of New Jersey alleging that Carnegie ANDA product would infringe the '571, '912, and
'196 patents.

312.     Bausch and Carnegie subsequently negotiated a Confidential Settlement and
License Agreement, and on June 23, 2025, the Court entered a stipulation dismissing Bausch's
patent infringement claims.

313.     Carnegie's ANDA approval remains bottlenecked behind Teva.

**6.      Saba files an ANDA and gets sued.**

314.     In or about February 2025, Saba Ilac Sanayi ve Ticaret A.S. ("Saba") submitted
an ANDA (No. 219940) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets (the
"Saba ANDA Product").

315.     Saba's ANDA includes a Paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or not infringed by the Saba ANDA Product. Saba's ANDA seeks FDA approval for the treatment of IBS-D.

316.     On or about February 20, 2025, Saba sent a notice letter and detailed statement as to its Paragraph IV certification to Bausch, asserting that the Saba ANDA Product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, '196 and '115 patents.

317.     On April 4, 2025, Bausch filed a patent infringement lawsuit against Saba under the Hatch-Waxman Amendments, in the United States District Court for the District of New Jersey alleging that Saba ANDA product would infringe the '571, '912, '196 and '115 patents.

318.     Bausch and Saba subsequently negotiated a Confidential Settlement and License Agreement, and on August 21, 2025, the parties filed a Stipulation of Dismissal with respect to Bausch's patent infringement claims.

319.     Saba's ANDA approval remains bottlenecked behind Teva.

**7.     Alkem files an ANDA and gets sued.**

320.     In or about April 2025, Alkem Laboratories Ltd. ("Alkem") submitted an ANDA (No. 220451) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets (the "Alkem ANDA Product").

321.     Alkem's ANDA includes a Paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or not infringed by the Alkem ANDA Product. Alkem's ANDA seeks FDA approval for the treatment of IBS-D.

322.    On or about April 28, 2025, Alkem sent a notice letter and detailed statement as to its Paragraph IV certification to Bausch, asserting that the Alkem ANDA Product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, and '196 patents.

323.    On June 10, 2025, Bausch filed a patent infringement lawsuit against Alkem under the Hatch-Waxman Amendments, in the United States District Court for the District of New Jersey alleging that the Alkem ANDA product would infringe the '571, '912, and '196 patents.

324.    Bausch and Alkem subsequently negotiated a Confidential Settlement and License Agreement, and on August 14, 2025, the parties filed a Stipulation of Dismissal with respect to Bausch's patent infringement claims.

325.    Alkem's ANDA approval remains bottlenecked behind Teva.

## VI.    WITHOUT BAUSCH'S PAYMENTS TO TEVA, GENERIC COMPETITION WOULD HAVE ALREADY BEGUN

326.    Bausch's unlawful agreement with Teva has forestalled generic entry of Xifaxan 550 mg. The agreement prompted Teva to give up on its patent challenge and to accept a delayed market entry of up to nine years. The agreement also created disincentives for second filers to litigate the Xifaxan 550 mg patents to conclusion. Without the unlawful payments to Teva, generic competition may have begun much earlier than January 2028, and it is virtually certain that several generics would have already entered the market by now.

### A.    Bausch's Weak Patents Could Not Prevent Generic Entry.

327.    The Bausch-Teva Litigation involved 24 patents (either asserted by Bausch against Teva or introduced by Teva in its declaratory judgment counterclaims). Teva had strong

defenses as to the IBS-D and polymorph patents, as evidenced by the district court's 2022 decision in the Bausch-Norwich litigation. To the extent the HE patents were held valid, Teva could have also taken action to avoid the HE patents and get to market significantly earlier than January 2028. There was no valid business reason for Teva to agree to wait until 2028 to enter the market with its generic Xifaxan 550 mg.

328.    As described above, the patents asserted against Teva as of the date of the 2018 settlement fell into four groups: (1) IBS method of treatment patents expiring on August 11, 2019; (2) IBS-D method of treatment patents with specific dosing regimens and/or target subjects expiring in 2029; (3) polymorph patents expiring between June 2024 and September 2027; and (4) HE method of treatment patents expiring in 2029.

**1.    The patents expiring on August 11, 2019 provided no basis for Teva to delay entry until 2028.**

329.    As to the first group, those patents would all expire on August 11, 2019 and thus, even if they were valid, infringed and enforceable, they presented no reason for Teva to agree to wait beyond August 11, 2019 to enter the market, let alone wait until 2028.

**2.    The IBS-D method of treatment patents provided no basis for Teva to delay entry until 2028.**

330.    Teva had strong validity challenges to all of the IBS-D patents, including the method of treatment patents with specific dosing regimens and/or target subjects expiring in 2029, which were exceptionally vulnerable to being invalidated. The federal courts did indeed invalidate the representative claims of the '569 and '667 patents in the later Bausch-Norwich Litigation.

**3.    The polymorph patents provided no basis for Teva to delay entry until 2028.**

331.    Similarly, Teva had strong validity challenges to all of the polymorph patents and those patents were exceptionally vulnerable to being invalidated, as again evidenced by the

invalidation in the Bausch-Norwich Litigation of the representative claims of the '199 and '206 patents, which claimed the polymorphic form β of rifaximin.

332.    Furthermore, the latest expiring polymorphic rifaximin patent was the '196 patent expiring on September 2, 2027, directed to processes for making pharmaceutical compositions of the delta and epsilon polymorphic forms of rifaximin. So that patent, even if valid, could not justify Teva's agreement to delay its entry into January 2028. And Teva had solid noninfringement defenses to all of the delta and epsilon polymorphic rifaximin patents (including the '196 patent), because the rifaximin used by Teva was neither the delta or epsilon forms.

333.    And in any event, the 2027 expiration date of the '196 patent could not warrant Teva waiting until 2028 to enter the market; nor could the earlier '949 and '762 patents (directed to the delta and epsilon forms of rifaximin), which expire on February 27, 2026.

**4.    The HE patents, to the extent valid, could have been simply carved out by Teva, and thus provided no basis for Teva to delay entry until 2028.**

334.    As for the patents directed to HE, separate and apart from any invalidity and noninfringement defenses, Teva could have eliminated all of those patents as a barrier to entry by simply amending its ANDA to include a section viii statement to them and carving the HE indications out of its label. Thus, they too did not present a reason to wait until 2028 to enter the market.

**B.    Teva would have entered by now.**

335.    Absent the unlawful reverse payment, a reasonable generic company in the position of Teva would have launched generic Xifaxan 550 mg much earlier than January 1, 2028. This launch could have occurred: (1) "at risk" (before a judicial determination as to the Xifaxan patents); (2) after litigating victoriously with respect to the Xifaxan patents; or (3) under a lawful license from Bausch.

336.    Absent the unlawful reverse payments, a reasonable and competitively acting company in Teva's position would have begun marketing generic Xifaxan 550 mg years earlier than the agreed January 2028 licensed entry date.

337.    Notably, the payments that Bausch made to Teva were more than Teva could have made *even if it had litigated and won the patent case*. As described in detail above, if Teva had litigated and won, it would have made about $247.5 million during the 180-day ANDA Exclusivity Period. Under the unlawful pact, Teva likely stands to make more like $420.75 million, meaning Bausch's payments were likely worth $173.25 million more than Teva could have made by competing.

338.    Most Hatch-Waxman patent cases are settled without a reverse payment. Absent the unlawful payments, Bausch and Teva might have settled the patent case—lawfully—rather than litigating to conclusion. If Bausch and Teva had not exchanged a payment for delay, their economic interests would still have likely led to their settling the patent litigation. Given each party's economic circumstances, their mutual interests would likely have led to an agreement that licensed Teva to enter before now, years sooner than the delayed January 2028 licensed entry date.

339.    Alternatively, if the parties had not settled, Teva would have won the patent case, at least with respect to the IBS-D and polymorph patents. As discussed in detail below, another generic manufacturer—Norwich Pharmaceuticals—in fact litigated essentially the same patent case against Bausch and won. Norwich had filed its ANDA much later than Teva did, so Norwich did not receive its favorable ruling until August 2022 in the district court, and April 2024 in the court of appeals. Teva would have received its similar rulings much earlier, as the Bausch-Teva Litigation likely would have gone to trial by some point in 2019.

340.    Upon information and belief, the Bausch-Teva Litigation and the resulting, unlawful settlement affected FDA and Teva's behavior with respect to Teva's ANDA and disrupted Teva's progress in obtaining FDA approval. With entry delayed until January 2028 and the option of selling a Bausch-supplied AG product, per the settlement, Teva was not incentivized to seek approval of its own ANDA. A reasonable and competitively acting company in Teva's position, however, would have sought and obtained FDA approval at the earliest opportunity.

341.    Following the favorable district court decision and court of appeals ruling, Teva (who, as the sole first-filer, would not have been blocked by any regulatory exclusivity) would already have obtained FDA approval and be on the market.

**C.    Other generics would have entered by now.**

342.    Further, the final FDA approvals and market entry of at least three other generic manufacturers have been bottlenecked behind Teva's 180-day ANDA Exclusivity. Absent the unlawful reverse payments, Teva would have already launched a generic Xifaxan 550 mg, and its 180-day ANDA Exclusivity would have expired long ago.

343.    In the absence of Teva's 180-day ANDA Exclusivity, the FDA would have already granted final approval to these other generic manufacturers, and they too would have already launched their generic versions. Absent the unlawful deal, the market for Xifaxan 550 mg would already be enjoying robust competition. Purchasers would be paying less than $4.50 per pill rather than the $52 dollars per pill they are continuing to pay today.

## VII.    MARKET EFFECTS

344.    By impeding competition from generic Xifaxan 550 mg, Defendants' anticompetitive conduct has caused Plaintiff to pay more than it would have paid for Xifaxan 550 mg. Entry of Teva's generic Xifaxan 550 mg would have given purchasers the choice

between branded Xifaxan 550 mg and AB-rated generic substitutes of Xifaxan 550 mg, which are priced substantially below the brand. Many purchasers would have bought the lower-priced generic drugs rather than the higher-priced branded Xifaxan 550 mg.

345.    Every State's pharmacy substitution laws require or encourage pharmacies to substitute AB-rated generics for branded prescription pharmaceuticals whenever possible. Absent the Defendants' anticompetitive conduct, Plaintiff and other purchasers would have saved billions of dollars by paying less for branded Xifaxan 550 mg and purchasing generic Xifaxan 550 mg. Defendants' anticompetitive conduct caused Plaintiff to incur overcharges on their purchases of branded Xifaxan 550 mg.

346.    Absent the Defendants' anticompetitive conduct, immediately upon Teva's entry into the market, Bausch, as a rational economic actor seeking to recoup lost branded sales, would have sold authorized generic Xifaxan 550 mg in competition with Teva.

347.    The economic rationality of marketing an authorized generic (absent an unlawful No-AG pact) is confirmed by Bausch's conduct. Bausch has a subsidiary, Oceanside Pharmaceuticals, Inc., that it uses to launch authorized generic versions of its products, and Bausch has launched authorized generics for more than 50 of its NDA products. In the absence of a no-AG pact, Bausch markets authorized generics when its branded drugs first experience generic competition. For example, it did so with respect to its drugs Syprine and Uceris immediately following Teva's generic entries for those products.

348.    Defendants' anticompetitive conduct maintained and extended the Xifaxan 550 mg monopoly. As a result of the delay, only the branded product is available today. Bausch has fully exploited that monopoly, taking consistent and exorbitant price increases. Absent the

Defendants' unlawful conduct, Teva and others would have entered the market by now or otherwise before Teva's 2028 licensed entry date.

349.    Today the price of a 14-day supply of branded Xifaxan 550 mg is more than $2,184—12 times more than the $189 price that full generic competition would have delivered. And Bausch would have responded to the generic competition by also substantially lowering the price of branded Xifaxan 550 mg for the few patients who might have continued buying it.

## VIII.   CLASS ALLEGATIONS

350.    Plaintiff, on behalf of itself and all other end payor class members, seeks damages, measured as overcharges, trebled, against Defendants based on allegations of anticompetitive conduct in the market for Xifaxan, and its AB-rated generic equivalents.

351.    Plaintiff brings this action under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), on behalf of itself and as the representative of an end payor class defined as follows:

> All end payors (including any assignees of such end payors) in the United States and its territories and possessions, including the Commonwealth of Puerto Rico, who indirectly purchased and/or paid all or part of the purchase price of Xifaxan or its AB-rated generic equivalent, other than for resale, from any one of the Defendants at any time on or after January 1, 2021 through and including the date that the anticompetitive effects of Defendants' unlawful conduct cease (the "Xifaxan Class Period").

352.    Excluded from the end payor class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities

353.    Members of the end payor class are so numerous that joinder is impracticable. Plaintiff believes that the class numbers in the many scores of entities. Further, the end payor class is readily identifiable from information and records in Defendants' possession.

354.    Plaintiff's claims are typical of those of each of the members of the end payor class. Plaintiff and each of the class members were damaged by the same wrongful conduct of Defendants, i.e., as a direct and proximate result of Defendants' wrongful conduct, they paid

artificially inflated prices for Xifaxan and were deprived of the benefits of earlier and robust competition from cheaper generic versions of the products.

355.    Plaintiff will fairly and adequately protect and represent the interests of the end payor class. Plaintiff's interests coincide with, and not antagonistic to, the interests of the end payor class members.

356.    Plaintiff is represented by counsel with experience in prosecuting class action antitrust litigation, with particular experience in class action antitrust litigation involving pharmaceutical products.

357.    Questions of law and fact common to the class members predominate over questions that may affect only individual class members, because Defendants have acted on grounds generally applicable to the entire class, thereby making the recovery of overcharge damages with respect to the end payor class as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

358.    Questions of law and fact common to the end payor class include, but are not limited to:

- whether the Defendants conspired to willfully maintain and/or enhance Bausch's s monopoly power over Xifaxan, and its generic equivalents;

- whether Defendants conspired to suppress generic competition in Xifaxan;

- whether Bausch and Teva entered into an unlawful agreement in restraint of trade;

- whether, pursuant to such agreements in restraint of trade, Teva agreed to delay its entry into the market with a generic version of Xifaxan;

- whether, pursuant to such agreements in restraint of trade, Bausch paid Teva to delay its entry into the market with a generic version of Xifaxan;

- whether Bausch's payments to Teva were for a purpose other than delayed entry of generic Xifaxan;

- whether Bausch's payments to Teva were necessary to yield a procompetitive benefit that is cognizable and non-pretextual;

- whether the September 2018 Bausch-Teva Settlement was unlawful under the rule of reason;

- whether Bausch possessed market power or monopoly power in the relevant market(s);

- whether Defendants' above-described conduct has substantially affected interstate and intrastate commerce;

- whether, and to what extent, Defendants' conduct caused antitrust injury (*i.e.*, overcharges) to Plaintiff and class members; and

- the *quantum* of aggregate overcharge damages to Plaintiff and class members.

359.    Class action treatment is the superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this action as a class action.

360.    Plaintiff knows of no special difficulty that would be encountered in this action that would preclude its maintenance as a class action.

361.    Certification of the class is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

362.    Defendants' wrongful actions are generally applicable to the class members as a whole, for which Plaintiff seeks, *inter alia*, damages and equitable remedies.

## IX.    MARKET POWER

363.    At all relevant times, Bausch has had market power over Xifaxan 550 mg and its generic equivalents. Bausch has the power to maintain the prices of those drugs at supracompetitive levels without losing sufficient sales to make the supracompetitive prices unprofitable.

364.    Direct evidence of Bausch's market power includes the following: (a) Bausch's internal business records will show that it forecast that, when generic Xifaxan 550 mg enters the market, it will rapidly take most of the Xifaxan 550 mg unit sales, at substantially reduced prices; (b) internal business records of Teva and other generic manufacturers will show that they forecast that, when generic Xifaxan 550 mg enters the market, it will rapidly take most of the Xifaxan 550 mg unit sales, at substantially reduced prices; (c) Bausch's gross margin on Xifaxan 550 mg (including the costs of ongoing research/development, marketing, selling, and administrative expenses) has been more than 80% since at least 2015; (d) Bausch never lost Xifaxan 550 mg sales or lowered the price of Xifaxan 550 mg to the competitive level in response to the pricing of other brand or generic drugs; and (e) from 2015 to 2023, Bausch has profitably raised the price of Xifaxan 550 mg a cumulative total of more than 100%.

365.    Since acquiring Xifaxan in 2015 Bausch has raised the price of Xifaxan 550 mg from $26 per pill in 2015 to $52 per pill in 2024. IBS-D patients must take Xifaxan 550 mg three times a day for 14 days. So a 14-day regimen of Xifaxan 550 mg costs purchasers $2,184.

366. This chart shows the price per pill of Xifaxan 550 mg from 2015 through mid-2024:



Xifaxan Price Per Pill (USD)

Source: Medicaid National Average Drug Acquisition Cost (NADAC) Data

367. Bausch's 100% price increase during that period was more than three times greater than the increase in the Consumer Price Index.

368. The price increases were completely detached from its production costs for Xifaxan, which remained stable, and the price increases far outpaced any increases in Bausch's other Xifaxan-related expenses.

369. Bausch's price hikes also cannot be attributed to ongoing research and development (R&D) costs. For example, Bausch's net revenue from U.S. sales of Xifaxan 550 mg in 2023 was about $1.8 billion That year the R&D expenditures of *the entire Bausch enterprise* were less than a third of that amount.

370. The high profit margin of Xifaxan 550 mg and its lack of generic competition were a prime motivation in Bausch's purchase of Salix. A press release by Valeant specifically

identified the "Expected Near-Term Approval for [Xifaxan's] IBS-D Indication" as an

"Additional Catalyst for Future Growth[.]" ᵒᴮᴶ

371.    Bausch's power to profitably raise price above the competitive level results in

substantial part from a significant imperfection in the United States marketplace for prescription

pharmaceuticals. Branded drug manufacturers can exploit this imperfection to obtain or maintain

market power.

372.    Markets function best when the person responsible for paying for a product is also

the person who chooses which product to buy. When the same person has both the product

choice and the payment obligation, the product's price plays an appropriate role in the person's

choice and, consequently, manufacturers have an appropriate incentive to reduce their prices to

the competitive level.

373.    The pharmaceutical marketplace is characterized by a "disconnect" between

product selection and the payment obligation. State laws prohibit pharmacists from dispensing

many pharmaceutical products, including Xifaxan 550 mg, to patients without a prescription.

The prohibition on dispensing certain products without a prescription creates this disconnect.

The patient's doctor chooses which product the patient will buy, while the patient (and in most

cases his or her insurer) has an obligation to pay for it.

374.    Brand manufacturers, including Bausch, exploit this price disconnect by

employing large sales forces that visit doctors' offices and persuade them to prescribe the brand

manufacturers' products. These sales representatives do not advise doctors of the cost of the

branded products. Moreover, studies show that doctors typically are not aware of the relative

costs of brand pharmaceuticals and, even when they are aware, are largely insensitive to price

differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

375.    The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up. This reduced price elasticity, in turn, gives brand manufacturers the ability to raise prices substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Xifaxan 550 mg.

376.    The majority of Bausch's sales of Xifaxan 550 mg are for the IBS-D indication. Bausch does not discriminate in price based on whether the drug is being dispensed for the IBS-D indication or another indication, including the HE indication. Therefore, Bausch's pricing of the drug is driven by the competition it faces for use in treating IBS-D.

377.    No other prescription pharmaceuticals for IBS-D constrain Xifaxan's price to the competitive level. Bausch has long boasted that the absence of such competition affords it very substantial pricing power. For the last nine years Bausch has highlighted in statements to its investors that its increases in annual revenue are "attributable to price increases implemented subsequent to [Xifaxan's] acquisition."[66]

---

[66] 2017 Annual Report at 75, Valeant, https://www.annualreports.com/HostedData/Annual ReportArchive/b/NYSE_BHC_2017.pdf (last visited Sept. 12, 2025).

378.    Xifaxan has distinct qualities and characteristics that distinguish it from other drugs indicated to treat IBS-D. Xifaxan 550 mg tablets contain rifaximin, a semisynthetic, rifamycin-based, non-systemic antibiotic with low gastrointestinal absorption rates and a broad-spectrum activity against both Gram-negative and -positive bacteria.

379.    Rifaximin is active in the small intestine due to its high bile solubility. The drug's pharmacokinetic properties limit its systemic effects and can restore microflora imbalances by modulating gut-immune signaling and decreasing bacterial adherence to epithelial cells. Consequently, rifaximin has become a major therapeutic agent in several gastrointestinal diseases in which microflora may play a role, especially in treatment of IBS-D.

380.    In contrast, for example, prescription alosetron (brand name Lotronex) is intended only for severe cases of IBS-D in women who have not responded to other treatments; it is not approved for use by men.[67] Until recently, Lotronex was subject to a Risk Evaluation and Mitigation Strategy program that required a showing that the patient did not have anatomic or biochemical abnormalities of the gastrointestinal tract, and that they had not responded adequately to conventional therapy.

381.    Similarly, the active ingredient in prescription eluxadoline (brand name Viberzi) is listed in Schedule IV of the Controlled Substances Act, and clinical trial data suggest that eluxadoline may produce psychological dependence.

382.    A course of treatment with Xifaxan 550 mg (three pills daily for 14 days) costs $2,184; a course of treatment with alosetron (twice daily for four weeks) or eluxadoline (twice

---

[67] *See* Lotronex label, FDA, https://accessdata.fda.gov/drugsatfda_docs/label/2008/021107 s013lbl.pdf (last visited Sept. 12, 2025).

daily for four weeks) costs $294 and $1,400, respectively. That is, Xifaxan 550 mg commands a price premium of 700% and 150% over these other prescription products.

383.    Bausch's price for Xifaxan 550 mg is at least 10 times greater than the price of generic Xifaxan 550 mg if three or more generic competitors were in the market, and at least 12 times greater with more than three generic competitors.

384.    Bausch needs to control only Xifaxan 550 mg and its AB-rated generic equivalents, and no other products, to maintain the price of Xifaxan 550 mg at supracompetitive levels. Only the market entry of a competing, AB-rated version of Xifaxan 550 mg could prevent Bausch from profitably maintaining prices at supracompetitive levels.

385.    To the extent that Plaintiff is required to prove market power through circumstantial evidence by first defining a relevant product market, the relevant antitrust product market for judging the anticompetitive effect of delaying the entry of generic Xifaxan is the market for Xifaxan 550 mg and its AB-rated generic equivalents.

386.    A small but significant, non-transitory increase in the price of brand Xifaxan 550 mg, above the competitive level, did not cause a significant loss of sales to any other product. At competitive prices, brand Xifaxan 550 mg does not exhibit significant, positive cross-elasticity of demand with respect to price with any other product or treatment for IBS-D.

387.    At all relevant times, Bausch was protected by high barriers to entry due to patent protection, statutory and regulatory barriers, the high cost of entry and expansion, expenditures in marketing and physician detailing, and State statutes that require prescriptions for the purchase of the products at issue and restrict substitution of those products at the pharmacy counter.

388.    The products in this market require significant investments of time and money to design, develop, and distribute. In addition, the products require government approvals to enter

and/or may assertedly be covered by patents or other forms of intellectual property. Defendants'

unlawful conduct further restricted entry. Thus, during the relevant time, existing and potential

market entrants lacked the ability to enter the market and/or expand output quickly in the short

run in response to Bausch's higher prices and Defendants' reduced output.

389.    The relevant geographic market is the United States and its territories. At all

relevant times, Bausch's market share in the relevant market has been 100%.

## X.    EFFECT ON INTERSTATE COMMERCE

390.    During the relevant time period, Bausch manufactured, marketed, sold, and

shipped Xifaxan 550 mg across State lines in an uninterrupted flow of interstate commerce.

391.    During the relevant time period, Plaintiff's assignors purchased substantial

amounts of Xifaxan 550 mg directly from Bausch. As a result of Defendants' illegal conduct,

Plaintiff was compelled to pay, and did pay, artificially inflated prices for Xifaxan 550 mg.

392.    During the relevant time period, Defendants used various devices to effectuate the

illegal acts alleged herein, including the United States mail, interstate and foreign travel, and

interstate and foreign wire commerce. Defendants engaged in illegal activities, as charged in

herein, within the flow of, and substantially affecting, interstate commerce, including in this

district.

## XI.    CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF SECTION 16 OF THE CLAYTON ACT AND SECTIONS 1 & 2 OF THE SHERMAN ACT**
**(DECLARATORY AND INJUNCTIVE RELIEF AGAINST BAUSCH AND TEVA)**

393.    Plaintiff repeats and incorporates by reference each preceding and succeeding

paragraph as though fully set forth herein.

-98-

394.    Bausch and Teva knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme, including entering an unlawful reverse payment agreement constituting an illegal contract, combination, and restraint of trade designed to delay and block entry of AB-rated generic equivalents of Xifaxan. Defendants injured the Plaintiff and the proposed Class through this conduct.

395.    Had manufacturers of generic Xifaxan entered the market and lawfully competed with Bausch, the Plaintiff and members of the Class would have substituted lower-priced generic Xifaxan for the higher-priced brand-name drugs for most of their purchases.

396.    Plaintiff and members of the Class have suffered harm and will continue to suffer harm in the future as a result of paying higher prices for Xifaxan than they would have absent the Defendants' continuing anticompetitive conduct.

397.    Plaintiff's allegations described herein comprise violations of Sections 1 and 2 of the Sherman Act, as well as state laws.

398.    Plaintiff and members of the Class have overpaid for substantial amounts of Xifaxan between at least 2023 (and likely earlier) and the present.

399.    Plaintiff and members of the Class seek a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Bausch and Teva's conduct violates Sections 1 and 2 of the Sherman Act.

400.    Plaintiff and members of the Class also seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Bausch and Teva's unlawful conduct and other relief to assure that similar anticompetitive conduct does not recur.

401.    Plaintiff and members of the Class have no adequate alternative form of relief in the United States for its overpayment for Xifaxan purchased indirectly in the states that do not provide damages remedies to indirect purchasers injured by Defendants' anticompetitive agreement.

## COUNT II

## MONOPOLIZATION AND MONOPOLISTIC SCHEME UNDER STATE LAW (AGAINST BAUSCH)

402.    Plaintiff repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

403.    Bausch possessed monopoly power in the defined relevant market at all times since its NDAs for Xifaxan were approved. Bausch knowingly and willfully engaged in a course of exclusionary conduct designed to prevent generic manufacturers from entering the market and unlawfully extended its monopoly power.

404.    Bausch intentionally extended its monopoly power in the relevant market through its anticompetitive and illegal scheme. Thus, Plaintiff and class members paid artificially inflated prices for their indirect purchases of Xifaxan, including by assignment from its subsidiaries. There is and was no non-pretextual justification for Bausch's anticompetitive actions.

405.    As a direct and proximate result of Bausch's conduct, as alleged herein, the Plaintiff and members of the Class sustained injury to their business and/or property.

406.    By engaging in the foregoing conduct, Bausch has intentionally and wrongfully maintained monopoly power in the relevant market in violation of the following state laws:

a.    Arizona Rev. Stat. §§ 44-1403, *et seq*., with respect to purchases of Xifaxan in Arizona.

b.    Cal. Bus. & Prof. Code §§ 17200, *et seq*., and California common law, with respect to purchases of Xifaxan in California.

c.      Conn. Gen. Stat. §§ 35-27 and 29, *et seq*., with respect to purchases of Xifaxan in Connecticut.

d.      D.C. Code §§ 28-4503, *et seq*., with respect to purchases of Xifaxan in the District of Columbia.

e.      Fla. Stat. §§ 501.201, *et seq*., with respect to purchases of Xifaxan in Florida.

f.      Hawaii Code §§ 480, *et seq*., with respect to purchases of Xifaxan in Hawaii.

g.      740 Ill. Comp. Stat. 10/3, *et seq*., with respect to purchases of Xifaxan in Illinois.

h.      Iowa Code §§ 553.5 *et seq*., with respect to purchases of Xifaxan in Iowa.

i.      Mass. Gen. L. Ch. 93A, *et seq*., with respect to purchases of Xifaxan in Massachusetts.

j.      Me. Rev. Stat. Ann. 10, §§ 1102, *et seq*., with respect to purchases of Xifaxan in Maine.

k.      Md. Code, Com. Law §§ 11-204, *et seq*., with respect to purchases of Xifaxan in Maryland.

l.      Mich. Comp. Laws Ann. §§ 445.773, *et seq*., with respect to purchases of Xifaxan in Michigan.

m.      Minn. Stat. §§ 325D.52, *et seq*., and Minn. Stat. § 8.31, *et seq*., with respect to purchases of Xifaxan in Minnesota.

n.      Miss. Code Ann. §§ 75-21-3, *et seq*., with respect to purchases of Xifaxan in Mississippi.

o.      Neb. Code Ann. §§ 59-802, *et seq*., with respect to purchases of Xifaxan in Nebraska.

p.      Nev. Rev. Stat. Ann. §§ 598A.060, *et seq*., with respect to purchases of Xifaxan in Nevada.

q.      N.H. Rev. Stat. Ann. §§ 356.1, *et seq*., with respect to purchases of Xifaxan in New Hampshire.

r.      N.J. Stat. Ann. §§ 56:9-1 and 9-3, *et seq.*, with respect to purchases of Xifaxan made in New Jersey.

s.      N.M. Stat. Ann. §§ 57-1-2, *et seq*., with respect to purchases of Xifaxan in New Mexico.

t.    N.C. Gen. Stat. §§ 75-2.1, *et seq*., with respect to purchases of Xifaxan in North Carolina.

u.    N.D. Cent. Code §§ 51-08.1-03, *et seq*., with respect to purchases of Xifaxan in North Dakota.

v.    Or. Rev. Stat. §§ 646.705, *et seq*., with respect to purchases of Xifaxan in Oregon.

w.    10 L.P.R.A. §§ 257, *et seq*., with respect to purchases of Xifaxan in Puerto Rico.

x.    R.I. Gen. Laws §§ 6-36-1, *et seq*., with respect to purchases of Xifaxan in Rhode Island.

y.    S.D. Codified Laws §§ 37-1-3.2, *et seq*., with respect to purchases of Xifaxan in South Dakota.

z.    Utah Code Ann. §§ 76-10-911, *et seq*., with respect to purchases of Xifaxan in Utah.

aa.    Vt. Stat. Ann. 9, §§ 2453, *et seq*., with respect to purchases of Xifaxan in Vermont.

bb.    W.Va. Code §§ 47-18-4, *et seq*., with respect to purchases of Xifaxan in West Virginia.

cc.    Wis. Stat. §§ 133.03, *et seq*., with respect to purchases of Xifaxan in Wisconsin.

407.    The Plaintiff and class members have been injured in their business and/or property by reason of the Defendants' violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xifaxan; and (ii) forced to pay higher prices for Xifaxan than they would have paid but for the Defendants' unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes the Defendants' conduct unlawful.

408.    Plaintiff and members of the Class seek damages and multiple damages as permitted by law.

## COUNT III

### ATTEMPTED MONOPOLIZATION UNDER STATE LAW
### (AGAINST BAUSCH)

409.    The Plaintiff repeats and incorporates the above paragraphs as though fully set forth herein.

410.    Count Three is pled on behalf of the Plaintiff and class members under the antitrust laws of each jurisdiction identified below.

411.    Count Three arises from Bausch's exclusionary, anticompetitive conduct, including entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in violation of the various state antitrust statutes set forth below, that was designed to create and maintain Bausch's improper monopoly over rifaximin and exclude or substantially exclude its generics from the market.

412.    Count Three arises from Bausch entering into an unlawful reverse payment agreement that restrained, and continue to restrain, competition in the market for Xifaxan and/or its AB-rated generic equivalents. The agreement also constitutes an unlawful market allocation.

413.    The essential elements of each antitrust claim in Count Three are the same. The above-alleged conduct that violates the Sherman Act will, if proven, establish a claim under each of the laws cited below.

414.    At all relevant times, Bausch possessed and continues to possess substantial market power (i.e., monopoly power) in the market for rifaximin. Bausch possessed and continues to possess the power to control prices in, prevent prices from falling in, and exclude competitors from the U.S. market for rifaximin.

415.    Alternatively, if Bausch does not already have a monopoly in the market for rifaximin in the United States, it has attempted to monopolize this market.

416.    Bausch engaged in predatory or anticompetitive conduct by entering the unlawful settlement agreement with Teva described above.

417.    Through its anticompetitive scheme, Bausch specifically intended to monopolize the market for rifaximin in the United States after lawful generic competition should have commenced using restrictive or exclusionary conduct, rather than by means of a superior product, business acumen, or historic accident.

418.    The goal, purpose, and effect of Bausch anticompetitive scheme was to delay and/or block rifaximin generics from entering the market, extend Bausch's monopoly in that market, and maintain its supracompetitive prices for Xifaxan.

419.    Based on its current market power in the market for rifaximin in the United States, there is a dangerous probability that Bausch will achieve monopoly power.

420.    During the Class Period, Xifaxan, manufactured, marketed, and sold by Bausch, was shipped into each state, and was sold to or paid for by the Plaintiff and the Class.

421.    During the Class Period, in connection with the purchase and sale of Xifaxan, money changed hands and business communications and transactions occurred in each state.

422.    Bausch's conduct as set forth in this Complaint had substantial effects on intrastate commerce in that, *inter alia*, retailers within each state were foreclosed from offering less expensive generic Xifaxan to end payors purchasing inside each respective state. This impairment of competition directly impacts and disrupts commerce within each state.

423.    Bausch's anticompetitive activities have directly, foreseeably, and proximately caused injury to the Plaintiff and members of the Class throughout the United States. The

Plaintiff's and class members' injuries consist of being: (a) denied the opportunity to purchase lower-priced Xifaxan from Bausch; (b) forced to pay higher prices for rifaximin than they would have paid in the absence of Bausch's unfair, illegal, and deceptive conduct; and (c) denied the opportunity to purchase generic rifaximin at prices substantially lower than what they were forced to pay for Xifaxan. These injuries are of the type that the laws of the jurisdictions below were designed to prevent, and they flow from that which makes Bausch's conduct unlawful.

424.    Plaintiff and members of the Class are the proper entities to bring a case concerning Bausch's unlawful anticompetitive scheme.

425.    The Defendants are jointly and severally liable for all damages suffered by the Plaintiff and members of the Class.

426.    By engaging in the foregoing conspiratorial conduct, Bausch intentionally, wrongfully, and flagrantly attempted to monopolize the market for rifaximin in the United States in violation of the following state laws:

    a.    Ariz. Arizona Rev. Stat. §§ 44-1403, *et seq*., including Ariz. Rev. Stat. § 44-1403, with respect to purchases of Xifaxan in Arizona.

    b.    Cal. Bus. & Prof. Code §§ 17200, *et seq*., with respect to purchases of Xifaxan in California.

    c.    Conn. Gen. Stat. §§ 35-27, *et seq*., with respect to purchases of Xifaxan in Connecticut.

    d.    D.C. Code §§ 28-4503, *et seq*., with respect to purchases of Xifaxan in the District of Columbia.

    e.    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Xifaxan in Florida.

    f.    Haw. Rev. Stat. §§ 480, *et seq.*, with respect to purchases of Xifaxan in Hawaii.

    g.    740 Ill. Comp. Stat. 10/3, *et seq*., including 740 Ill. Comp. Stat. 10/3, with respect to purchases of Xifaxan in Illinois.

h.      Iowa Code §§ 553.5, *et seq*., including Iowa Code § 553.5, with respect to purchases of Xifaxan in Iowa.

i.      Me. Rev. Stat. Ann. tit. 10, §§ 1102, *et seq*., including Me. Rev. Stat. Ann. tit. 10, §1102, with respect to purchases of Xifaxan in Maine;

j.      Md. Code Com. Law § 11-204, *et seq*., including Md. Code Com. Law § 11-204, wwith respect to purchases of Xifaxan in Maryland.

k.      Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases of Xifaxan in Massachusetts.

l.      Mich. Comp. Laws Ann. §§ 445.773, *et seq*., with respect to purchases of Xifaxan in Michigan.

m.      Minn. Stat. Ann. §§ 325D.52, *et seq*., and Minn. Stat. Ann. § 8.31, *et seq*., with respect to purchases of Xifaxan in Minnesota.

n.      Miss. Code Ann. §§ 75-21-3, *et seq*., with respect to the Plaintiff's and class members' purchases in Mississippi.

o.      Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases of Xifaxan in Nebraska.

p.      Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Xifaxan in Nevada.

q.      N.H. Rev Stat. Ann. §§ 356.1, *et seq*., with respect to purchases of Xifaxan in New Hampshire.

r.      N.J. Stat. Ann. §§ 56:9-1 and 9-3, *et seq.*, with respect to purchases of Xifaxan in New Jersey.

s.      N.M. Stat. Ann. §§ 57-1-2, *et seq*., with respect to purchases of Xifaxan in New Mexico.

t.      N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases of Xifaxan in New York.

u.      N.C. Gen. Stat. Ann. §§ 75-2.1, *et seq.*, with respect to purchases of Xifaxan in North Carolina.

v.      N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases of Xifaxan in North Dakota.

w.      Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of Xifaxan in Oregon.

x.    10 L.P.R.A. §§ 257, *et seq.*, with respect to purchases of Xifaxan in Puerto Rico.

y.    R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Xifaxan in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of Xifaxan in South Dakota.

aa.    Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of Xifaxan in Utah.

bb.    Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases of Xifaxan in Vermont.

cc.    W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of Xifaxan in West Virginia.

dd.    Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Xifaxan in Wisconsin.

427.    As a result of the unlawful and anticompetitive conduct described above, the Plaintiff and/or members of the Class paid artificially inflated prices for Xifaxan, in each of these listed jurisdictions.

## COUNT IV

## CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW
## (AGAINST BAUSCH AND TEVA)

428.    The Plaintiff repeats and incorporates the above paragraphs as though fully set forth herein.

429.    Count Four is pled on behalf of the Plaintiff and class members under the antitrust laws of each jurisdiction identified below.

430.    Count Four arises from Bausch and Teva's exclusionary, anticompetitive conduct, including entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to that contract, combination or conspiracy in violation of the various state antitrust statutes set forth below. Bausch and Teva's conduct was designed to create

and maintain Bausch's improper monopoly over rifaximin and exclude or substantially exclude generics from the market, allowing Bausch and Teva to allocate the market to themselves.

431.    Count Four arises from Bausch and Teva entering into an unlawful reverse payment agreement that restrained, and continue to restrain, competition in the market for Xifaxan and/or its AB-rated generic equivalents. The agreement also constitutes an unlawful market allocation.

432.    The essential elements of each antitrust claim in Count Four are the same. The above-alleged conduct that violates the Sherman Act will, if proven, establish a claim under each of the laws cited below.

433.    At all relevant times, Bausch possessed and continues to possess substantial market power (i.e., monopoly power) in the market for rifaximin. Indeed, from the launch of brand Xifaxan until the present day, Bausch controlled 100% of the relevant market. Were it not for the unlawful reverse payment agreement, Bausch would have lost a large portion of its 100% share of the market no later than 2023.

434.    Bausch possessed and continues to possess the power to control prices in, prevent prices from falling in, and exclude competitors from the U.S. market for rifaximin.

435.    Through its unlawful conduct, as alleged above, Bausch willfully maintained its monopoly power in the market for rifaximin in the United States after lawful generic competition should have commenced using restrictive or exclusionary conduct, rather than by means of a superior product, business acumen, or historic accident, and thereby injured the Plaintiff and the class members. Bausch engaged in its anticompetitive conduct with the specific intent to maintain its monopoly in the market for rifaximin in the United States.

436.    Bausch accomplished its anticompetitive scheme by engaging in the unlawful conduct described above, including by paying Teva to delay its generic entry as described above.

437.    The goal, purpose, and effect of Bausch and Teva's unlawful conduct was to delay and/or block rifaximin generics from entering the market, extend Bausch's monopoly in that market, and maintain its supracompetitive prices for Xifaxan.

438.    Bausch and Teva's anticompetitive conduct substantially reduced and harmed competition in the relevant market and was an unreasonable restraint on trade.

439.    Bausch and Teva's anticompetitive conduct directly impacts and disrupts commerce within each jurisdiction below.

440.    Had Bausch competed on the merits, instead of unlawfully maintaining its monopoly in the market for rifaximin, one or more rifaximin generics would have been available years ago. The Plaintiff and class members would have substituted the lower-priced rifaximin generics for the higher-priced brand Xifaxan (or paid less for Xifaxan) for some or all their rifaximin requirements. As a result, they would have paid substantially lower prices for rifaximin.

441.    During the Class Period, Xifaxan, manufactured and sold by Bausch, was shipped into each state and was sold to or paid for by the Plaintiff and the members of the Class.

442.    During the Class Period, in connection with the purchase and sale of Xifaxan, money changed hands and business communications and transactions occurred in each state.

443.    Bausch and Teva's conduct as set forth in this Complaint had substantial effects on intrastate commerce in that, *inter alia*, retailers within each state were foreclosed from offering cheaper generic Xifaxan to end payors purchasing inside each respective state. This impairment of competition directly impacts and disrupts commerce within each state.

444.     Bausch and Teva's anticompetitive activities have directly, foreseeably, and proximately caused injury to the Plaintiff and class members throughout the United States. The Plaintiff's and class members' injuries consist of being: (a) denied the opportunity to purchase lower-priced Xifaxan from Bausch; (b) forced to pay higher prices for rifaximin than they would have paid in the absence of Bausch's unfair, illegal, and deceptive conduct; and (c) denied the opportunity to purchase generic rifaximin at prices substantially lower than what they were forced to pay for Xifaxan. These injuries (often referred to as "overcharges") are of the type that the laws of the jurisdictions below were designed to prevent, and they flow from that which makes Bausch's conduct unlawful.

445.     Plaintiff and members of the Class are the proper entities to bring a case concerning Bausch's unlawful anticompetitive scheme.

446.     The Defendants are jointly and severally liable for all damages suffered by the Plaintiff and the class members.

447.     Defendants' agreement constitutes a market allocation agreement that is *per se* unlawful. Alternatively, Bausch and Teva are liable for their anticompetitive agreement under the "rule of reason" standard of the antitrust laws.

448.     There is and was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on payers and competition. Even if there were some conceivable and cognizable justification, the payment was unnecessary to achieve such purpose.

449.     By engaging in the foregoing conduct, Bausch and Teva intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state laws:

a.  Ariz. Arizona Rev. Stat. §§ 44-1401, *et seq*., including Ariz. Rev. Stat. § 44-1403, with respect to purchases of Xifaxan in Arizona.

b.  Cal. Bus. & Prof. Code §§16700, *et seq.* and §§ 17200, *et seq*., with respect to purchases of Xifaxan in California.

c.  C.G.S.A. §§ 35-26 and 28, *et seq*., with respect to purchases of Xifaxan in Connecticut.

d.  D.C. Code §§ 28-4501, *et seq*., with respect to purchases of Xifaxan in the District of Columbia.

e.  Haw. Rev. Stat. §§ 480-1, *et seq.*, with respect to purchases of Xifaxan in Hawaii.

f.  740 Ill. Comp. Stat. 10/1, *et seq*., with respect to purchases of Xifaxan in Illinois.

g.  Iowa Code §§ 553.1, *et seq*., with respect to purchases of Xifaxan in Iowa.

h.  Kan. Stat. Ann. § 50-101, *et seq.*, with respect to purchases of Xifaxan in Kansas.

i.  Me. Rev. Stat. Ann. 10, §§ 1101, *et seq*., with respect to purchases of Xifaxan in Maine.

j.  Md. Code Ann., Com. Law § 11-204, *et seq*., with respect to purchases of Xifaxan in Maryland.

k.  Mich. Comp. Laws Ann. §§ 445.771, *et seq*., with respect to purchases of Xifaxan in Michigan.

l.  Minn. Stat. Ann. §§ 325D.49, *et seq*., and Minn. Stat. Ann. § 8.31, *et seq*., with respect to purchases of Xifaxan in Minnesota.

m.  Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to purchases of Xifaxan in Mississippi.

n.  Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of Xifaxan in Nebraska.

o.  Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, with respect to purchases of Xifaxan in Nevada.

p.  N.H. Rev Stat Ann. §§ 356:1, *et seq*.,with respect to purchases of Xifaxan in New Hampshire.

q.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, wwith respect to purchases of Xifaxan in New Mexico.

r.    N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases of Xifaxan in New York.

s.    N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Xifaxan in North Carolina.

t.    N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases of Xifaxan in North Dakota.

u.    Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of Xifaxan in Oregon.

v.    P.R. Laws Ann. tit. 10 §§ 258, *et seq.*, with respect to purchases of Xifaxan in Puerto Rico.

w.    R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Xifaxan in Rhode Island.

x.    S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases of Xifaxan in South Dakota.

y.    Tenn. Code Ann §§ 47-25-101, *et seq.*, with respect to purchases of Xifaxan in Tennessee.

z.    Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases of Xifaxan in Utah.

aa.   W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of Xifaxan in West Virginia.

bb.   Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases of Xifaxan in Wisconsin.

450.    As a result of the unlawful and anticompetitive conduct described above, the Plaintiff and/or members of the Class paid artificially inflated prices for Xifaxan, in each of these listed jurisdictions.

## COUNT V

## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

451.    The Plaintiff repeats and incorporates the above paragraphs as though fully set forth herein.

452.    As described above, Bausch and Teva engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent conduct, acts, or practices in violation of the consumer protection statutes set forth below. As a direct and proximate result of Bausch's anticompetitive, deceptive, unfair, unconscionable, and/or fraudulent conduct, the Plaintiff has been and continue to be deprived of the opportunity to purchase lower-priced rifaximin.

453.    Bausch established, maintained, and/or used a monopoly, or attempted to establish a monopoly, and to restrain trade or commerce in the U.S. market for rifaximin. A substantial part of this conduct occurred within each jurisdiction identified below. Bausch intended to injure competitors and exclude or substantially lessen competition. Bausch intended to injure consumers by unlawfully reaping supracompetitive profits.

454.    By unlawfully delaying the entry of rifaximin generics, Bausch, as a supplier, and Teva engaged in a fraudulent or deceptive act or practice in connection with a consumer transaction.

455.    Bausch and Teva's conduct constitutes consumer-oriented deceptive acts or practices that resulted in consumer injury and broad adverse impact on the public at large. Bausch and Teva's conduct thereby harmed consumers' interest in an honest marketplace where economic activity is conducted in a competitive manner.

456.    Bausch and Teva withheld material facts and information from the Plaintiff and class members, including that Bausch was unlawfully excluding manufacturers of generic rifaximin from the market and monopolizing the market for rifaximin (and thereby profiting from the resulting supracompetitive prices that the Plaintiff and class members who purchased or reimbursed purchases of Xifaxan paid).

457.    Bausch and Teva's conduct was willful and knowing. Bausch and Teva intended to deceive the Plaintiff and class members regarding the nature of their actions within the stream of commerce in each jurisdiction below.

458.    Bausch and Teva's acts, omissions, misrepresentations, practices, and/or non-disclosures constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices.

459.    Plaintiff and members of the Class purchased (or reimbursed their members for their purchases of) rifaximin primarily for personal, family, or household purposes.

460.    Plaintiff and members of the Class include non-profit health and welfare plans whose core mission includes providing cost-effective health benefits, including prescription drug benefits, to their members and members' spouses and dependents. In carrying out that core mission, those health and welfare plans purchase or provide reimbursement for rifaximin.

461.    Plaintiff and members of the Class do not engage in the resale of prescription drugs or otherwise profit from purchasing rifaximin or from reimbursing their members for purchases of rifaximin are "consumers" under the consumer protection laws of the jurisdictions below.

462.    There was and is a gross disparity between the price that the plaintiff and class members paid for rifaximin and the value they received, given that less expensive generic versions of rifaximin should have been available and would have been but for Bausch and Terva's unlawful conduct.

463.    As a direct and proximate result of Bausch and Teva's unlawful conduct, the Plaintiff and class members have been injured and are threatened with continued injury.

464.     As a direct and proximate result of Bausch and Teva's unfair, unconscionable, deceptive, and fraudulent conduct in violation of the state consumer protection statutes listed below, the Plaintiff and class members were denied the opportunity to purchase lower-priced rifaximin generics and paid higher prices for Xifaxan than they would otherwise have paid.

465.     The gravity of harm from Bausch and Teva's wrongful conduct significantly outweighs any conceivable utility from that conduct. The Plaintiff and class members could not reasonably have avoided injury from Bausch and Teva's wrongful conduct.

466.     Bausch and Teva's unlawful conduct substantially affected the trade and commerce of each jurisdiction in which rifaximin was sold.

467.     Bausch and Teva's unfair and deceptive acts described above were knowing and willful and constitute violations or flagrant violations of the following unfair trade practices and consumer protection statutes. As a result of Bausch and Teva's unfair and deceptive conduct, as described above, the Plaintiff and members of the Class paid artificially inflated prices in each of the following jurisdictions.[68]

---

[68] Upon completion of the requisite statutory notices, the plaintiff intends to file a Consolidated Class Action Complaint to add claims under the following state statutes:

1. Ala. Code §§ 8-19-10(e), *et seq.*, with respect to purchases in Alabama.
2. Alaska Stat. §§ 45.50.471, *et seq.*, with respect to purchases in Alaska.
3. Cal. Civ. Code §§ 1750, *et seq.*, with respect to purchases in California.
4. Ga. Stat. §§ 10-1-390, *et seq.*, with respect to purchases in Georgia.
5. Ind. Code Ann. §§ 24-5-0.5-3, *et seq.*, with respect to purchases in Indiana.
6. 5 Me. Rev. Stat. §§ 207, *et seq.*, with respect to purchases in Maine.
7. Mass. Gen. Laws ch. 93A, §§ 1, *et seq.*, with respect to purchases in Massachusetts.
8. Tex. Bus. & Com. Code §§ 17.41, *et seq.*, with respect to purchases in Texas.
9. West Va. Code §§ 46A-6-101, *et seq.*, with respect to purchases in West Virginia.
10. Wyo. Stat. §§ 40-12-100, *et seq.*, with respect to purchases in Wyoming.

1.    **Ariz. Rev. Stat. §§ 44-1521, *et seq*. (with respect to purchases of Xifaxan in Arizona)**

468.    Section 44-1522 of the Arizona Revised Statutes provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

469.    As set forth in detail above, Bausch and Teva violated § 44-1522 of the Arizona Revised Statutes by entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

470.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

471.    The Plaintiff's and class members' injuries are of the type that § 44-1522 of the Arizona Revised Statutes was intended to prevent.

472.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 44-1533 of the Arizona Revised Statutes.

473.    The Plaintiff and class members are entitled to recover actual damages and punitive damages because Bausch and Teva's conduct was wanton, was reckless, shows spite or ill will, and demonstrates a reckless indifference to the interests of others.

2.    **Ark. Code Ann. §§ 4-88-101,** *et seq.* **(with respect to purchases of Xifaxan in Arkansas)**

474.    Section 4-88-107 of the Arkansas Code provides as follows:

(a) Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to, the following: . . .

(10) Engaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade; . . .

(b) The deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state.

475.    As set forth in detail above, Bausch and Teva violated § 4-88-107 of the Arkansas Code by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

476.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

477.    The Plaintiff's and class members' injuries are of the type that § 4-88-107 of the Arkansas Code was intended to prevent.

478.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 4-88-113 of the Arkansas Code.

479.    The Plaintiff and class members are entitled to recover its actual damages, along with reasonable attorneys' fees, pursuant to § 4-88-113(f) of the Arkansas Code.

**3.    Colo. Rev. Stat. §§ 6-1-105, *et seq.* (with respect to purchases of Xifaxan in Colorado)**

480.    Colorado Revised Statute § 6-1-105 (as amended and effective as of August 7, 2024) provides that "a person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person… [e]ither knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice…." Colo. Rev. Stat. § 6-1-105(1)(rrr).

481.    The Colorado Revised Statute is clear that the "deceptive trade practices listed in this section are in addition to *and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state*." Colo. Rev. Stat. § 6-1-105(3) (emphasis added).

482.    As alleged above in Count Four, Colorado Revised Statute § 6-4-105 provides that it is "illegal for any person to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of trade or commerce."

483.    As set forth in detail above, Bausch and Teva violated § 6-1-105 *et seq*. of the Colorado Revised Statute (as well as § 6-4-105) by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

484.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch's wrongful conduct.

485.    The Plaintiff's and class members' injuries are of the type that § 6-1-105 *et seq.* was intended to prevent.

486.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 6-1-105 of the Colorado Revised Code.

487.    The Plaintiff and class members are entitled to recover its actual damages and injunctive relief, along with reasonable attorneys' fees and costs, pursuant to § 6-1-113 of the Colorado Revised Code.

**4.    Conn. Gen. Stat. § 42-110,** ***et seq.*** **(with respect to purchases of Xifaxan in Connecticut)**

488.    Connecticut General Statutes § 42-110b(a) provides, "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

489.    Connecticut General Statutes § 42-110g(a) provides that any person "who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business . . . " to recover actual damages, and permits the court in its discretion to award punitive damages and equitable relief.

490.    As set forth in detail above Bausch and Teva violated § 42-110b of the Connecticut General Statutes by entering into the unlawful reverse-payment agreement, which

was a contract that monopolized the U.S. market for rifaximin and that has delayed, and will continue to delay, full generic competition in the Xifaxan market.

491.    As a direct and proximate result of the Defendants' conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for Xifaxan than they would have paid but for the Defendants' unlawful conduct.

492.    The Plaintiff and class member's injury is of the type that § 42-110b of the Connecticut General Statutes was intended to prevent.

493.    The Plaintiff and class members are entitled to bring this action for damages and equitable relief pursuant to Connecticut General Statutes § 42-110g.

494.    The Plaintiff and class members are entitled to recover actual damages and punitive damages, along with costs and reasonable attorney fees.  Conn. Gen. Stat. § 42-110g.

**5.    D.C. Code §§ 28-3901, *et seq.* (with respect to purchases of Xifaxan in the District of Columbia)**

495.    District of Columbia Code § 28-3904 provides that "[i]t shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice. . . ."

496.    District of Columbia Code § 28-4502 provides that every contract or conspiracy "in restraint of trade or commerce all or any part of which is within the District of Columbia is declared to be illegal."

497.    District of Columbia Code § 28-4503 provides that it shall be unlawful for any person "to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce, all or any part of which is within the District of Columbia."

498.    As set forth in detail above, Bausch and Teva violated §§ 28-3901, *et seq.*, of the District of Columbia Code by deceptively, and wrongfully, entering a continuing contract,

-120-

combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

499.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

500.    The Plaintiff's and class members' injuries are of the type that §§ 28-3901, *et seq*., of the District of Columbia Code was intended to prevent.

501.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 28-3905 of the District of Columbia Code.

502.    The Plaintiff and class members are entitled to recover its actual damages, treble damages, and punitive damages, along with reasonable attorneys' fees as expenses, pursuant to § 28-3905(k) of the District of Columbia Code.

**6.    Fla. Stat. §§ 501.201, *et seq.* (with respect to purchases of Xifaxan in Florida)**

503.    Section 501.204(1) of the Florida Statutes declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

504.    As set forth in detail above, Bausch and Teva violated §§ 501.201, *et seq*., of the Florida Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition— deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or

blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

505.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch's unlawful conduct.

506.    The Plaintiff's and class members' injuries are of the type that §§ 501.201, *et seq.*, of the Florida Statutes was intended to prevent.

507.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 501.211 of the Florida Statutes.

508.    The Plaintiff and class members are entitled to recover its actual damages, along with reasonable attorneys' fees and expenses, pursuant to §§ 501.211 & 501.2015 of the Florida Statutes.

**7.    Idaho Code §§ 48-601, *et seq.* (with respect to purchases of Xifaxan in Idaho)**

509.    The Idaho Consumer Protection Act, Idaho Code § 48-601 et seq., makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . where a person knows, or in the exercise of due care should know" (§ 48-603) that he has "engag[ed] in any act or practice that is … misleading, false, or deceptive to the consumer" (§ 48-603(17)), or "engag[ed] in any unconscionable method, act or practice in the conduct of trade or commerce[.]" (§ 48-603(18)).

510.    As set forth in detail above Bausch and Teva violated Idaho Code §§ 48-601 et seq.  by entering into the unlawful reverse-payment agreement, which has delayed, and will continue to delay, full generic competition in the Xifaxan market.

511.     As a direct and proximate result of the Defendants' conduct, the Plaintiff and class members have suffered injury, ascertainable loss, and actual damages in the form of paying higher prices for Xifaxan than they would have paid but for the Defendants' unlawful conduct.

512.     The Plaintiff and class members' injury is of the type that Idaho Code § 48-601 et seq. was intended to prevent.

513.     The Plaintiff and class members are entitled to bring this action for damages and equitable relief pursuant to Idaho Code § 48-608.

514.     The Plaintiff and class members are entitled to recover actual damages and punitive damages, along with reasonable costs and attorney fees.  Idaho Code § 48-608(5).

**8.     815 Ill. Comp. Stat. §§ 505/1, *et seq*. (with respect to purchases of Xifaxan in Illinois)**

515.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Illinois Compiled Statutes § 505/2, makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

516.     As set forth in detail above, Bausch and Teva violated 815 Ill. Comp. Stat. §§ 505/1, *et seq*., of the Illinois Compiled Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above which had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

517.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

518.    The Plaintiff's and class members' injuries are of the type that 815 Ill. Comp. Stat. §§ 505/1, *et seq.*, of the Illinois Compiled Statutes was intended to prevent.

519.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 505/10a of the Illinois Compiled Statutes.

520.    The Plaintiff and class members are entitled to recover its actual damages and punitive damages, along with reasonable attorneys' fees and costs, pursuant to 815 Ill. Comp. Stat. §§ 505/10a(a) & 505/10a(c) of the Illinois Compiled Statutes.

**9.    Kan. Stat. §§50-623, *et seq.* (with respect to purchases of Xifaxan in Kansas)**

521.    The Kansas Consumer Protection Act, Kansas Statutes § 50-626 provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."

522.    Additionally, Kansas Statutes § 50-624 provides that no supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during or after the transaction."

523.    As set forth in detail above Bausch and Teva violated §§ 50-623 and 50-624 of the Kansas Consumer Protection Act by entering into the unlawful reverse-payment agreement that has delayed, and will continue to delay, full generic competition in the Xifaxan market.

524.    As a direct and proximate result of the Defendants' conduct, the Plaintiff and class members suffered injury in the form of paying higher prices for Xifaxan than they would have paid but for the Defendants' unlawful conduct.

525.    The Plaintiff and class members' injury is of the type that §§ 50-623 and 50-624 of the Kansas Consumer Protection Act were intended to prevent.

526.    The Plaintiff and class members are entitled to bring this action for damages and equitable relief pursuant to § 50-634 of the Kansas Statutes.

**10.    La. Rev. Stat. Ann. §§ 51:1401, *et seq*. with respect to purchases of Xifaxan in Louisiana)**

527.    The Louisiana Unfair Trade Practices and Consumer Protection Law, §§ 51:1401 *et seq*., of the Louisiana Revised Statutes, declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405.

528.    As set forth in detail above, Bausch and Teva violated the Louisiana Unfair Trade Practices and Consumer Protection Law by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

529.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

530.    The Plaintiff's and class members' injuries are of the type that Louisiana Unfair Trade Practices and Consumer Protection Law was intended to prevent.

531.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 51:1409 of the Louisiana Revised Statutes.

**11.    5 Md. Code, Com. Law §§ 13-301, *et seq*. (with respect to purchases of Xifaxan in Maryland)**

532.    Section 13-303 of the Maryland Code provides that "[a] person may not engage in any unfair, abusive, or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in . . . [t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services . . . ."

533.    As set forth in detail above, Bausch and Teva violated the §§ 13-301, *et seq.*, of the Maryland Code by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

534.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

535.    The Plaintiff's and class members' injuries are of the type that §§ 13-301, *et seq.*, of the Maryland Code was intended to prevent.

536.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 13-408 of the Maryland Code.

**12.    Mich. Comp. Laws Ann. §§ 445.901, *et seq*. (with respect to purchases of Xifaxan in Michigan)**

537.    Section 445.903 of the Michigan Compiled Laws provides that "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful."

538.     As set forth in detail above, Bausch and Teva violated §§ 445.901, *et seq*., of the Michigan Compiled Laws by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair, unconscionable, and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

539.     As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

540.     The Plaintiff's and class members' injuries are of the type that §§ 445.901, *et seq*., of the Michigan Compiled Laws was intended to prevent.

541.     The Plaintiff and class members are entitled to bring this action for damages pursuant to § 445.911 of the Michigan Compiled Statutes.

542.     The Plaintiff and class members are entitled to recover its actual damages and punitive damages, along with reasonable attorneys' fees, pursuant to § 445.911 of the Michigan Compiled Statutes.

**13.     Minn. Stat. §§ 325D.43, *et seq*. (with respect to purchases of Xifaxan in Minnesota)**

543.     Section 325D.44 of the Minnesota Statutes provides that "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . engages in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices[.]"

544.     Section 325F.69 of the Minnesota Statutes provides:

> The act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise,

misrepresentation, misleading statement or deceptive practice, with
the intent that others rely thereon in connection with the sale of any
merchandise, whether or not any person has in fact been misled,
deceived, or damaged thereby, is enjoinable . . . .

545.    As set forth in detail above, Bausch and Teva violated §§ 325D.43, *et seq*., of the
Minnesota Statutes by deceptively, and wrongfully, entering a continuing contract, combination
or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment
settlement agreement described above in order to unlawfully delay and/or block competition—
unfair and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking
the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and
maintaining supracompetitive prices for Xifaxan.

546.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and
class members suffered injury and actual damages in the form of paying higher prices for
rifaximin than they would have paid but for Bausch and Teva's conduct.

547.    The Plaintiff's and class members' injuries are of the type that §§ 325D.43, *et
seq*., of the Minnesota Statutes was intended to prevent.

548.    The Plaintiff and class members are entitled to bring this action for damages
pursuant to § 8.31 of the Minnesota Statutes.

549.    The Plaintiff and class members are entitled to recover its actual damages, along
with reasonable attorneys' fees and costs, pursuant to § 8.31 of the Minnesota Statutes.

**14.    Miss. Code Ann. §§ 75-24-5, *et seq*. (with respect to purchases of Xifaxan in
Mississippi)**

550.    Section 75-24-5 of the Mississippi Code prohibits "[u]nfair methods of
competition affecting commerce and unfair or deceptive trade practices in or affecting
commerce."

551.    As set forth in detail above, Bausch and Teva violated §§ 75-24-5, *et seq*., of the Mississippi Code by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition— unfair and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

552.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

553.    The Plaintiff's and class members' injuries are of the type that §§ 75-24-5, *et seq.*, of the Mississippi Code was intended to prevent.

554.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 75-24-15 of the Mississippi Code

**15.    Mo. Rev. Stat. §§ 407.010, *et seq*. (with respect to purchases of Xifaxan in Missouri)**

555.    Section 407.020 of the Missouri Statutes provides:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice.

556.    As set forth in detail above, Bausch and Teva violated §§ 407.010, *et seq*., of the Missouri Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment

settlement agreement described above in order to unlawfully delay and/or block competition—
unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the
launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and
maintaining supracompetitive prices for Xifaxan.

557.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and
class members suffered injury and actual damages in the form of paying higher prices for
rifaximin than they would have paid but for Bausch and Teva's conduct.

558.    The Plaintiff's and class members' injuries are of the type that §§ 407.20, *et seq*.,
of the Missouri Statutes was intended to prevent.

559.    The Plaintiff and class members are entitled to bring this action for damages
pursuant to § 407.025 of the Missouri Statutes.

**16.    Neb. Rev. Stat. §§ 59-1601, *et seq*. (with respect to purchases of Xifaxan in
Nebraska)**

560.    Nebraska's Consumer Protection Act, Nebraska Revised Statutes §§ 59-1602,
provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the
conduct of any trade or commerce shall be unlawful."

561.    Section 59-1603 of the Nebraska Revised Statutes provides that "[a]ny contract,
combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce
shall be unlawful."

562.    Section 59-1604 of the Nebraska Revised Statutes provides that "it shall be
unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with
any other person or persons to monopolize, any part of trade or commerce."

563.    As set forth in detail above, Bausch and Teva violated §§ 59-1602, 59-1603, &
59-1604 of the Nebraska Revised Statutes by deceptively, and wrongfully, entering a continuing

contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

564.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

565.    The Plaintiff's and class members' injuries are of the type that §§ 59-1601, *et seq.*, of the Nebraska Revised Statutes was intended to prevent.

566.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 59-1609 of the Nebraska Revised Statutes.

**17.    Nev. Rev. Stat. §§ 598.0903, *et seq*. (with respect to purchases of Xifaxan in Nevada)**

567.    Section 41.600 of the Nevada Revised Statutes provides that "an action may be brought by any person who is a victim of consumer fraud . . . '[c]onsumer fraud' means . . . a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive[.]"

568.    Section 598.0915 of the Nevada Revised Statutes provides:

> A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she . . . [m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions.

569.    Section 598.0923 of the Nevada Revised Statutes provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . uses an unconscionable practice in a transaction."

570.     As set forth in detail above, Bausch and Teva violated §§ 598.0903, *et seq*., of the Nevada Revised Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

571.     As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

572.     The Plaintiff's and class members' injuries are of the type that §§ 598.0903, *et seq*., of the Nevada Revised Statutes was intended to prevent.

573.     The Plaintiff and class members are entitled to bring this action for damages pursuant to § 41.600 of the Nevada Revised Statutes.

574.     The Plaintiff and class members are entitled to recover actual damages, along with costs and reasonable attorneys' fees, pursuant to § 41.600 of the Nevada Revised Statutes.

**18.    N.H. Rev. Stat. §§ 358-A:1, *et seq*. (with respect to purchases of Xifaxan in New Hampshire)**

575.     Section 358-A:2 of the New Hampshire Revised Statutes provides:

> It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following:
>
> . . .

XIV. Pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, including the pricing of generic prescription drugs.

576.    As set forth in detail above, Bausch and Teva violated §§ 358-A:1, *et seq*., of the New Hampshire Revised Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

577.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

578.    The Plaintiff's and class members' injuries are of the type that §§ 358-A:1, *et seq*., of the New Hampshire Revised Statutes was intended to prevent.

579.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 358-A:10 of the New Hampshire Revised Statutes.

580.    Because Bausch and Teva's conduct constitutes a willful or knowing violation of § 358-A:2 of the New Hampshire Revised Statutes, the Plaintiff and class members are entitled to recover a damages award up to three times the amount of its actual damages, along with the costs of suit and reasonable attorneys' fees, pursuant to § 358-A:10 of the New Hampshire Revised Statutes.

**19.    N.J. Stat. Ann. §§ 56:8-1, *et seq*. and §§ 56:9-1, *et seq*. (with respect to purchases of Xifaxan in New Jersey)**

581.    Section 56:8-2 of the New Jersey Statute provides that

"The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]"

582.    As set forth in detail above, Bausch and Teva violated §§ 56:8-1, *et seq.* and 56:9-1, *et seq.*, of the New Jersey Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair, deceptive acts, and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

583.    The actions of Bauch and Teva, described above, are and were unconscionable as that term is defined in the New Jersey Statutes, and such actions were inherently misleading.

584.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

585.    The Plaintiff's and class members' injuries are of the type that §§ 56:9-1, *et seq.*, of the New Jersey Statutes was intended to prevent.

586.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 56:9-12 of the New Jersey Statutes.

587.    The Plaintiff and class members are entitled to recover their damages, along with the costs of suit and reasonable attorneys' fees, pursuant to § 56:9-12 of the New Jersey Statutes.

### 20.    N.M. Stat. Ann. §§ 57-12-1, *et seq*. (with respect to purchases of Xifaxan in New Mexico)

588.    Section 57-12-3 of the New Mexico Statutes provides that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

589.    As set forth in detail above, Bausch and Teva violated §§ 57-12-1, *et seq*., of the New Mexico Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair, deceptive acts, and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

590.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

591.    The Plaintiff's and class members' injuries are of the type that §§ 57-12-1, *et seq*., of the New Mexico Statutes was intended to prevent.

592.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 57-12-10 of the New Mexico Statutes.

593.    Because Bausch and Teva's conduct constitutes a willful violation of § 57-12-10 of the New Mexico Statutes, the Plaintiff and class members are entitled to recover a damages award up to three times the amount of its actual damages, along with the costs of suit and reasonable attorneys' fees, pursuant to § 57-12-10 of the New Mexico Statutes.

21.    **N. Y. Gen. Bus. Law §§ 349,** *et seq.* **(with respect to purchases of Xifaxan in New York)**

594.    Section 349(a) of the New York General Business Law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

595.    As set forth in detail above, Bausch and Teva violated §§ 349, *et seq.*, of the New York General Business Law by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair, deceptive acts, and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

596.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

597.    The Plaintiff's and class members' injuries are of the type that §§ 349, *et seq.*, of the New York General Business Law was intended to prevent.

598.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 349(h) of the New York General Business Law.

599.    Because Bausch and Teva's conduct constitutes a willful or knowing violation of § 349(a) of the New York General Business Law, the Plaintiff and class members are entitled to recover a damages award up to three times the amount of its actual damages up to one thousand dollars, along reasonable attorneys' fees, pursuant to § 349(h) of the New York General Business Law.

22. **N.C. Gen. Stat. §§ 75-1.1,** *et seq*. **(with respect to purchases of Xifaxan in North Carolina)**

600.    Section 75-1.1(a) of the North Carolina General Statutes provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

601.    As set forth in detail above, Bausch and Teva violated §§ 75-1.1, *et seq*., of the North Carolina General Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

602.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

603.    The Plaintiff's and class members' injuries are of the type that §§ 75-1.1, *et seq*., of the North Carolina General Statutes was intended to prevent.

604.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 75-16 of the North Carolina General Statutes.

605.    The Plaintiff and class members are entitled to recover a damages award up to three times the amount of its actual damages pursuant to § 75-16.1 of the North Carolina General Statutes. Because Bausch's conduct constitutes a willful violation of § 75-1.1(a) of the North Carolina General Statutes, the Plaintiff is also entitled to recover costs of suit and reasonable attorneys' fees.

**23.    Or. Rev. Stat. §§ 646.605, *et seq.* (with respect to purchases of Xifaxan in Oregon)**

606.    Section 646.608 of the Oregon Revised Statutes provides that "[a] person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person . . . [e]ngages in any other unfair or deceptive conduct in trade or commerce."

607.    As set forth in detail above, Bausch and Teva violated §§ 646.605, *et seq.*, of the Oregon Revised Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

608.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

609.    The Plaintiff's and class members' injuries are of the type that §§ 646.605, *et seq.*, of the Oregon Revised Statutes was intended to prevent.

610.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 646.648 of the Oregon Revised Statutes.

611.    The Plaintiff and class members are entitled to its actual damages and punitive damages, along with reasonable attorneys' fees and costs, pursuant to § 646.638 of the Oregon Revised Statutes.

**24.    73 Pa. Cons. Stat. §§ 201-1, *et seq*. (with respect to purchases of Xifaxan in Pennsylvania)**

612.    Section 201-3 of the Pennsylvania Statutes declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

613.    As set forth in detail above, Bausch and Teva violated §§ 201-1, *et seq.*, of the Pennsylvania Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

614.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

615.    The Plaintiff's and class members' injuries are of the type that §§ 201-1, *et seq.*, of the Pennsylvania Statutes was intended to prevent.

616.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 201-9.2 of the Pennsylvania Statutes.

617.    The Plaintiff and class members are entitled to a damages award of up to three times the amount of its actual damages, along with reasonable attorneys' fees and costs, pursuant to § 201-9.2 of the Pennsylvania Statutes.

**25.    S.C. Code Ann. §§ 39-5-10, *et seq.* (with respect to purchases of Xifaxan in South Carolina)**

618.    Section 39-5-20 of the Code of Laws of South Carolina provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

619.    As set forth in detail above, Bausch and Teva violated §§ 39-5-10, *et seq.*, of the Code of Laws of South Carolina by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

620.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

621.    The Plaintiff's and class members' injuries are of the type that §§ 39-5-10, *et seq.*, of the Code of Laws of South Carolina was intended to prevent.

622.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 39-5-140 of the Code of Laws of South Carolina.

623.    Because Bausch and Teva's conduct constitutes a willful or knowing violation of § 39-5-20, the Plaintiff and class members are entitled to a damages award of up to three times the amount of its actual damages, along with reasonable attorneys' fees, pursuant to § 39-5-140 of the Code of Laws of South Carolina.

**26.    S.D. Codified Laws §§ 37-24-1, *et seq*. (with respect to purchases of Xifaxan in South Dakota)**

624.    Section 37-24-6 of the South Dakota Codified Laws provides that:

> It is a deceptive act or practice for any person to . . . [k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby . . . .

625.    As set forth in detail above, Bausch and Teva violated §§ 37-24-1, *et seq*., of the South Dakota Codified Laws by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

626.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

627.    The Plaintiff's and class members' injuries are of the type that §§ 37-24-1, *et seq*., of the South Dakota Codified Laws was intended to prevent.

628.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 37-24-31 of the South Dakota Codified Laws.

**27.    Utah Code Ann. §§ 13-11-1, *et seq.* (with respect to purchases of Xifaxan in Utah)**

629.    Section 13-11-5 of the Utah Code provides that "[a]n unconscionable act or practice in connection with a consumer transaction violates this chapter whether the unconscionable act or practice occurs before, during, or after the transaction."

630.    As set forth in detail above, Bausch and Teva violated §§ 13-11-1, *et seq.*, of the Utah Code by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition— unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

631.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

632.    The Plaintiff's and class members' injuries are of the type that §§ 13-11-1, *et seq.*, of the Utah Code was intended to prevent.

633.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 13-1119 of the Utah Code.

634.    The Plaintiff and class members are entitled to recover its actual damages, along with reasonable attorneys' fees and court costs, pursuant to § 13-11-19 of the Utah Code.

**28.    9 Vt. Stat. Ann. 9 §§ 2451, et seq. (with respect to purchases of Xifaxan in Vermont)**

635.    Section 2453 of the Vermont Statutes provides that "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful."

636.    As set forth in detail above, Bausch and Teva violated §§ 2453, *et seq.*, of the Vermont Statutes by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition— unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

637.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

638.    The Plaintiff's and class members' injuries are of the type that §§ 2453, *et seq.*, of the Vermont Statutes was intended to prevent.

639.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 2453 of the Vermont Statutes.

**29.    Va. Code Ann. §§ 59.1-196, *et seq.* (with respect to purchases of Xifaxan in Virginia)**

640.    Section 59-1-200 of the Virginia Code provides:

> A. The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:
>
> . . .

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

641.    As set forth in detail above, Bausch and Teva violated §§ 59-1-196, *et seq*., of the Virginia Code by deceptively, and wrongfully, entering a continuing contract, combination or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition— unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

642.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

643.    The Plaintiff's and class members' injuries are of the type that §§ 59-1-196, *et seq.*, of the Virginia Code was intended to prevent.

644.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 59-1.204 of the Virginia Code.

645.    Because Bausch and Teva's conduct was willful, the Plaintiff and class members are entitled to a damages award of up to three times the amount of its actual damages, along with reasonable attorneys' fees and court costs, pursuant to § 59.1-204 of the Virginia Code.

**30.    Wis. Stat. § 100.18; Wis. Stat. § 100.20, *et seq.* (with respect to purchases of Xifaxan in Wisconsin)**

646.    Section 100-20 of the Wisconsin Statutes prohibits "[u]nfair methods of competition in business and unfair trade practices in business."

647.    As set forth in detail above, Bausch and Teva violated §§ 100.20, *et seq.*, of the Wisconsin Statutes by deceptively, and wrongfully, entering a continuing contract, combination

or conspiracy in unreasonable restraint of trade in executing and adhering to the reverse payment settlement agreement described above in order to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of rifaximin generics, extending Bausch's monopoly in the rifaximin market, and maintaining supracompetitive prices for Xifaxan.

648.    As a direct and proximate result of Bausch and Teva's conduct, the Plaintiff and class members suffered injury and actual damages in the form of paying higher prices for rifaximin than they would have paid but for Bausch and Teva's conduct.

649.    The Plaintiff's and class members' injuries are of the type that §§ 100.20, *et seq.*, of the Wisconsin Statutes was intended to prevent.

650.    The Plaintiff and class members are entitled to bring this action for damages pursuant to § 100.20 of the Wisconsin Statutes.

651.    The Plaintiff and class members are entitled to a damages award of twice the amount of its actual pecuniary loss, along with reasonable attorneys' fees and court costs, pursuant to § 100.20(5) of the Wisconsin Statutes.

## COUNT VI

## UNJUST ENRICHMENT UNDER STATE LAW

652.    The Plaintiff repeats and incorporates the above paragraphs as though fully set forth herein.

653.    To the extent required, this claim is pled in the alternative to the other claims in this complaint.

654.    As a result of its unlawful conduct described above, Bausch and Teva have been and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from sales of rifaximin. Bausch and Teva's financial benefits are traceable to the

Plaintiff's and class members' overpayments for rifaximin. Bausch has received, and Teva will receive, a benefit from the class in the form of revenue resulting from unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and Teva and to the economic detriment of the Plaintiff and the class. Bausch and Teva have benefited and will benefit from their unlawful acts, and it would be inequitable for Bausch and Teva to retain any of the ill-gotten gains resulting from the Plaintiff's and class members' overpayments for rifaximin during the class period.

655.    It would be futile for the Plaintiff and class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Xifaxan, as those intermediaries are not liable for, and would not compensate the Plaintiff and class members for, Bausch and Teva's unlawful conduct.

656.    The economic benefit Bausch and Teva derived from the Plaintiff's and class members' purchases of rifaximin is a direct and proximate result of Bausch and Teva's unlawful and anticompetitive practices.

657.    The financial benefits Bausch and Teva derived are ill-gotten gains that rightfully belong to the Plaintiff and class members who paid and continue to pay artificially inflated prices that inured to Bausch and Teva's benefit.

658.    It would be inequitable under unjust enrichment principles under the laws of the jurisdictions identified below for Bausch and Teva to retain any of the benefits they derived from their unfair, anticompetitive, and unlawful methods, acts, and trade practices.

659.    Bausch and Teva are aware of and appreciate the benefits that the Plaintiff and class members have bestowed upon them.

660.    Bausch and Teva should be ordered to disgorge all unlawful or inequitable proceeds they received to a common fund for the benefit of the Plaintiff and class members who collectively have no adequate remedy at law.

661.    A constructive trust should be imposed upon all unlawful or inequitable sums Bausch and Teva received that are traceable to the Plaintiff and class members.

662.    By engaging in the unlawful or inequitable conduct described above, which deprived the Plaintiff and class members of the opportunity to purchase lower-priced generic versions of rifaximin and forced them to pay higher prices for Xifaxan, Bausch and Teva have been unjustly enriched in violation of the common law of the following jurisdictions:

**1.    Alabama**

663.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Alabama. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

664.    Bausch received money from the Plaintiff and class members as a direct result of the unlawful overcharges and has retained this money.

665.    Bausch has benefitted at the expense of the Plaintiff and class members from revenue resulting from unlawful overcharges for rifaximin.

666.    It is inequitable for Bausch to accept and retain the benefits received without compensating the Plaintiff and class members.

**2.    Alaska**

667.    Bausch unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for rifaximin in Alaska. Class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

668.    Bausch has received a benefit from class members in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch, to the economic detriment of class members.

669.    Bausch appreciated the benefits bestowed upon it by class members.

670.    Bausch accepted and retained the benefits bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to class members.

671.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating class members.

**3.    Arizona**

672.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Arizona. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

673.    Bausch has been enriched by revenue resulting from unlawful overcharges for rifaximin.

674.    The Plaintiff and class members have been impoverished by the overcharges for rifaximin resulting from Bausch's unlawful conduct.

675.    Bausch's enrichment and the impoverishment of the Plaintiff and class members are connected. Bausch has paid no consideration to any other person for any benefits it received from the Plaintiff and class members.

676.    There is no justification for Bausch's receipt of the benefits causing its enrichment and the impoverishment of the Plaintiff and class members because the Plaintiff and class members paid supracompetitive prices that inured to Bausch's benefit, and it would be inequitable for Bausch to retain any revenue gained from its unlawful overcharges.

677.    The Plaintiff and class members have no adequate remedy at law.

**4.    Arkansas**

678.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Arkansas. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

679.    Bausch received money from the Plaintiff and class members as a direct result of the unlawful overcharges and have retained this money.

680.    Bausch has paid no consideration to any other person in exchange for this money.

681.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the Plaintiff and the Class.

**5.    California**

682.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in California. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

683.    Bausch has received a benefit from the Plaintiff and the class as a direct result of Bausch's fraudulent and misleading conduct and the resulting unlawful overcharges to the class.

684.    Bausch retained the benefits bestowed upon it under inequitable and unjust circumstances at the expense of the Plaintiff and the Class.

685.    Plaintiff and members of the Class are entitled to restitution from Bausch.

**6.    Colorado**

686.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Colorado. The Plaintiff and

class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

687.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

688.    Bausch retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to the Plaintiff and the class.

689.    Under the circumstances, it would be inequitable and unjust for Bausch to retain such benefits without compensating the Plaintiff and class members.

**7.    Connecticut**

690.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Connecticut. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

691.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

692.    Bausch has paid no consideration to any other person in exchange for this benefit.

693.    Bausch retained the benefits bestowed upon it under inequitable and unjust circumstances at the expense of the Plaintiff and class members.

694.    Under the circumstances, it would be inequitable and unjust for Bausch to retain such benefits.

### 8.    Delaware

695.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Delaware. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

696.    Bausch has been enriched by revenue resulting from unlawful overcharges for rifaximin.

697.    The Plaintiff and the class have been impoverished by the overcharges for rifaximin resulting from Bausch's unlawful conduct.

698.    Bausch's enrichment and the impoverishment of the Plaintiff and the class are connected. Bausch has paid no consideration to any other person for any benefits they received from the Plaintiff and class members.

699.    There is no justification for Bausch's receipt of the benefits causing its enrichment and the impoverishment of the Plaintiff and the class because the Plaintiff and the class paid supracompetitive prices that inured to Bausch's benefit, and it would be inequitable for Bausch to retain any revenue gained from its unlawful overcharges.

700.    The Plaintiff and the class have no remedy at law.

### 9.    District of Columbia

701.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in the District of Columba. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

702.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch, to the economic detriment of the Plaintiff and the class.

703.    Bausch accepted and retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to the class.

704.    Under the circumstances, it would be inequitable and unjust for Bausch to retain such benefits.

**10.    Florida**

705.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Florida. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

706.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

707.    Bausch appreciated and retained the benefit bestowed upon it by the Plaintiff and class members.

708.    It is inequitable and unjust for Bausch to accept and retain such benefits without compensating the Plaintiff and class members.

**11.    Georgia**

709.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Georgia. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

710.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

711.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the Plaintiff and the class.

**12.    Hawaii**

712.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Hawaii. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

713.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

714.    It is unjust for Bausch to retain such benefits without compensating the Plaintiff and the class.

**13.    Idaho**

715.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Idaho. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

716.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

717.    Bausch appreciated the benefit conferred upon it by the class.

718.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

**14.    Illinois**

719.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Illinois. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

720.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

721.    Bausch retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to the class.

722.    It is against equity, justice, and good conscience for Bausch to be permitted to retain the revenue resulting from its unlawful overcharges without compensating the Plaintiff and class members.

**15.    Iowa**

723.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Iowa. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

724.    Bausch has been enriched by revenue resulting from unlawful overcharges for rifaximin, which revenue resulted from anticompetitive prices paid by the class, which inured to Bausch's benefit.

725.    Bausch's enrichment has occurred at the expense of the class.

726.    It is against equity and good conscience for Bausch to retain such benefits without compensating the class.

**16.    Kansas**

727.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Kansas. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

728.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

729.    Bausch retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to the class.

730.    Bausch was unjustly enriched at the expense of the Plaintiff and the class members.

**17.    Kentucky**

731.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Kentucky. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

732.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

733.    Bausch appreciated the benefit bestowed upon it by the class.

734.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

**18.    Louisiana**

735.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Louisiana. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

736.    Bausch has been enriched by revenue resulting from unlawful overcharges for brand and rifaximin.

737.    The Plaintiff and class members have been impoverished by the overcharges for rifaximin resulting from Bausch's unlawful conduct.

738.    Bausch's enrichment and the impoverishment of the Plaintiff and the class are connected.

739.    There is no justification for Bausch's receipt of the benefits causing its enrichment and the class's impoverishment because the Plaintiff and the class paid supracompetitive prices that inured to Bausch's benefit, and it would be inequitable for Bausch to retain any revenue gained from its unlawful overcharges.

740.    The Plaintiff and the class have no other remedy at law.

**19.    Maine**

741.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Maine. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

742.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

743.    Bausch was aware of or appreciated the benefit bestowed upon it by the Plaintiff and the class.

744.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

**20.    Maryland**

745.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Maryland. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

746.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch, to the economic detriment of the Plaintiff and the class.

747.    Bausch was aware of or appreciated the benefit bestowed upon it by the class.

748.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

**21.    Massachusetts**

749.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Massachusetts. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

750.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

751.    Bausch was aware of and/or appreciated the benefit conferred upon it by the class.

752.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class. Fairness and good conscience require Bausch not be permitted to retain the revenue resulting from its unlawful overcharges at the expense of the Plaintiff and class members.

### 22.    Michigan

753.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Michigan. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

754.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch.

755.    Bausch retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to the class.

756.    Bausch was unjustly enriched at the expense of the Plaintiff and the class members.

### 23.    Minnesota

757.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Minnesota. The Plaintiff

and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

758.    Bausch appreciated and knowingly accepted the benefits bestowed upon it by the Plaintiff and class members. Bausch has paid no consideration to any other person for any of the benefits they have received from the Plaintiff and class members.

759.    It would be inequitable for Bausch to accept and retain such benefits without compensating the class.

**24.    Mississippi**

760.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Mississippi. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

761.    Bausch received money from the class as a direct result of the unlawful overcharges. Bausch retains the benefit of overcharges received on the sales of brand rifaximin, which in equity and good conscience belong to the class on account of Bausch's anticompetitive conduct.

762.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

**25.    Missouri**

763.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Missouri. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

764.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

765.    Bausch appreciated the benefit bestowed upon it by the class.

766.    Bausch accepted and retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to the class.

**26.    Montana**

767.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Montana. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

768.    The Plaintiff and the class have conferred an economic benefit upon Bausch in the form of revenue resulting from unlawful overcharges to the economic detriment of the Plaintiff and the class.

769.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

**27.    Nebraska**

770.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Nebraska. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

771.    Bausch received money from the class as a direct result of the unlawful overcharges and have retained this money. Bausch has paid no consideration to any other person in exchange for this money.

772.    In justice and fairness, Bausch should disgorge such money and remit the overcharged payments back to the class.

**28.    Nevada**

773.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Nevada. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

774.    The Plaintiff and the class have conferred an economic benefit upon Bausch in the form of revenue resulting from unlawful overcharges.

775.    Bausch appreciated the benefits bestowed upon it by the class, for which it has paid no consideration to any other person.

776.    Bausch has knowingly accepted and retained the benefits bestowed upon it by the Plaintiff and class members.

777.    The circumstance under which Bausch has accepted and retained the benefits bestowed on it by the Plaintiff and the class are inequitable in that they result from Bausch's unlawful overcharges.

**29.    New Hampshire**

778.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in New Hampshire. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

779.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

780.    Under the circumstances, it would be unconscionable for Bausch to retain such benefits.

**30.    New Jersey**

781.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in New Jersey. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

782.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

783.    The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Plaintiff and class members.

784.    Bausch has paid no consideration to any other person for any of the unlawful benefits they received from the Plaintiff and class members with respect to Bausch's sales of brand rifaximin.

785.    Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Plaintiff and class members.

**31.    New Mexico**

786.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in New Mexico. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

787.    Bausch has knowingly benefitted at the expense of the class from revenue resulting from unlawful overcharges for rifaximin.

788.    To allow Bausch to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Bausch's benefit and because Bausch has paid no consideration to any other person for any of the benefits it received.

**32.    New York**

789.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in New York. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

790.    Bausch has been enriched by revenue resulting from unlawful overcharges for brand rifaximin, which revenue resulted from anticompetitive prices paid by the class, which inured to Bausch's benefit.

791.    Bausch's enrichment has occurred at the expense of the class.

792.    It is against equity and good conscience for Bausch to be permitted to retain the revenue resulting from its unlawful overcharges.

**33.    North Carolina**

793.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in North Carolina. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

794.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

795. The class did not interfere with Bausch's affairs in any manner that conferred these benefits upon Bausch.

796. The benefits conferred upon Bausch were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from Bausch's actions in delaying entry of generic versions of rifaximin to the market and preventing fulsome generic competition in the market for rifaximin.

797. The benefits conferred on Bausch are measurable, in that the revenue Bausch has earned due to unlawful overcharges are ascertainable by review of sales records.

798. Bausch consciously accepted the benefits conferred upon it and continues to do so as of the date of this filing.

**34.    North Dakota**

799. Bausch unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for rifaximin in North Dakota. Class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

800. Bausch has been enriched by revenue resulting from unlawful overcharges paid by Plaintiff and members of the class.

801. The class has been impoverished by the overcharges for rifaximin resulting from Bausch's unlawful conduct.

802. Bausch's enrichment and the class's impoverishment are connected. Bausch has paid no consideration to any other person for any benefits it received directly or indirectly from class members.

803. There is no justification for Bausch's receipt of the benefits causing its enrichment because the class paid supracompetitive prices that inured to Bausch's benefit, and it would be inequitable for Bausch to retain any revenue gained from its unlawful overcharges.

804.    The class has no remedy at law.

**35.    Oklahoma**

805.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Oklahoma. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

806.    Bausch received money from the Plaintiff and class members as a direct result of the unlawful overcharges and have retained this money.

807.    Bausch has paid no consideration to any other person in exchange for this money.

808.    The Plaintiff and class members have no remedy at law.

**809.**    It is against equity and good conscience for Bausch to be permitted to retain the revenue resulting from its unlawful overcharges.

**36.    Oregon**

810.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Oregon. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

811.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

812.    Bausch was aware of the benefit bestowed upon it by the class.

813.    Under the circumstances, it would be unjust for Bausch to retain any of the overcharges derived from its unfair conduct without compensating the Plaintiff and the class.

37.    **Pennsylvania**

814.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Pennsylvania. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

815.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

816.    Bausch was aware of and/or appreciated the benefit bestowed upon it by the class.

817.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

38.    **Puerto Rico**

818.    Bausch unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for rifaximin in Puerto Rico. Class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

819.    Bausch has been enriched by revenue resulting from unlawful overcharges.

820.    The class has been impoverished by the overcharges for rifaximin resulting from Bausch's unlawful conduct.

821.    Bausch's enrichment and the class's impoverishment are connected.

822.    There is no justification for Bausch's receipt of the benefits causing its enrichment and the class's impoverishment because the class paid supracompetitive prices that inured to Bausch's benefit, and it would be inequitable for Bausch to retain any revenue gained from its unlawful overcharges.

823.    The class has no remedy at law.

### 39.    Rhode Island

824.    Bausch unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for rifaximin in Rhode Island. Class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

825.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the class.

826.    Bausch was aware of and/or recognized the benefit bestowed upon it by the class.

827.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

### 40.    South Carolina

828.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in South Carolina. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

829.    The benefits conferred upon Bausch were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to the class.

830.    Bausch realized value from the benefit bestowed upon it by the class.

831.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

### 41.    South Dakota

832.    Bausch unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for rifaximin in South Dakota. Class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

833.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the class.

834.    Bausch was aware of the benefit bestowed upon it by the class.

835.    Under the circumstances, it would be inequitable and unjust for Bausch to retain such benefits without reimbursing the class.

**42.    Tennessee**

836.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Tennessee. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

837.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

838.    Bausch was aware of or appreciated the benefit bestowed upon it by the class.

839.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

840.    It would be futile for the class to seek a remedy from any party with whom they have privity of contract. Bausch has paid no consideration to any other person for any of the unlawful benefits they received indirectly from the class with respect to Bausch's sale of rifaximin. It would be futile for the class to exhaust all remedies against the entities with which the class has privity of contract because the class did not purchase rifaximin directly from any Defendant.

**43.    Texas**

841.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Texas. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

842.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch, to the economic detriment of the Plaintiff and class members.

843.    Bausch was aware of and/or appreciated the benefit bestowed upon it by the Plaintiff and class members.

844.    The circumstances under which Bausch has retained the benefits bestowed upon it by the Plaintiff and class members are inequitable in that they result from Bausch's unlawful conduct.

845.    The Plaintiff and class members have no remedy at law.

**44.    Utah**

846.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Utah. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

847.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

848.    Bausch was aware of and/or appreciated the benefit bestowed upon it by the class.

849.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

### 45.    Vermont

850.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Vermont. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

851.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

852.    Bausch accepted the benefit bestowed upon it by the class.

853.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

### 46.    Virginia

854.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Virginia. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

855.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

856.    Bausch was aware of the benefit bestowed upon it.

857.    Bausch should reasonably have expected to repay the class.

858.    The benefits conferred upon Bausch were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Bausch's illegal and unfair actions to inflate the prices of rifaximin.

859.    Bausch has paid no consideration to any other person for any of the benefits it has received from the class.

**47.    Washington**

860.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in the state of Washington. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

861.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

862.    Bausch was aware of and/or appreciated the benefit bestowed upon it by the class.

863.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

**48.    West Virginia**

864.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in West Virginia. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

865.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

866.    Bausch was aware of and/or appreciated the benefit bestowed upon it by the class.

867.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

**49.    Wisconsin**

868.    Bausch unlawfully profited from overcharges paid by the Plaintiff and class members who made purchases of or reimbursements for rifaximin in Wisconsin. The Plaintiff and class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

869.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the Plaintiff and the class.

870.    Bausch was aware of and/or appreciated the benefit bestowed upon it by the class.

871.    Under the circumstances, it would be inequitable for Bausch to retain such benefits without compensating the class.

**50.    Wyoming**

872.    Bausch unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for rifaximin in Wyoming. Class members paid higher prices for rifaximin than they would have paid but for Bausch's actions.

873.    Bausch has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Bausch and to the economic detriment of the class.

874.    Bausch accepted, used, and enjoyed the benefits bestowed upon it by the class under inequitable and unjust circumstances arising from unlawful overcharges to class members.

875.    Under the circumstances it would be inequitable for Bausch to retain such benefits without compensating the class

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff respectfully demands that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the class, and declare the Plaintiff as representative of the Class;

B.    Enter joint and several judgments against Defendants and in favor of the Plaintiff and members of the proposed Class;

C.    Award to the Plaintiff and the members of the proposed Class damages (i.e., three times overcharges) in an amount to be determined at trial;

D.    Grant permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to remedy the ongoing anticompetitive effects of the defendants' unlawful conduct;

E.    Enter a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), that the Defendants' conduct violated Sections 1 and 2 of the Sherman Act and other applicable law;

F.    Award to the Plaintiff and the members of the proposed Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

G.    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, the Plaintiff demands a trial by jury on all issues so triable.

DATED: this 22nd day of September, 2025

*/s/ Patrick C. Lynch, Esquire*
Patrick C. Lynch (# 4867)
Lynch & Pine Attorneys at Law, LLC
One Park Row, 5th Floor
Providence, RI  02903
P:  (401) 274-3306
F:  (401) 274-3326
plynch@lynchpine.com

Joseph H. Meltzer (*pro hac* forthcoming)
Terence S. Ziegler (*pro hac* forthcoming)
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
jmeltzer@ktmc.com
tziegler@ktmc.com

Thomas M. Sobol (*pro hac* forthcoming)
Gregory T. Arnold (*pro hac* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Tel: (617) 482-3700
tom@hbsslaw.com
grega@hbsslaw.com

John Radice (*pro hac* forthcoming)
**Radice Law Firm**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
jradice@radicelawfirm.com

*Attorneys for Plaintiff Rhode Island Laborers*
*Health & Welfare Fund*